Thomas A. Larkin, OSB #923623
tlarkin@lawssl.com
Tyler J. Storti, OSB #034695
tstorti@lawssl.com
STEWART SOKOL & LARKIN LLC
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
Telephone: (503) 221-0699
Facsimile: (503) 223-5706

Thomas G. Yoxall (*admitted Pro Hac Vice*)
tyoxall@lockelord.com
Daron L. Janis (*admitted Pro Hac Vice*)
djanis@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX  75201
Telephone: (214) 740-8000
Facsimile: (214) 740-8800

Brendan Herbert (*admitted Pro Hac Vice*)
Brendan.Herbert@lockelord.com
LOCKE LORD LLP
525 Okeechobee Blvd, Suite 1600
West Palm Beach, Florida 33401
Telephone: (561) 820-0216
Facsimile: (561) 655-8719

*Attorneys for Defendant/Third-Party Plaintiff*
*The Bank of New York Mellon*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| MERITAGE HOMEOWNERS' ASSOCIATION, an Oregon domestic nonprofit corporation,<br><br>Plaintiff,<br><br>v.<br><br>THE BANK OF NEW YORK MELLON, fka The Bank of New York, as Trustee on Behalf of the Holders of the Alternative Loan Trust 2006-OA21, Mortgage Pass Through Certificates Series | Case No. 6:16-cv-00300-AA<br><br>**DEFENDANT/COUNTER-PLAINTIFF/THIRD-PARTY PLAINTIFF THE BANK OF NEW YORK MELLON'S RESPONSE IN OPPOSITION TO MERITAGE HOMEOWNERS' ASSOCIATION AND THIRD-PARTY DEFENDANT KURT FREITAG'S MOTION FOR SUMMARY JUDGMENT** |

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

2006-OA21,

                                  Defendant.

THE BANK OF NEW YORK MELLON, a
Delaware corporation,

                          Third-Party Plaintiff,

MERITAGE HOMEOWNERS' ASSOCIATION,
an Oregon domestic nonprofit corporation,

                Nominal Third-Party Plaintiff,

    v.

KURT FREITAG,

                  Third-Party Defendant.

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ 2

TABLE OF AUTHORITIES ......................................................................................... 4

I.      INTRODUCTION ......................................................................................... 8

II.     STATEMENT OF FACTS ........................................................................ 12

      A.     The Declaration and Bylaws Required Freitag to Turn Over Administrative
Control of the Association ............................................................ 13

      B.     Freitag's Failure to Turn Over Administrative Control of the Association.... 15

      C.     Freitag's Unauthorized Campaign that Bankrupted the Watts and Others..... 18

      D.     The Watts' Bankruptcy and BNYM's Purchase of the Property .................... 21

      E.     Freitag's Post-§ 363 Sale Conduct ................................................................. 22

      F.     Freitag's Failure to Maintain Commonly Maintained Property, and not
Allegedly Defective Windows, has been Causing Damage to the Property... 25

III.    LEGAL STANDARD ................................................................................. 27

PAGE 2 – DEFENDANT/COUNTER-PLAINTIFF/THIRD-PARTY PLAINTIFF THE BANK OF
NEW YORK MELLON'S RESPONSE IN OPPOSITION TO MERITAGE HOMEOWNERS'
ASSOCIATION AND THIRD-PARTY DEFENDANT KURT FREITAG'S MOTION FOR SUMMARY
JUDGMENT

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

IV.    MEMORANDUM OF LAW ............................................................................ 28

    A.    BNYM is Not Bound by Releases in the Purported Agreements .................. 28

        1.    *BNYM is Not a "Successor or Assign" of the Watts*........................... 29

        2.    *The Agreements are Unenforceable with Respect to Any Anticipatory Release of Future Claims*..................................................................... 30

        3.    *BNYM Took the Subject Property Free and Clear of Any Interests Created by the Settlement Agreements* ................................................ 31

        4.    *Judicial Estoppel Does Not Apply to the Settlement Agreements*....... 34

    B.    BNYM's Claims Are Supported by the Evidence .......................................... 38

    C.    BNYM Has Standing to Assert Claims Based on Conduct that Occurred After it Became the Owner of the Subject Property.................................................. 42

    D.    BNYM May Bring a Derivative Action Against Freitag ............................... 43

        1.    *BNYM Has Individual Standing to Assert its Claims Against Freitag* 44

        2.    *There is Statutory Authority for Bringing a Derivative Action Against the Association* ..................................................................................... 45

        3.    *BNYM Has Adequately Pleaded a Derivative Action* ......................... 47

    E.    Movants Are Not Entitled to Attorney's Fees ............................................... 49

V.    CONCLUSION ............................................................................................... 49

CERTIFICATE OF COMPLIANCE ........................................................................ 51

CERTIFICATE OF SERVICE ................................................................................. 52

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bagley v. Mt. Bachelor, Inc.*,
    356 Or. 543 (2014)......................................................................................30

*Bank of N.Y. Mellon v. Watt*,
    867 F.3d 1155 (9th Cir. 2017) ................................................................25

*Bank of N.Y. Mellon v. Watt*,
    No. 3:14-cv-02051-AA, 2015 WL 1879680 (D. Or. Apr. 22, 2015)........22

*Cargo Partners v. Albatrans, Inc.*,
    352 F.3d 41 (2d Cir. 2003)......................................................................29

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).............................................................................27, 38

*Clicks Billiards Inc. v. Sixshooters Inc.*,
    251 F.3d 1252 (9th Cir. 2001) ................................................................28

*Commerce & Industry Ins. v. Orth*,
    254 Or. 226 (1969)..................................................................................31

*Commonwealth Ins. Co. v. Titan Tire Corp.*,
    398 F.3d 879 (7th Cir. 2004) ..................................................................36

*Devereaux v. Abbey*,
    263 F.3d 1070 (9th Cir. 2001) ...........................................................28, 38

*East Prairie R-2 School Dist. v. US Gypsum Co.*,
    813 F. Supp. 1396 (E.D. Mo. 1993)........................................................29

*Erection Co., Inc. v. W & W Steel, LLC*,
    No. 11-805-JE, 2011 WL 5008325 (D. Or. Oct. 20, 2011) ....................29

*Estey v. MacKenzie Engineering Inc.*,
    324 Or. 372 (1996)..................................................................................31

*Garrison v. Pac. Nw. Bell*,
    45 Or. App. 523 (1980)...........................................................................40

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

*Goodsell v. Eagle-Air Estates Homeowners Ass'n*,
   249 Or. App. 639 (2012)................................................................46

*Hamilton v. State Farm Fire & Cas. Co.*,
   270 F.3d 778 (9th Cir. 2001) .......................................................35

*Harmon v. Mt. Hood Meadows*,
   146 Or. App. 215 (1997)..............................................................30

*Harris v. County of Orange*,
   682 F.3d 1126 (9th Cir. 2012) .....................................................12

*Hickman v. Thomas C. Thompson Co.*,
   592 F. Supp. 1282 (D. Colo. 1984)...............................................29

*Huff v. Duncan*,
   263 Or. 408 (1972)................................................................33, 34

*K-Lines, Inc. v. Roberts Motor Co.*,
   273 Or. 242 (1975)......................................................................30

*Kale v. Obuchowski*,
   985 F.2d 360 (7th Cir. 1993) .......................................................36

*Lindgren v. Berg*,
   307 Or. 659 (1989)......................................................................30

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).....................................................................45

*Maher v. Gagne*,
   448 U.S. 122 (1980).....................................................................36

*Makaeff v. Trump Univ.*,
   LLC, 736 F.3d 1180 (9th Cir. 2013)............................................28

*Meritage Homeowners' Ass'n v. Watt*,
   No. 3:17-cv-00267-AA, 2017 WL 1364209 (D. Or. Apr. 11, 2017)......................43

*New Hampshire v. Maine*,
   532 U.S. 742 (2001).....................................................................35

*Nordbye v. BRCP/GM Ellington*,
   246 Or. App. 209 (2011)..............................................................33

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(503) 221-0699
FAX (503) 223-5706

*Oregon Auto Ins. Co. v. Fitzwater,*
   271 Or. 249 (1975)................................................................................40

*Otoski v. Avidyne Corp.,*
   No. CV.09-3041-PK, 2010 WL 4739943 (D. Or. Oct. 6, 2010), *report and*
   *recommendation adopted,* No. 09-3041-PK, 2010 WL 4737815 (D. Or. Nov.
   15, 2010) ................................................................................................32

*Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.,*
   752 F.3d 807 (9th Cir. 2014) ................................................................28

*Risetto v. Plumbers & Steamers Local 343,*
   94 F.3d 597 (9th Cir. 1996) ..................................................................35

*Russell v. Rolfs,*
   893 F.2d 1033 (9th Cir. 1990) ..............................................................35

*Teledyne Indus., Inc. v. NLRB,*
   911 F.2d 1214 (6th Cir. 1990) ..............................................................37

*Whatley v. Nike, Inc.,*
   2000 U.S. Dist. LEXIS 20227 (D. Or. Sept. 8, 2000).........................37

**Statutes and Rules**

Fed. R. Civ. P. 23.1(a) .................................................................................47

Fed. R. Civ. P. 23.1(b)(1).............................................................................48

Fed. R. Civ. P. 56(a) ...........................................................................27, 38

Fed. R. Evid. 201(b)....................................................................................12

ORS 65.174(1) ............................................................................................45

ORS 65.327(1) ............................................................................................46

ORS 65.369 .................................................................................................44

ORS 94.600(3) ............................................................................................14

ORS 94.609(3) ............................................................................................14

ORS 94.616(1) ............................................................................................14

ORS 94.621 .................................................................................................14

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

ORS 94.625(1) ..................................................................................................................45

ORS 94.640(1) ..................................................................................................................44

ORS 94.640(6) ..................................................................................................................46

ORS 94.719 ......................................................................................................................49

ORS 94.780(3) ..................................................................................................................43

**Treatises and Commentary**

David S. Coale, *A New Framework for Judicial Estoppel*, 18 Rev. Litig. 1, 6
    (1999) ........................................................................................................................37

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

## I.    INTRODUCTION

For at least ten years, Kurt Freitag ("Freitag") inexplicably has resisted relinquishing control of the Meritage Homeowners' Association ("Association") to the homeowners, themselves (Freitag and the Association will be collectively referred to herein as "Movants").  He does not, nor has he ever, personally owned a unit at Meritage.  Yet, he has wreaked havoc on the Meritage homeowners, strong-arming several into bankruptcy which ultimately led to the loss of their homes.  Freitag's decade long odyssey is littered with relentless litigation, a wholesale failure to comply with the Declaration and Bylaws that govern himself and the Association, and a pattern of unauthorized, arbitrary decision-making that is detrimental to the Association.  Freitag's actions are the very effect of which the Declaration and Bylaws exist to protect and prevent.

The Bank of New York Mellon, fka The Bank of New York, as Trustee on Behalf of the Holders of the Alternative Loan Trust 2006-OA21, Mortgage Pass Through Certificates Series 2006-OA21 ("BNYM") purchased a unit in Meritage at a sale pursuant to 11 U.S.C. § 363(b). Once BNYM took title to the unit, Freitag immediately pursued BNYM for hundreds of thousands of dollars, for which it simply was not liable.  Consistent with his pattern of mismanagement and aggressive behavior that has spanned the last decade, Freitag levied assessments and charges against BNYM and arbitrarily applied quarterly assessment payments received from BNYM to charges for which BNYM has no responsibility to pay.  Despite taking actions he claims are authorized by the Meritage Declaration and Bylaws (which he, without the consent of the homeowners, has attempted to amend to serve his own self-interest), those very governing documents unambiguously dictate that Freitag is acting—and has, since 2007 at the

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

latest, been acting—contrary to and without any authority from the Declaration and

Bylaws.  Notwithstanding this lack of authority, the Freitag-controlled Association has continued

to act so aggressively that it now owns at least eight of the eighteen units that make up Meritage.

Those are units previously owned by individual homeowners who were forced to surrender or

abandon their properties to the Association because of outrageous assessments, fees, penalties,

and attorney's fees that, in some cases, exceeded the value of the units themselves.

When BNYM agreed to take title to the subject property, Freitag saw it as an opportunity

for another payday.  Immediately, he demanded hundreds of thousands of dollars from BNYM

predicated on theories that run contrary to law, and which are unsupported by fact.  Additionally,

Freitag, on behalf of the Association, demanded that BNYM replace windows at the subject

property that he estimates will cost $175,000.  When BNYM determined that it was not liable for

the unfounded fees it was charged because the windows were not defective, and when it did not

capitulate to Freitag's demands like many of the Meritage homeowners had in the past, the

Freitag-controlled Association initiated this lawsuit, seeking nearly $4 million from BNYM in

connection with a property BNYM purchased for a credit bid of $184,200 just one year prior.

Not only was it apparent to BNYM that the Freitag-controlled Association was

attempting to charge it with inappropriate assessments, penalties, late charges, and attorney's

fees, it also became apparent that the Association was failing to maintain the common elements

of Meritage, such as the exterior siding and chimney of BNYM's unit.  This failure has caused

damage to BNYM's unit.  As such, BNYM filed counterclaims against the Association for

declaratory relief, injunctive relief, and nuisance based on one or more of the following: (1) the

Association's unauthorized and improper imposition of a special assessment for replacement of

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

windows that are not defective, plus fines and penalties on that assessment; (2) the Association's failure to maintain the Commonly Maintained Property, including exterior elements of the Property such as the siding, trim, and exterior chimney; (3) the Association providing a higher level and quality of maintenance for units in Meritage whose owners have replaced allegedly defective windows than for those who have not; and (4) the Association's refusal to remove plywood that is covering a functional window. *See* The Bank of New York Mellon's First Amended Answer, Counterclaims, and Third-Party Complaint, Dkt. 36 at 10-13.

Additionally, it became obvious that a third-party complaint was appropriate against Freitag, individually, because of his longstanding mismanagement and failure to comply with his fiduciary duties to the Meritage homeowners, including BNYM.  Accordingly, BNYM filed third-party claims, both derivatively and directly, against Freitag for gross negligence and breach of fiduciary duty.  Those claims are based on one or more of the following types of conduct by Freitag: (1)  wrongfully asserting authority to impose assessments, fines, and penalties for the replacement of functioning windows; (2) failing to maintain Commonly Maintained Property, including siding, trim, and the exterior of the chimney, at the unit owned by BNYM; (3) retaliating or discriminating by providing different levels and qualities of service and maintenance for units whose owners have replaced their windows than for units whose owners have not; (4) refusing to remove plywood from a functioning window; (5) incurring significant expenses in litigation that are not in the best interests of the Association or its members; (6) failing to provide owners with all financial and informational disclosures required by ORS Chapter 94; and (7) failing to fully fund and maintain an adequate reserve account balance. *See id.* at 16-18.

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

Movants argue they are entitled to summary judgment against all of BNYM's counterclaims and third-party claims for four reasons, each of which is factually unsupported and legally baseless.  First, they claim BNYM is bound by releases contained in purported agreements to which BNYM was not a party.  Specifically, they posit that: (1) BNYM is a successor and assign with respect to the releases in those agreements simply because it purchased the subject property; (2) the alleged enforceability of the releases as against BNYM was not affected by the § 363 sale; (3) a covenant that Freitag recorded in the property records allegedly runs with the land and, therefore, survived the § 363 sale; (4) the claims BNYM is asserting are allegedly the same as those released by the Watts; and (5) BNYM is allegedly judicially estopped from contradicting recitals in the purported agreements.  These arguments fail because, as an arm's length purchaser, BNYM is not subject to successor liability for any releases the seller may have made, any interest that Movants may have had in the releases was wiped out by the § 363 sale, the purported covenant does not run with the land, the claims BNYM is asserting are distinct from those purportedly released by the prior homeowners, and the doctrine of judicial estoppel does not apply to the purported agreements.

Second, Movants contend that BNYM's claims are not supported by evidence.  BNYM will show that its claims are supported by the evidence.

Third, Movants reason that if BNYM is not bound by the releases in the purported agreements, BNYM does not have standing.  This argument fails because BNYM is asserting different claims than those purportedly released by the prior owners.

Fourth, Movants argue that BNYM may not bring a derivative action against Freitag because there allegedly is no statutory authority for such actions against the director of a

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

homeowners association and BNYM allegedly has not properly pleaded a derivative action.  This

argument lacks merit because, as required under the Oregon Revised Statutes, the Association is

organized as a nonprofit organization, and there is clear statutory authority for bringing a

derivative claim under the statutes governing nonprofit corporations.  BNYM has also

adequately pled a derivative claim.  And even if BNYM somehow lacks derivative standing, it

can still assert direct claims against Freitag because his actions and failures have caused direct

harm to BNYM.

     For these reasons, Movants' motion should be denied, and BNYM is entitled to the entry

of an order in its favor on its cross-motion.

## II.    STATEMENT OF FACTS[1]

     Nicholas and Patricia Watt (collectively, "Watts") purchased the townhouse at 56 B

Northwest 33rd Place, Newport, Oregon ("Property") in 2006.  (Declaration of Tyler J. Storti in

Support of The Bank of New York Mellon's Responses in Opposition to Motions for Summary

Judgment ("Storti Decl."), Ex. C at 33-35).[2]  They financed the purchase with a loan that was

later assigned to BNYM.  (*Id.*; Declaration of Troy S. Bundy in Support of Meritage

Homeowners' Association and Third-Party Defendant Kurt Freitag's Motion for Summary

---

[1] BNYM acknowledges that there is some overlap between the facts set forth in this response and in its response to Plaintiff's Motion for Partial Summary Judgment (Dkt. 50).  BNYM has tried to minimize repetition between the two responses as much as possible while ensuring that the complicated factual background underlying the issues addressed in the respective responses are clearly set forth within their similar, though far from identical, contexts.

[2] Some exhibits attached to the Storti Decl. consist of property records that are publicly available on the Lincoln County Clerk's website at http://www.co.lincoln.or.us/clerk/page/recording-web-query.  Other exhibits to the Storti Decl. consist of bankruptcy court filings that are publicly available on PACER.  The Court may, and BNYM asks that it do, take judicial notice of these documents.  *See* Fed. R. Evid. 201(b); *Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial notice of undisputed matters of public record, including documents on file in federal or state courts.") (internal citation omitted).

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

Judgment, Dkt. 47 ("Bundy Decl."), Ex. 1).  The Property is one of eighteen units within the

Meritage at Little Creek planned community ("Meritage").

### A.    The Declaration and Bylaws Required Freitag to Turn Over Administrative Control of the Association

Meritage is subject to a Declaration of Covenants, Conditions, and Restrictions for

Meritage ("Declaration") made by Kurt Freitag ("Freitag") and Rita Schaeffer (collectively

defined as "Declarant") on December 19, 2003, and to the Bylaws of Meritage Homeowners'

Association ("Bylaws").  (Storti Decl., Exs. A-B).  The Declaration assigns to the Meritage

Homeowners' Association ("Association") the responsibility to maintain, repair, and replace the

"Commonly Maintained Property" within Meritage, which includes, among other things, all

exterior portions of the buildings except for the doors, windows, and other glass surfaces.  (Storti

Decl., Ex. A, at 1, § 1.8).

Membership in the Association consists of the owners of the various lots and is divided

into two classes.  (*Id.* at §§ 1.16, 1.19, 7.3).  Class A members are owners other than Declarant.

(*Id.* at § 7.3.1).  Declarant is the sole Class B member.  (*Id.* at § 7.3.2).  The Declaration provides

that Declarant's Class B membership is to terminate and be converted to Class A membership on

"[t]he date on which seventy-five percent (75%) of the total number of Lots in Meritage have

been sold and conveyed to Owners other than Declarant."  (*Id.* at § 7.3.2).  Similarly, while the

Declaration allows Declarant to initially retain administrative control of the Association, it

mandates that such control be turned over to the Class A members at a so-called turnover

meeting.  (*Id.* at § 8.1).  In conjunction with the termination of Declarant's Class B membership,

the turnover meeting must be held "within sixty (60) days of … [t]he date on which Lots

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

representing seventy-five percent (75%) of the total number of votes of all Lots in the final Phase

of Meritage have been sold and conveyed to persons other than Declarant." (*Id.* at § 7.3.1).[3]

Pursuant to the Declaration and Planned Community Act ("PCA"), ORS 94.550-94.783,

Declarant may not retain administrative control of the Association for any reason after the

mandatory turnover meeting.  For example, both the Declaration and PCA provide that Declarant

"*shall* call" a turnover meeting within a certain period after a triggering event occurs.  (*Id.* at

§ 8.2 (emphasis added)); ORS.94.609(1) (emphasis added).  Both also provide if Declarant does

not call the turnover meeting as required, any owner may do so.  (Storti Decl., Ex. A, at § 8.2);

ORS 94.609(3).  Other examples include the following:

- Once a triggering event for the turnover meeting occurs, "the rights [to control] *automatically shall* pass to the lot owners."  ORS 94.600(3) (emphasis added).

- At the turnover meeting, "the *declarant shall turn over* to the homeowners association the responsibility for the administration of the planned community, and the *association shall accept* the administrative responsibility from the declarant."  ORS 94.616(1) (emphasis added).

- "If a declarant has not completed development of lots or common property in a planned community at the time of the [turnover] meeting …, the declarant may continue to hold the special declarant rights, *other than a right of declarant control*, reserved under the declaration."  ORS 94.621 (emphasis added).

---

[3] Alternatively, the Declaration requires the turnover meeting to be held within 60 days of the date on which Declarant elects in writing to terminate Class B membership, if that occurs earlier than the other trigger date.  (Storti Decl., Ex. A, at § 8.2.2).  This illustrates the close relationship between termination of Declarant's Class B membership and the mandatory turnover of administrative control.

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

- Declarant may appoint and remove members of an interim board only "*until the Turnover Meeting*." (Storti Decl., Ex. A, at § 8.1 (emphasis added)).

## B.    Freitag's Failure to Turn Over Administrative Control of the Association

Development of Meritage began sometime around December 2003, with six lots in Phase I. (*Id.* at 1). By June 5, 2004, all six lots had been sold to parties other than Declarant. (Storti Decl., Ex. C at 1-8). No other lots had been annexed as of that date, so "the total number of Lots in Meritage" that had "been sold and conveyed to Owners other than Declarant" exceeded 75 percent. (Storti Decl., Ex. A, at § 7.3.2(a)). Declarant's Class B membership, therefore, terminated on June 5, 2004. Moreover, because the "Lots representing seventy-five percent (75%) of the total number of votes of all Lots in the final Phase of Meritage" had been "sold and conveyed to persons other than Declarant," Freitag was required to call a turnover meeting within 60 days thereafter and, at that meeting, turn over administrative control of the Association to the Class A members.[4] (*Id.* at § 8.2). Freitag admits he failed to do so. (Videotaped 30(b)(6) Deposition of Meritage Homeowners' Association Designee Kurt Freitag ("Freitag's 30(b)(6) Depo.") at 29:6-31:4, 46:17-18).[5]

A similar pattern occurred after six additional lots (Lots 7-12) were annexed as part of Phase II on August 10, 2005. (Storti Decl., Ex. E). By October 24, 2005, three of those lots had been sold to parties other than Declarant, bringing the total number of such lots to nine out of the twelve (75 percent) then constituting Meritage. (Storti Decl., Ex. C at 9-11, 17-23). Freitag still

---

[4] The term "Phases" is defined in the Declaration as "any group of Lots and Common Area Tracts which are subject to this Declaration *at a specific time*." (Storti Decl., Ex. A, at § 1.20). While annexation of additional lots in future phases was permitted, there was "no obligation" to do so. (*Id.* at 1). Thus, the "final Phase of Meritage" as of June 5, 2004, consisted only of Lots 1 through 6.

[5] Freitag's 30(b)(6) Depo. is attached to the Storti Decl. as Exhibit D.

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(503) 221-0699
FAX (503) 223-5706

did not call a turnover meeting or cede control of the Association. (Freitag's 30(b)(6) Depo. at 29:6-31:4, 46:17-18). By June 16, 2006, the three remaining lots in Phase II had also been sold to parties other than Declarant. (Storti Decl., Ex. C at 24-32).

Yet again, this pattern was repeated after six more lots (Lots 13-18) were annexed as part of Phase III on October 6, 2006. (Storti Decl., Ex. F). Two of those lots were sold to parties other than Declarant that same day, bringing the total number of such lots to fourteen out of the eighteen (over 75 percent) then constituting Meritage. (Storti Decl., Ex. C at 36-37, 43). Still, Freitag did not call a turnover meeting or give control of the Association to the Class A members. (Freitag's 30(b)(6) Depo. at 29:6-31:4, 46:17-18). The last four lots of Phase III were sold to third parties by July 12, 2007, including Lot 13, which was the one purchased by the Watts. (Storti Decl., Ex. C at 33-35, 38-42, 44-47).

According to Freitag, the first time he ever called a turnover meeting was in connection with the 2009 annual meeting of the Association. (Freitag's 30(b)(6) Depo. at 29:19-30:2). However, he refused to turn over administrative control of the Association at that meeting because he did not believe any of the owners were willing to undertake that responsibility. (Freitag's 30(b)(6) Depo. at 29:19-30:20, 46:25-47:20).[6]

In October 2010, Freitag recorded two "supplements" to the Declaration in which he conceded that the lots in Phases I-III "were sold to Owners with no affiliation or connection to

---

[6] According to Freitag, he "found out to [his] consternation" at the annual meeting that the owners had not formed a pre-turnover board even though he had been "given assurances a few days before the annual meeting that that would occur." (Freitag 30(b)(6) Depo. at 30:9-12). However, he then testified that "whether in that few day period they did it and I just didn't know about it, or it was never done at all, that I can't say." (Id. at 30:16-18). If Freitag did not know at the annual meeting whether the owners had formed a pre-turnover board, it is unclear how he "found out" at the annual meeting that they had not done so. In any event, it was Freitag, not the owners, who was supposed to form such a board pursuant to the Declaration and Bylaws. (Storti Decl., Ex. A, at § 1.8; Storti Decl., Ex. B, at § 3.4).

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

Declarant," but he claimed that "the threshold of Lots owned by parties not affiliated or connected with Declarant triggering turn over was not reached" and that he, therefore, "remained and remains responsible for administration of the [Association.]"  (Storti Decl., Exs. H-I).  In light of Freitag's admission that 100 percent of the lots in Meritage had been sold to owners other than Declarant, and his admission that he called a turnover meeting the prior year, Freitag's claims were patently false.  (Freitag 30(b)(6) Depo. at 29:19-30:20).

Freitag further tried, in vain, to justify his failure to turn over control of the Association in a Clarification of Declaration of Covenants, Conditions and Restrictions for Meritage ("Clarification") that he executed on the same day he recorded the two supplements.  (*Compare* Storti Decl., Ex. J *with* (Storti Decl., Exs. H-I).  In it, he asserted that provisions in the Declaration and Bylaws governing the trigger date for the turnover meeting were inconsistent with one another and, as such, needed clarification.  (Storti Decl., Ex. J).  Freitag purportedly "clarified" that, although he called a turnover meeting the prior year, the trigger date for turnover would not occur until "annexation of the final phase of Meritage, and conveyance of 18 of the 23 Lots approved for Meritage … to Owners other than Declarant …."  (*Id.*).

Ironically, Freitag's attempts at subterfuge failed to accomplish his apparent purpose.  Even under his "clarification" of the trigger date for turnover, Freitag was required to relinquish control of the Association once 18 of the 23 lots approved for Meritage had been sold to owners other than Declarant.  (*Id.*).  The 18th lot was sold to a party other than Declarant on July 12, 2007.  (Storti Decl., Ex. C).  Thus, at the absolute latest under any scenario, Freitag was required to turn over control of the Association to the owners by September 12, 2007.  He admits he did not.  (Freitag's 30(b)(6) Depo.") at 29:6-31:4; 46:17-18).

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

### C.    Freitag's Unauthorized Campaign that Bankrupted the Watts and Others

In 2009, having improperly refused to turn over control of the Association as required by the Declaration and PCA, Freitag launched an unauthorized campaign against the Watts and other owners that involved litigation, special assessments, fines, and penalties so burdensome that several Meritage unit owners ended up in bankruptcy and lost their respective properties.  It began when Freitag sued window manufacturers, window installers, and contactors (whom Freitag had used in his development of Meritage) for alleged construction defects and allegedly defective installation of windows ("Window Litigation").  (Bundy Decl., Ex. 3).

On January 13, 2011, owners of 16 of the 18 units in Meritage, including the Watts, tried to force a turnover by suing Freitag and the Association for breach of fiduciary duty and negligence ("HOA Litigation").  (Bundy Decl., Ex. 7).[7]  They also intervened in the Window Litigation.

---

[7] A February 11, 2011 article in the News-Times documents a dispute that had arisen between Freitag and the owners because Freitag had decided the Association would begin collecting trash from the owners in lieu of using the City of Newport's authorized franchisee for solid waste removal.  (Storti Decl., Ex. P). The article reports that Freitag told the owners that their garbage would be picked up from their porches and gone through by Gail Zettel, who also did housecleaning service for the owners.  (*Id.*).  He is quoted as having written to the owners: "Gail is pretty discreet, so if she finds drug paraphernalia or body parts, she is more likely than most to bite her tongue."  (*Id.*).  He also was quoted as having advised the owners: "This year, 2011, you will need to find a way to live with the grueling reality of someone coming by each and every day to hand carry your garbage and recycling off your porch.  Believe me, I know it is a sacrifice to make.  I expect Michael Moore may start his documentary concerning your suffering this spring.  But if you grit your teeth, I think you can make it, I really do."  (*Id.*).  The article reports that the City ultimately issued Freitag a citation because his action allegedly violated a City ordinance providing that only its authorized franchisee can provide solid waste removal and disposal service.  (*Id.*)  The owners' attorney explained in the article that the owners did not file suit simply because of the garbage issue, but that it was "part of the pattern and practice of overly aggressive behavior by the HOA toward the members."  (*Id.*).  The attorney further explained that "[t]he only thing the homeowners really want is to get control of the homeowners association so they can essentially manage the association themselves. He (Freitag) doesn't actually own a unit in the association ….  They're concerned about the cost of the dues and a lot of things that have gone on in the past."  (*Id.*).  The article further notes that Freitag allegedly increased the Association's budget in December 2010, from $60,000 annually to $167,000, and that he passed the expense of defending the lawsuit to the owners who had filed it by allocating $36,000 in attorney fees for "homeowner issues."  (*Id.*).

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

About a month later, on February 23, 2011, at a meeting where only Freitag and one other owner, Jim Johnstone, were present, Freitag purportedly passed motions (1) directing the owners to replace certain windows and setting a deadline of July 1, 2011, for completing that replacement; (2) providing that in the event of noncompliance with the window-replacement requirement, he could, at his discretion, charge owners the costs of replacement as an additional assessment, pending completion of the work; and (3) supplementing the Association's policy regarding the charging of late fees and interest on late and delinquent dues and assessments. (Declaration of Kurt Freitag in Support of Plaintiff's Motion for Partial Summary Judgment Against Defendant The Bank of New York Mellon, Dkt. 51 ("Freitag MPSJ Decl."), Ex. 3, at 2-3).[8]

At some undisclosed time,[9] Freitag purportedly adopted a resolution in which he claimed that an assessment had been levied for the cost of window replacement against owners who had not replaced their windows as directed. (Freitag MPSJ Decl., Ex. 3 at 5-6). The purported resolution also imposes a fine of $500 per day, not to exceed $5,000 per month (Freitag says he later reduced it to $2,500 per month), against any owner who fails to provide sufficient and adequate evidence to Freitag, in his sole discretion, "of genuine and timely intent" to replace their windows. (*Id.* at 5).

---

[8] An unsigned copy of the purported supplemental policy provides for a one-time $25 late fee per late payment, interest at the rate of 9 percent simple annual interest on payments made after the 15th of the second month of the quarter in which payment is late, and interest at the rate of 18% per annum on payments made after the 15th of the third month of the quarter in which payment is late. (Freitag MPSJ Decl., Ex. 7 at 6-7). The policy is silent with regard to the order in which payments are to be applied to various categories of charges. (*Id.*).

[9] The resolution is unsigned and undated, so when it was adopted, if ever, is a mystery. (Freitag MPSJ Decl., Ex. 3 at 5-6). If it was adopted, it would likely have been sometime after July 1, 2011, since that was the deadline for replacing windows and there are claims in the resolution that several such deadlines had already passed and an assessment had already been levied. (*Id.* at 5).

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

The Watts did not initially surrender to Freitag's demands that they replace their windows, so he sued them in August 2011, to collect the windows assessment and associated fines ("Collection Litigation"). (Declaration of Kurt Freitag in Support of Meritage Homeowners' Association and Third-Party Defendant Kurt Freitag's Motion for Summary Judgment, Dkt. 48 ("Freitag MSJ Decl.") at ¶¶ 3-4, Ex. 1). Two-and-a-half years of active litigation ensued. (*Id.*). During that time, in January 2012, one of the diamond windows in the Property blew out and a repair team was dispatched to board up the window. (Bundy Decl., Ex. 5). The Watts later replaced the blown out window, but plywood was reapplied to the new window and has remained there to this day. (Freitag MSJ Decl. at ¶ 2).

Meanwhile, the HOA Litigation was allegedly settled in July 2012. (Bundy Decl., Ex. 8). The purported settlement would have required the Watts and other owners to pay the Association $100,000. (*Id.* at ¶ 2). In exchange, Freitag and the Association would have provided the Watts and other owners with a release that contained several carve-outs for, among other things, $450,000 in attorney's fees and claims the Association might have had with regard to its efforts to force the owners to replace the allegedly defective windows. (*Id.* at ¶ 3). However, the purported settlement agreement states that it "shall be deemed entered into" only "*once fully executed*," and it is not executed by many of the parties identified therein. (*Id.* at 1, 8-23 (emphasis added)).

The Window Litigation was also allegedly settled, in December 2013. (Bundy Decl., Ex. 4). That purported settlement would have required the Watts and other owners to use the settlement proceeds for the cost of repairing the windows of their respective units, (*Id.* at ¶ IV-A), but it also provided that it should not be regarded as an admission of liability or fault. (*Id.* at

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

¶ VI-A).  In any event, like the purported settlement of the HOA Litigation, the purported

settlement agreement of the Window Litigation contains numerous provisions specifically

conditioning its effectiveness and enforceability upon execution of the agreement by all parties

identified therein, (*Id.* at ¶¶ III-A, III-B, IV-A, V-A), and it is not executed by at least one of

those parties (*Id.* at 17-28).

      In February 2014, after all litigation between Freitag and the Watts except for the

Collection Litigation had finally ceased (at least temporarily), they entered into an "Agreement

for Pooling Litigation Repair Proceeds and Financing of Repair Work" ("Repair Agreement").

(Bundy Decl., Ex. 9).  The Repair Agreement reflects the sad state of the Watts' financial

situation after years of litigation with Freitag when it states that the Watts had not provided

evidence of financial ability to pay the balance due for replacement of windows.  (*Id.* at ¶ 5).  It

further requires the Watts to enter a confession of judgment in the Collection Litigation in favor

of the Association for all outstanding dues, assessments, fines, penalties, and interest.  (*Id.* at

¶ 8).  As in the other purported agreements discussed above, Freitag gave up nothing in

exchange.  (*Id.*).  On February 18, 2014, a judgment was awarded to the Association against the

Watts in the Collection Litigation for $175,504, in accordance with the Repair Agreement,.

(Freitag MSJ Decl. at ¶ 4).

    **D.**    **The Watts' Bankruptcy and BNYM's Purchase of the Property**

      Less than one month later, having been thoroughly defeated by years of litigation that the

Watts had to fund for both sides because Freitag was using Association funds obtained from the

owners to pay his and the Association's attorney's fees, they filed a voluntary petition for relief

under Chapter 13 of the Bankruptcy Code.  (Storti Decl., Ex. K at 1).  Initially, the Watts

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

proposed selling the Property pursuant to 11 U.S.C. § 363(b), but Freitag objected on the ground

that such a sale would discharge their obligation to pay the window assessment and fines. (Storti

Decl., Ex. L at 1-19).

    The Watts then amended their plan to include a nonstandard provision proposing to

forcibly vest the Property in BNYM upon confirmation of the plan. (Storti Decl., Ex. L at 20-

25). The amended plan was confirmed over BNYM's objection, but the confirmation order was

later vacated by this Court because the bankruptcy court had no statutory authority to force an

objecting creditor to assume a debtor's interest in ongoing liabilities associated with a piece of

property. *Bank of N.Y. Mellon v. Watt*, No. 3:14-cv-02051-AA, 2015 WL 1879680, at *7 (D. Or.

Apr. 22, 2015, Aiken, C.J.) ("For the reasons set forth above, the bankruptcy court's order is

*VACATED* ....") (italics emphasis added).

    After the confirmation order was vacated, BNYM agreed to purchase the Property from

the Watts pursuant to 11 U.S.C. § 363. (Storti Decl., Ex. L at 52-58). BNYM thereby acquired

title to the Property pursuant to the § 363 sale on August 12, 2015. (Storti Decl., Ex. L at 133-

35).[10]

### E.    Freitag's Post-§ 363 Sale Conduct

    It did not take long after BNYM purchased the Property under the § 363 sale for Freitag

to turn his aggressive and illegal conduct on BNYM. Just a few months later, at the

Association's annual meeting at which only Freitag and the Association's attorney were present,

he made the self-serving determination that any earlier resolutions authorizing assessments for

---

    [10] The Watts are not the only owners who Freitag has forced into bankruptcy and lost their homes. At
least six other owners have, in Freitag's words, "surrendered" ownership of their units to the Association
in lieu of paying the assessments, fines, penalties, and attorney's fees he had heaped upon them. (Freitag
MPSJ Decl. at ¶ 8).

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(503) 221-0699
FAX (503) 223-5706

the replacement of windows and fines for non-compliance "were essentially self-renewing upon any event that would otherwise abrogate them." (Freitag MPSJ Decl., Ex. 11 at 4). Apparently with the Watts' recent bankruptcy and the § 363 sale to BNYM in mind, Freitag opined that "in the event of a bankruptcy filing, say, whereas the prior fines and assessments might be discharged, a new assessment and continuing fines would effectively apply beginning immediately after the filing." (*Id.* at 4-5). "The same logic[,]" he reasoned, "would apply to any other operation of law that stripped these obligations." (*Id.* at 5). Thus, he concluded, "even if a sale free and clear [such as the § 363 sale to BNYM] did affect [the] prior assessment, a new assessment would attach immediately after the sale." (*Id.* at 5).

Armed with this newly minted weapon of self-renewing assessments, Freitag wasted no time in using it by sending several invoices to BNYM for the following amounts:

- a pre-§ 363 sale annual assessment, plus interest, late fees, and collection costs in the aggregate amount of $13,167.81;

- interest and fines on a pre-§ 363 sale special assessment for the alleged cost of replacing windows in the aggregate amount of $33,368.43;

- a post-§ 363 sale special assessment for the alleged cost of replacing windows, plus interest and fines in the aggregate amount of $203,891.78;

- the annual assessment for the first quarter of 2016 in the amount of $6,611.80; and

- unspecified "general" and "bankruptcy related" attorneys' fees in the aggregate amount of $44,570.50.

(Declaration of Kevin Jonas Supporting The Bank of New York Mellon's Responses in Opposition to Motions for Summary Judgment ("Jonas Decl."), Ex. 1). Freitag gave BNYM one month, until February 15, 2016, to pay all of the invoices. (*Id.*).

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

On March 14, 2016, BNYM tendered $6,685.70 for the first quarterly assessment of 2016.  (Freitag MPSJ Decl., Ex. 12; Jonas Decl. at ¶ 4 & Ex. 4).  That amount covered all of the amounts due—*e.g.*, $6,611.80 for the quarterly assessment, $48.90 in interest on that amount at the rate of 9% over 30 days, and a $25.00 late fee.  (Jonas Decl., Ex. 4).  Instead of crediting BNYM for paying the quarterly assessment, Freitag declared BNYM to be in default, claimed that the first quarterly assessment remained due in full, and accelerated the remaining quarterly assessments for 2016 (totaling $26,447.20).  (Freitag MPSJ Decl., Ex. 12).  He did so without first providing the 10-days' advance written notice required by the Declaration.  (Storti Decl., Ex. A, at § 10.7.4).

Ironically, the next invoice Freitag sent to BNYM in April 2016 reflected both the accelerated quarterly assessments and what appears to be a credit against those assessments in the amount tendered by BNYM in March 2016.  (Jonas Decl., Ex. 2).  On May 6, 2016, in response to that invoice, BNYM tendered the second quarterly assessment of $6,611.80 under protest.  (Freitag MPSJ Decl.,Ex. 13).

Freitag once again refused to credit BNYM's payment to the quarterly assessment for which it was tendered.  Instead, he sent BNYM an invoice demanding payment of the following:

- the accelerated 2016 quarterly assessments in the amount of $26,447.20, plus $2,152.00 in interest and $175.00 in collection/late fees on that amount;

- an assessment of $11,792.55, which he alleged was due for the period between the improper order confirming the Watts' amended plan and the vacating of that order by this Court, plus interest of $2,047.06 and $525.00 in collection/late fees on that amount;

- a $175,000.00 special assessment for the estimated cost of replacing the Milgard windows, plus $32,500 in fines and $26,925.15 in interest on that assessment; and

- $60,000.00 for unspecified "estimated attorneys' fees."

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

(Jonas Decl., Ex. 3).

Meanwhile, BNYM became concerned that Freitag was not maintaining adequate reserves for the Association and was not providing BNYM or the other owners with updated reserve studies or full financials for the Association. Those concerns were substantiated during Freitag's deposition in this case. When asked whether the amount in the Association's reserve account in March 2015 was about half the size as before, he acknowledged that was the case. (Freitag 30(b)(6) Depo. at 145:10-146:1). He further testified that, for the past several years, the reserve studies he has obtained have all essentially been the same, with the firm performing the studies simply asking Freitag whether there had been any changes from the prior year without reexamining the Association's reserves. (*Id.* at 146:2-147:2). He also admitted he has not made it a practice to distribute the reserve study reports to all of the owners. (*Id.* at 147:6-14).

### F.    Freitag's Failure to Maintain Commonly Maintained Property, and not Allegedly Defective Windows, has been Causing Damage to the Property

Lacking important financial information regarding the Association and faced with Freitag's exorbitant demands for immediate payment of about $325,000.00,[11] all of which was ultimately based on his assertion that the windows in the Property were defective, BNYM resurrected its efforts to determine whether the windows were, in fact, defective. Those efforts dated back to May 2015, when BNYM hired David York, an architect licensed in Oregon for 33 years with 25 years of experience in design, planning, and construction consulting including building science technology. (Declaration of David York ("York Decl.") at ¶ 1). For nearly a

---

[11] This amount is significantly more than the property is even worth. For example, when the Watts filed for bankruptcy in March 2014, they reported the property's value as $271,220. *Bank of N.Y. Mellon v. Watt*, 867 F.3d 1155, 1156 (9th Cir. 2017). It is also almost twice the amount BNYM paid for the property in the § 363 sale, (Bundy Decl., Ex. 18, at ¶ 6]), and almost as much as the $371,175 the Watts originally paid to purchase the property in 2006. (Storti Decl., Ex. C at 33-35).

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

decade, Mr. York has offered forensic services related to building envelope assessment and construction defects. (*Id.*).

Mr. York first inspected the Property on May 19, 2015. (*Id.*). He observed that the exterior wood trim surrounding the aluminum windows had degraded, but the cause of the degradation appeared to be from a lack of whole building exterior maintenance because the same degradation was occurring in all exposed exterior locations. (*Id.* at ¶ 4).

Mr. York performed a follow-up inspection of the Property on March 6, 2017. (*Id.* at ¶ 5). During that inspection, he observed and documented widespread degradation and accelerated deterioration of the Property's exterior that was consistent with (though worse than) his findings from May 2015. (*Id.*). For example, after removing a small piece of trim from the base of an exterior wall, he found moisture, organic growth, and rot. (*Id.*). He also observed elevated moisture levels in trim and siding locations at the Property's exterior. (*Id.*). He saw wood trim pieces from the chimney cap had fallen off, and siding had radically deteriorated having lost material integrity. (*Id.*). In addition, he found evidence of water intrusion from an area above the gutter line. (*Id.*). He noted that the trim on the exterior of the Property was in such poor condition in a few locations that it was detaching from the building. (*Id.*). Copies of some of the photos he took during that inspection of the described conditions are attached to his declaration. (*Id.*, Ex. B). Mr. York concluded that the results of his March 2017 inspection substantiated his earlier findings that the damage and deterioration around the entire structure was caused by the lack of exterior maintenance; and there was no sign of water intrusion or property damage caused by defective or failing windows. (*Id.* at ¶ 5).

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S  A T  L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

Mr. York also compared the exterior of the Property to other units within Meritage during his March 2017 inspection. (*Id.* at 6). He observed that units with newer window systems also had visibly better, newer, and fully maintained exteriors built of newer materials, while the exteriors of units with older window systems—like BNYM's unit—were visibly weathered, unkept, and in need of basic maintenance and material replacement. (*Id.*).

Most recently, Mr. York inspected the Property again on September 20, 2017. (*Id.* at ¶ 7). Utilizing non-invasive and non-destructive methods, he inspected a small section of badly degraded exterior cladding high upon the exterior siding around the chimney. (*Id.*). The rotten cladding materials crumbled in his hand. (*Id.*). Copies of some of the photos he took during the September inspection of the described conditions are attached to his declaration. (*Id.*, Ex. C).

Based on his observations, education, experience, and analysis, Mr. York has concluded that the window systems at the Property appear to have been code-compliant at the time of installation, are not defective, and do not require replacement. (*Id.* at ¶ 8). He believes his inspections and analysis establish that the source of water intrusion and resultant property damage can be traced to the unkept exterior surfaces of the framed wall, the exterior roof sheathing and upslope portion of the chimney. (*Id.*). He found no indication that any window failure or defect is causing water intrusion or other problems that would require replacement of the entire window system. (*Id.*).

## III.    LEGAL STANDARD

A party moving for summary judgment bears the burden of showing there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant fails to

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

satisfy this initial burden, summary judgment must be denied, regardless of what the nonmovant does. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). Only if the moving party meets its initial burden does the burden then shift to the nonmovant to avoid summary judgment. *Id.* To do so, "the nonmovant need only designate specific facts showing that there is a genuine issue for trial." *Makaeff v. Trump Univ.*, LLC, 736 F.3d 1180, 1189 (9th Cir. 2013) (citation and quotation marks omitted). Evidence must be viewed in the light most favorable to the nonmovant and all reasonable inferences must be drawn in the nonmovant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). "Where conflicting inferences may be drawn from the facts, the case must go to the jury." *Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 818 (9th Cir. 2014) (citation and quotation marks omitted).

## IV.     MEMORANDUM OF LAW

### A.     BNYM is Not Bound by Releases in the Purported Agreements

Movants argue that BNYM is bound by four agreements, which they collectively refer to as the "Agreements." MSJ at 4. They include: (1) the purported settlement of the HOA Litigation ("HOA Litigation Agreement"), (2) the purported settlement of the Window Litigation ("Window Litigation Agreement"), (3) the Repair Agreement, and (4) another document entitled "Covenant Running with the Land" ("Covenant"), which Movants allege the Watts signed on December 16, 2013, and which Freitag allegedly recorded in the chain of title for the Property. *See* MSJ at 4.

As an initial matter, the HOA Litigation Agreement and Window Litigation Agreement are unenforceable as a matter of law because they are not executed by all of the parties. *See, e.g.*,

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

*Erection Co., Inc. v. W & W Steel, LLC*, No. 11-805-JE, 2011 WL 5008325, at *9-10 (D. Or. Oct. 20, 2011) (no binding agreement where there was explicit statement that it would be effective only when signed by both parties, and one party did not sign).

> 1.    *BNYM is Not a "Successor or Assign" of the Watts*

Movants claim the Agreements are expressly binding on the Watts' successors and assigns, but they cite nothing in the record to support that assertion. *See* MSJ at 7. Even if the Agreements are binding on the Watts' successors and assigns, BNYM is neither. Courts across jurisdictions uniformly hold that the purchaser of another's assets in an arms-length transaction does not become liable for the seller's debts or obligations as a successor or assign. *See, e.g.*, *Cargo Partners v. Albatrans, Inc.*, 352 F.3d 41, 44-45 (2d Cir. 2003) (finding no successor liability based on arms-length transaction under New York law); *East Prairie R-2 School Dist. v. US Gypsum Co.*, 813 F. Supp. 1396, 1400-01 (E.D. Mo. 1993) (same, under Missouri law); *Hickman v. Thomas C. Thompson Co.*, 592 F. Supp. 1282, 1284 (D. Colo. 1984) (finding that "a legitimate sale carried on at arms length" did not confer successor liability on the purchaser under Colorado law).

It cannot be disputed that BNYM was an arms-length purchaser of the Property under the § 363 sale because the order authorizing the sale expressly stated:   "As purchaser of the Subject Property in accordance with 11 U.S.C. § 363(k), Bank of New York Mellon is an arms-length purchaser, has not colluded with any third party in connection with the sale, and is entitled to all of the protections of a good faith purchaser."  (Bundy Decl., Ex. 18, at ¶ 2).  BNYM has never agreed to take on any of the Watts' responsibilities or obligations, if any, under the Agreements. BNYM did not purchase or merge with the Watts; it merely purchased their townhome as a good

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

faith, arms-length purchaser.  It did so "free and clear of any interest in the Subject Property of any entity[.]"  (Bundy Decl., Ex. 18, at ¶ 8).  Accordingly, BNYM is nothing more than a subsequent owner of the Property; it is not a successor or assign, and the releases in the Agreements are not binding on BNYM.

2.     *The Agreements are Unenforceable with Respect to Any Anticipatory Release of Future Claims*

The anticipatory releases in the Agreements are also unenforceable against BNYM because they purport to release claims that did not arise until after BNYM purchased the Property.[12]  The Oregon Supreme Court has consistently held that contractual enforceability is to be determined on an "as applied" basis.  *Harmon v. Mt. Hood Meadows*, 146 Or. App. 215, 223 (1997).  Under Oregon law, anticipatory releases have long been held to violate public policy where they purport to immunize the releasee from liability for gross negligence, reckless, or intentional conduct.  *K-Lines, Inc. v. Roberts Motor Co.*, 273 Or. 242, 249 (1975); *see also Bagley v. Mt. Bachelor, Inc.*, 356 Or. 543, 570 (2014) (reaffirming *K-Lines*).  Because BNYM's claims in this case arise from Freitag's grossly negligent, reckless, or intentional conduct after BNYM bought the Property and long after the Agreements were made, even if BNYM is bound by the Agreements, the anticipatory release of such claims is unenforceable as a matter of law.

---

[12] Movants gloss over this important point, asserting "it is well-established that a release can serve as a bar to liability in future claims."  MSJ at 6-7.  However, the only case they cite—*Lindgren v. Berg*, 307 Or. 659 (1989)—does not support them.  The issue in *Lindgren* was "whether a release signed by plaintiffs bars them from litigating whether the release itself was induced by [the] defendant[s'] fraud."  307 Or. at 661.  In the course of negotiating a settlement between joint venturers, the defendant, Berg, did not disclose to the plaintiffs that he had made a side deal that would result in him receiving secret profit from the venture even after his interest was bought out by the plaintiffs.  *Id.* at 661-63.  Upon learning of Berg's fraud, the plaintiffs sued for breach of fiduciary duty.  *Id.* at 663.  The court of appeals held that the plaintiffs' claim was barred by the settlement even if the fraud or nondisclosure occurred in connection with the negotiation of the release.  *Id.* at 665-66.  Because *Lindgren* dealt with a claim based on events that had already occurred when the settlement was reached, it does not answer the question of whether an anticipatory release of a claim based on events or actions that have not yet occurred.

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

Courts also consider whether enforcing an anticipatory release would cause harsh or inequitable results for the releasing party. *Commerce & Industry Ins. v. Orth*, 254 Or. 226, 231-32 (1969); *Estey v. MacKenzie Engineering Inc.*, 324 Or. 372, 376-77 (1996) (court's inquiry into intent of parties to immunize against negligence "focuse[s] not only on the language of the contract, but also on the possibility of a harsh or inequitable result that would fall on one party by immunizing the other party from the consequences of his or her own negligence"). Here, enforcing a 2013 release against BNYM would impose harsh and inequitable results. Freitag, attempts to shield himself and the Association from exposure to liability for his failures as a developer and declarant of Meritage at the expense of the very homeowners to whom he owes fiduciary duties. He should not be allowed to use his unauthorized control of the Association to resurrect old litigation claims ad nauseum simply by declaring them self-renewing.

> 3.    *BNYM Took the Subject Property Free and Clear of Any Interests Created by the Settlement Agreements*

Even if BNYM could be bound by the Agreements, any interest in a release of claims against Movants created by the Agreements did not survive the § 363 sale. The Order Granting Motion and Authorizing Sale of Property Pursuant to 11 U.S.C. §§ 363(b), (f) ("363 Order") explicitly confirms that: "The sale of the Subject Property shall be free and clear of any interest in the Subject Property of any entity, and Bank of New York Mellon shall be entitled to all of the protections of section 363(f)[.]" (Bundy Decl., Ex. 18, at ¶ 8).

The § 363 sale cut off all potential liability for any pre-sale interests created by the Agreements and held by Movants. This proposition has been supported by the decision of another District Judge in this District which adopted a finding that "the bankruptcy court was well within its authority to include the condition that [the buyer's] purchase [under § 363] was

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(503) 221-0699
FAX (503) 223-5706

free and clear of all successor liability claims based upon products manufactured, sold, and delivered prior to closing." *Otoski v. Avidyne Corp.*, No. CV.09-3041-PK, 2010 WL 4739943, at *6 (D. Or. Oct. 6, 2010) (Papak, M.J.), *report and recommendation adopted*, No. 09-3041-PK, 2010 WL 4737815 (D. Or. Nov. 15, 2010) (Marsh, J.).  In reaching this decision, the court found that the creditor seeking to impose personal liability on the buyer, as Movants seek to do here, "was a party to the bankruptcy proceeding since he received actual notice of the proposed sales agreement and hearing." *Id.* at *5.  Similar to the 363 Order here, the order in *Otoski* enumerated specific liabilities that would transfer to the buyer and that the buyer would only be liable for those enumerated in the order.  *See id.*

Contrary to Movants' contentions, it was not necessary for the 363 Order to specifically reference the Agreements for the sale to be made free and clear of those interests.  The 363 Order clearly stated that the sale would be "free and clear of *any* interest in the Subject Property of *any* entity."  (Bundy Decl., Ex. 18, at ¶ 8 (emphasis added)).  The term "any" is all inclusive, so it was unnecessary for the bankruptcy court to enumerate each of the interests being wiped out by the sale.

Similarly, even if the Watts signed a so-called Covenant that Movants argue runs with the land, it would still fall under the ambit of "[a]ny interest in the Subject Property of any entity" that did not survive the § 363 sale.  (Bundy Decl., Ex. 18, at ¶ 8).  That language is followed in the 363 Order by a specific carve-out requested by the Association for the Declaration and Bylaws.  (*See id.* ("*provided that* Bank of New York Mellon hereby acknowledges that the Subject Property includes the Declaration [] and Bylaws ….")).  The Association could have asked the bankruptcy court to also include a carve-out for any so-called Covenant, but it did not.

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

Because no Covenant is included in the carve-out language, it is subsumed within the "[a]ny interest in the Subject Property of any entity" that was cut off by the § 363 sale.

Even if Movants could avoid the application of the 363 Order's unambiguous language barring survival of the alleged Covenant, they fail to show that the alleged Covenant actually runs with the land, at all.  For a covenant to run with the land, (1) there must be privity of the estate between the promisor and his successors; (2) the promisor and promisee must intend that the covenant run; (3) the covenant must touch and concern the land of the promisor; and (4) the promisee must benefit in the use of some land possessed by him as a result of the performance of the promise.  *Nordbye v. BRCP/GM Ellington*, 246 Or. App. 209, 225 (2011).  Relying on the Restatement, Property (Servitudes), § 534, the Oregon Supreme Court has added: "The successors in title to land respecting the use of which the owner has made a promise are not bound as promisors upon the promise unless … the transaction of which the promise is a part includes a transfer of an interest either in the land benefited by or in the land burdened by the performance of the promise …."  *Huff v. Duncan*, 263 Or. 408, 412 (1972).  The alleged Covenant does not include any transfer of interest in the Property.

Movants also fail to meet the privity requirement for a covenant that runs with the land.  They argue that privity exists between the Watts and BNYM based solely on the fact that BNYM purchased the Property from the Watts.  *See* MSJ at 8.  The only authority they cite in support of that contention is *Huff*.  *See id.*  That case, however, is inapposite.  The passage in *Huff* cited by Movants states that "[p]rivity arises out of a transfer of an interest in the land benefited by the promise."  *Huff*, 263 Or. at 412.  Here, the Property was not *benefitted* by any promise contained in the Covenant.  To the contrary, Movants are arguing that the Property was *burdened* by the

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

promise not to litigate potentially meritorious claims. This is a distinction with a major—and dispositive—difference.

Movants also offer the dubious contention that the alleged Covenant "'touches and concerns the land' in that it concerns the windows affixed to the Property." MSJ at 8. But as *Huff* provides, "for a burden of a promise to run the promise must be one respecting the *use* of the land of the promisor." *Id.* (emphasis added). Here, the relevant promise is not to sue Movants for claims brought in the various lawsuits between Movants and the Watts. The promisor, the Watts, need not use the Property to abide by the terms of that promise. Thus, the alleged Covenant, if anything, is nothing more than just another agreement in which the Watts promised not to sue Movants. It does not run with the land; it is not binding on BNYM; and it did not survive the § 363 sale.

To reiterate, the 363 Order provided that the "sale of the Property shall be free and clear of any interest in the Subject Property of any entity, and Bank of New York Mellon shall be entitled to all of the protections of section 363(f)[.]" (Bundy Decl., Ex. 18, at ¶ 8). The Agreements necessarily could not have survived the § 363 sale. Nor could the Covenant, which is not at all a covenant that runs with the land. Movants cannot possibly prevail on these misguided theories, which should be rejected out of hand.

4.    *Judicial Estoppel Does Not Apply to the Settlement Agreements*

Movants next argue that BNYM should be judicially estopped from contradicting recitals in the Agreements. *See* MSJ at 11-12. In particular, Movants argue that BNYM cannot dispute whether the windows are, in fact, defective, or whether Freitag had authority to require window

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(503) 221-0699
FAX (503) 223-5706

replacement and to levy heavy assessments, fines, and penalties for not replacing the windows. *See id.* However, the doctrine of judicial estoppel is inapplicable.

Judicial estoppel is an equitable doctrine that protects the integrity of the judicial process by precluding a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position. *Risetto v. Plumbers & Steamers Local 343*, 94 F.3d 597, 600-601 (9th Cir. 1996); *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990). The Supreme Court has outlined three factors that courts may consider in determining whether to apply the doctrine of judicial estoppel:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus no threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) (internal citations and quotation marks omitted). The Ninth Circuit "has restricted the application of judicial estoppel to cases where the court relied on, or 'accepted,' the party's previous inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001).

This doctrine has no application to the present case for at least three independent reasons. First, the doctrine only applies to inconsistent positions taken by the same party. BNYM was not a party to the Agreements and, consequently, did not take any "positions" in those Agreements. Second, the doctrine only applies to positions taken in a prior judicial proceeding. The Agreements are not judicial proceedings. Third, judicial estoppel only applies if the court in the

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S  A T  L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

prior judicial proceeding relied on, or accepted, the prior inconsistent position.  Movants have provided no evidence that any court relied or, or accepted, the recitals in the Agreements.

With regard to this third point, Movants cite a single case from the Seventh Circuit for the proposition that the doctrine of judicial estoppel can be applied to settlement agreements.  *See* MSJ at 12 (citing *Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 887 (7th Cir. 2004)).  But *Commonwealth* does not support Movants' argument.  In fact, the case upon which it relies, *Kale v. Obuchowski*, 985 F.2d 360 (7th Cir. 1993), belies their argument.

In *Kale*, the court explained that judicial estoppel applies only if the party to be estopped prevailed in the prior judicial proceeding.  985 F.2d at 361.  A settlement agreement, the court noted, sometimes "sidesteps the issue in the first case, so that neither side prevails on a particular contested issue."  *Id.* at 362.  "Frequently, however, a settlement represents capitulation.  Persons who triumph by inducing their opponents to surrender have 'prevailed' as surely as persons who induce the judge to grant summary judgment."  *Id.* (citing *Maher v. Gagne*, 448 U.S. 122 (1980)).

Here, it was the Watts who capitulated to Movants in the Agreements, not the other way around.  The Watts agreed to breathtakingly broad releases of Movants while at the same time agreeing that Movants could continue to pursue the very claims from which the matters being settled had arisen.  Moreover, Freitag was not forced to relinquish control of the Association, even though that was a key part of the HOA Litigation filed by the Watts and other homeowners who were fed up with his bullying and irresponsible conduct.  Movants essentially gave up nothing, while the Watts and other homeowners effectively surrendered to the point where their

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

only recourse for relief from Movants was to seek the protection of bankruptcy.  If anyone prevailed in the Agreements, it was clearly Movants, and not the Watts or other homeowners.

In any event, this Court is not in the Seventh Circuit, and at least one other Circuit has reached a different conclusion.  For example, in *Teledyne Indus., Inc. v. NLRB*, the Sixth Circuit held that judicial estoppel could not be based on a settlement where the court in the prior proceeding had no "duty to ensure the agreement was fair and equitable."  911 F.2d 1214, 1219 (6th Cir. 1990).  The court further suggested that the doctrine of judicial estoppel likely has no application upon settlement of an "ordinary civil case."  *Id.*

Furthermore, as another District Judge in this District has pointed out, "[c]ommentators have emphasized that the judicial estoppel doctrine should be limited to those instances in which statements made to different courts or in different proceedings are 'truly inconsistent and mutually exclusive.'"  *Whatley v. Nike, Inc.*, 2000 U.S. Dist. LEXIS 20227, *6-7 (D. Or. Sept. 8, 2000), quoting David S. Coale, *A New Framework for Judicial Estoppel*, 18 Rev. Litig. 1, 6 (1999).  Putting aside the fact that the statements contained in the Agreements were never made to any court in the first place, BNYM has never taken the position or represented to any court (or to anyone else for that matter) that the windows in the Property are defective or that Movants had authority to impose assessments, fines, and penalties for not replacing the windows.  It should not be estopped from taking a position in this case that is consistent with the position it has always taken—*i.e.*, that the windows are not defective and that Movants lack authority to levy assessments, fines, or penalties for BNYM's refusal to replace the windows.

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

**B.**     **BNYM's Claims Are Supported by the Evidence**

Movants' argument that BNYM's claims are not supported by the evidence mistakes whose burden it is to produce evidence with respect to Movants' motion.  As referenced above with regard to the legal standard that applies to Movants' motion, the burden is on them to show there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 323.  The burden does not shift to BNYM to avoid summary judgment unless and until Movants satisfy their initial burden.  *Devereaux*, 263 F.3d at 1076.  Movants have not satisfied their burden.

In any event, the evidence most certainly supports BNYM's claims.  As noted above, BNYM's counterclaims against the Association and some of its third-party claims against Freitag are based on: (1) Movants' unauthorized assessment and accompanying fines and penalties for not replacing windows that are not defective; (2) damage caused by Movants' failure to maintain the common elements of the Property; (3) Movants' retaliation and discrimination against owners who refused to replace windows by providing a lower level and quality of maintenance of the common elements of those owners' units; and (4) Movants' refusal to remove plywood that is covering a functional window.  *See* The Bank of New York Mellon's First Amended Answer, Counterclaims, and Third-Party Complaint, Dkt. 36 at 10-13, 16-18.  BNYM asserts additional third-party claims against Freitag based on: (1) the significant expenses he has incurred in litigation that are not in the best interests of the Association or its members; (2) his failure to provide owners with all financial and informational disclosures required by ORS Chapter 94; and (3) his failure to fully fund and maintain an adequate reserve account balance. *See id.* at 16-18.

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

With regard to the special assessment for window replacement and associated fines and penalties, the evidence shows that Freitag has, for years, operated with sole, but unauthorized, control of the Association.  As explained above, Freitag was required under the Declaration, Bylaws, and PCA to turn over administrative control of the Association to the owners as early as June 2004, or, at the very latest, at the turnover meeting in 2009.  *See supra* at §§ II.A-II.B.  Every clarifying or supplemental instrument he recorded in the property records, every assessment he levied, every resolution he passed purporting to impose fines and penalties, and every lawsuit he filed on behalf of the Association since that time has been tainted by the fact that he had no authority whatsoever to take those actions.  The evidence also shows that Freitag has refused to apply BNYM's payments for quarterly assessments to the relevant assessments, and, as a consequence, he has wrongfully accelerated those assessments and continued to demand payment for assessments that have already been paid.  *See supra* at § II.E.  Furthermore, there is ample evidence based on Mr. York's expert observations and analysis that the windows are not, in fact, defective and do not need to be replaced. *See supra* at § II.F.  Thus, the very premise on which the window-replacement assessment, fines, and penalties is based is without merit.

Regarding Movants' obligation to maintain Commonly Maintained Property, Mr. York's declaration contains specific and detailed findings supported by photographs showing that Movants have failed in that obligation.  Those findings support his conclusion that Movants' failure to maintain the Commonly Maintained Property, and not allegedly defective windows, has been the cause of damage to both the exterior portions of the Property, including widespread degradation and even structural instability, and the interior of the Property from water intrusion.

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

(York Decl. at ¶¶ 4-8, Exs. B-C). At a minimum, this evidence gives rise to triable issues of fact whether and to what extent Movants' failures rise to a level of negligence or gross negligence that substantially interferes with BNYM's use and enjoyment of the Property. Ordinarily, the issue of negligence or gross negligence is a question of fact to be decided by the jury. *See Oregon Auto Ins. Co. v. Fitzwater*, 271 Or. 249, 258 (1975). The court will withdraw the issue from the jury only when it can say as a matter of law that the actor's conduct falls short of gross negligence. *Garrison v. Pac. Nw. Bell*, 45 Or. App. 523, 533 (1980).

Mr. York's declaration also supports BNYM's claims with regard to Movants' failure to uniformly maintain the Commonly Maintained Property among the various units. For example, based on multiple inspections of the Property, Mr. York has observed that Movants have repaired and maintained the Commonly Maintained Property on other units whose owners replaced their windows better than Movants have done on BNYM's unit. (York Decl. at ¶ 6). Mr. York has also observed that the units with new window systems had visibly better, newer, and fully maintained exteriors built of newer materials as compared to the exterior of BNYM's unit, which is visibly weathered, unkept, and in need of basic maintenance and material replacement. (*Id.*).

Movants' summary judgment evidence itself supports BNYM's claim that Movants have failed to remove unfitted plywood coverings from a functional window. Brian Johnston, the Chief Executive Officer and Senior Project Manager of Dallas Glass, states in his declaration that Dallas Glass installed a set of plywood coverings over the windows at the Property in February 2014, and that the plywood pieces were not cut to match the size of the windows. (Declaration of Brian Johnston in Support of Meritage Homeowners' Association and Third-Party Defendant Kurt Freitag's Motion for Summary Judgment, Dkt. 49 ("Johnston Decl.") at

PAGE 40 – DEFENDANT/COUNTER-PLAINTIFF/THIRD-PARTY PLAINTIFF THE BANK OF NEW YORK MELLON'S RESPONSE IN OPPOSITION TO MERITAGE HOMEOWNERS' ASSOCIATION AND THIRD-PARTY DEFENDANT KURT FREITAG'S MOTION FOR SUMMARY JUDGMENT

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(503) 221-0699
FAX (503) 223-5706

¶ 5).  He further states that the installation of plywood was intended as an emergency temporary measure.  (*Id.* at ¶ 7).  That was more than three-and-a-half years ago.  There is no dispute that the unfitted plywood coverings are still there, and Freitag agrees they are unsightly.  *See* MSJ at 17.

The evidence also shows that Freitag has incurred exorbitant expenses, mostly attorney's fees that he has assessed against the Meritage owners, pursuing and defending extensive litigation against those same owners.  *See supra* at §§ II.C-II.D.  In large part because of those expenses, the Association's regular assessments are now more than $2,200 *per unit per month* on townhomes that generally sold in the $300,000 to $400,000 range when brand new.  (Jonas Decl., Ex. 1 at 5, Ex. 2, Ex. 3; Storti Decl., Ex. C).

Finally, Freitag's own deposition testimony confirms that he has failed to provide owners with all financial and informational disclosures required by ORS Chapter 94, and has failed to fully fund and maintain an adequate reserve account balance.  For example, Freitag acknowledged that the Association's reserve account in March 2015, was about half the size as it previously had been.  (Freitag 30(b)(6) Depo. at 145:10-146:1).  He also admitted he has not made it a practice to distribute the mandatory reserve study reports to all of the owners.  (*Id.* at 147:6-14).  BNYM confirms that, while it has received certain budgets from the Association through BNYM's counsel, it has never received an updated reserve study or Association financials since it took title to the Property.  (Jonas Decl. at ¶ 8).

To the extent that Movants have satisfied their initial burden of showing there is no genuine issue of material fact and that they are entitled to judgment as a matter of law, the

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

evidence cited above is more than sufficient to support BNYM's claims in this case and to defeat Movants' motion for summary judgment.

### C.    BNYM Has Standing to Assert Claims Based on Conduct that Occurred After it Became the Owner of the Subject Property

Movants' next argument is that if BNYM is a successor and assign of the Watts with respect to the Watts's release obligations under the Agreements (which it is not), then BNYM is bound by those releases; if, however, BNYM is not the Watts's successor and assign, then it has no standing to bring claims related to events that occurred during the Watts's ownership of the Property. *See* MSJ at 18. While this argument is clever, it is just another misguided red herring.

Movants concede that even if BNYM is bound by the Agreements, it would only be prevented from bringing claims arising from events that occurred prior to the § 363 sale. *See id.* Thus, regardless of whether BNYM is or is not bound by the Agreements, it has standing to assert claims arising from events and actions that occurred after it acquired ownership of the Property, on August 12, 2015. As discussed throughout this response, the claims BNYM is asserting arise from such events. Thus, it matters not whether BNYM is bound by the Agreements; it has standing to pursue its claims regardless.

Movants' argument is also hypocritical. In one breath Movants argue that BNYM cannot bring claims relating to an assessment that was originally levied during the Watts' ownership of the Property, but in the same breath they are arguing that that very assessment self-renewed after BNYM purchased the Property. (*See* Freitag MPSJ Decl., Ex. 11 at 4 (Freitag asserting that any earlier resolutions authorizing assessments for the replacement of windows and fines for non-compliance "were essentially self-renewing upon any event that would otherwise abrogate them")). Movants cannot have it both ways. Either the assessment was levied sometime in or

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

prior to 2011, as they allege, in which case all claims that might arise from it are barred by

limitations and the 363 sale,[13] or it arose after the § 363 sale, in which case BNYM would still

have standing to challenge it even if BNYM is bound by the Agreements (which it is not).

### D.    BNYM May Bring a Derivative Action Against Freitag

Movants argue that BNYM may not bring a derivative action against Freitag because

such actions are not expressly authorized by chapter 94 of the ORS.  MSJ at 19-20.  They also

argue that BNYM has failed to adequately plead a derivative action against Freitag.  MSJ at 20-

22.  These arguments, even if persuasive, are hardly dispositive because BNYM has individual

standing to assert its claims against Freitag.  The arguments also fail because, pursuant to the

requirements of chapter 94 of the ORS, the Association was organized as a nonprofit corporation

and chapter 65 of the ORS clearly authorizes derivative suits on behalf of a nonprofit

---

[13] The statute of limitations for actions under the Planned Community Act is one year, and it begins running once the alleged violation is discovered or identified.  *See* ORS 94.780(3) ("A suit or action arising under this section must be commenced within one year after the discovery or identification of the alleged violation.").  It is undisputed that Plaintiff knew of any failure to pay a window assessment no later than July 1, 2011, because that was the deadline set in the February 23, 2011 resolution imposing fines and penalties on owners who refused to replace the windows after that date.  (Freitag MPSJ Decl., Ex. 7 at 10).  Thus, limitations on bringing a claim to collect any window assessment ran on July 1, 2012, long before BNYM became the owner of the property.  Freitag's after-the-fact attempt to avoid this limitations bar in December 2015, by designating any earlier resolutions authorizing assessments for the replacement of windows as "essentially self-renewing upon any event that would otherwise abrogate them" is ineffective.  (Freitag MPSJ Decl., Ex. 11 at 4).  As discussed elsewhere in this response, Freitag had no authority to make such a declaration because he previously failed to turn over administrative control of the Association when required to do so under the Declaration, Bylaws, and Planned Community Act.  *See supra* at §§ II.A-II.B.  Furthermore, BNYM is not aware of any authority that allows a party to unilaterally abrogate a statute of limitations by declaring the event upon which the action is based self-renewing every time it became barred by limitations.  To the contrary, this Court has already held that Movants may not simply re-cast prior assessments anew to circumvent the likelihood of the debts being discharged in bankruptcy.  *See Meritage Homeowners' Ass'n v. Watt*, No. 3:17-cv-00267-AA, 2017 WL 1364209, at *5 (D. Or. Apr. 11, 2017) (Aiken, J.) (concluding "that the second special assessment is simply the first special assessment in a new form" and was subject to being discharged in the Watts' bankruptcy).  If a prepetition assessment recast as a postpetition assessment is subject to discharge in bankruptcy, then certainly a claim barred by limitations cannot be recast into a claim not barred by limitations simply by declaring it self-renewing.

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

corporation.  BNYM has also adequately pled a derivative suit against Freitag because it has

alleged with particularity the actions it has demanded Freitag take and that Freitag has refused or

ignored those demands.

### 1.    BNYM Has Individual Standing to Assert its Claims Against Freitag

Whether BNYM may bring a derivative action on behalf of the Association against

Freitag is ultimately of little consequence because BNYM has individual standing to assert its

claims against Freitag.  As Freitag concedes, to the extent he is a director of the Association,

ORS 94.640(1), which incorporates ORS 65.369, subjects him to liability for any gross

negligence or intentional misconduct.  MSJ at 19.

Nothing in ORS 94.640(1) or ORS 65.369 requires a claimant to have derivative standing

to assert such claims, and all of the claims BNYM has asserted against Freitag fall within those

broad categories.  For example, BNYM has alleged the following grossly negligent or intentional

conduct by Freitag:

- Incurring significant expenses that are not in the best interests of the Association or its members;

- Failing to provide members of the Association with financial and informational disclosures required by chapter 94 of the ORS;

- Failing to fully fund and maintain adequate reserve account balances;

- Wrongfully asserting authority to levy an assessment against BNYM and other owners for the replacement of nondefective windows;

- Wrongfully asserting authority to impose fines and penalties in connection with the unauthorized assessment for replacing nondefective windows;

- Failing to remove from BNYM's unit or allowing BNYM to remove unsightly and unfitted plywood that was installed over functioning windows as an emergency temporary measure; and

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

- Retaliating and discriminating against BNYM by failing to maintain Commonly Maintained Property on BNYM's unit while providing such maintenance to the Commonly Maintained Property on other units in Meritage whose owners have bowed to Freitag's unauthorized demands.

Dkt. 36 at 16-18.  BNYM has further asserted that as a result of this conduct, its property has been substantially damaged.  *Id.* at 18.  Thus, BNYM's claims against Freitag clearly meet the familiar individual standing requirements of injury in fact, causation, and redressability as articulated in *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

2.      *There is Statutory Authority for Bringing a Derivative Action Against the Association*

Because BNYM has individual standing to bring its claims against Freitag, it matters little whether BNYM also has derivative standing to bring such claims on behalf of the Association.  In any event, BNYM also has derivative standing.

Freitag's argument that there is no statutory authority for a derivative action against him is meritless.  As Freitag acknowledges, homeowners associations in Oregon are governed by chapter 94 of the ORS, which requires that such associations be organized as nonprofit corporations.  *See* ORS 94.625(1) (requiring the declarant to "[o]rganize the homeowners association as a nonprofit corporation under ORS chapter 65").  In accordance with this requirement, the Association was, in fact, organized as a nonprofit association.  (Storti Decl., Ex. A, at 1).  Nonprofit organizations are governed by ORS chapter 65, which clearly authorizes derivative suits on behalf of nonprofit corporations.  *See* ORS 65.174(1) ("A proceeding may be brought in the right of a domestic or foreign corporation to procure a judgment in its favor by: (a) Any member or members having two percent or more of the voting power or by 20 members, whichever is less; or (b) Any director.").

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

Because ORS 94.625 requires that a homeowners association be organized as a nonprofit corporation, and ORS 65.174(1) already authorized derivative suits on behalf of such corporations, it was unnecessary (and, indeed, would have been redundant) for the legislature to include a specific provision within chapter 94 of the ORS authorizing derivative suits on behalf of homeowners associations.  Thus, the absence of a specific provision within chapter 94 of the ORS expressly authorizing derivative suits on behalf of a homeowners association is inconsequential.

Freitag argues in response that ORS 94.640(1), which governs directors of homeowners associations, incorporates only certain provisions from ORS chapter 65 and that, by negative implication, all unlisted provisions from chapter 65—such as the statute authorizing derivative suits on behalf of nonprofit corporations—should be ignored.  MSJ at 19-20.  However, that very argument was rejected in *Goodsell v. Eagle-Air Estates Homeowners Ass'n*, 249 Or. App. 639 (2012).  In *Goodsell*, the directors argued that the method for removing directors that is prescribed in ORS 94.640(6) was the exclusive method for removing directors of a homeowners association even though ORS 65.327(1) also allowed directors of nonprofit corporations to be judicially removed.  *Goodsell*, 249 Or. App. at 642-43.  The court of appeals disagreed.  The court explained that the method of removal in ORS 65.327(1) applies to all nonprofit corporations, except religious corporations whose bylaws limited or prohibited its application.  *Id.* at 646-47.  The court noted that there is "no exception for homeowners associations that were incorporated as nonprofit corporations" and "nothing in ORS chapter 94 purport[s] to preclude or qualify the application of ORS 65.327(1) to homeowners associations that were incorporated as nonprofit corporations."  *Id.* at 647.  Similarly, ORS 65.174(1) applies to all nonprofit

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

corporations and nothing in ORS chapter 94 purports to exclude homeowners associations that are organized as nonprofit corporations. Thus, BNYM, which as one of 18 members of the Association has two percent or more of the voting power of the Association, is statutorily entitled to bring a derivative action against Freitag under ORS 65.174(1).

>3.      *BNYM Has Adequately Pleaded a Derivative Action*

Freitag further argues that, even if BNYM has statutory authority to bring a derivative action, it has not satisfied the pleading requirements in Federal Rule of Civil Procedure 23.1 because it does not fairly and adequately represent the interests of the other members of the Association and because it was not a member of the Association at the time of the alleged transactions. *See* MSJ at 20. Both contentions are meritless, and the first one is highly hypocritical.

Rule 23.1 provides that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." Fed. R. Civ. P. 23.1(a). BNYM satisfies this requirement because all owners in Meritage have an interest in seeing Freitag enjoined from continuing his unauthorized and abusive control of the Association, which has resulted in numerous and costly lawsuits against members of the Association, a failure to maintain Commonly Maintained Property, misallocation of dues payments, massive assessments, fines, and penalties, and depreciation of everyone's property. Freitag even admits being sued by the other members to force a turnover of control of the Association in 2011. *See*

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

MSJ at 3. Clearly, BNYM fairly and adequately represents the interests of those other members in preventing Freitag from continuing his abusive and unauthorized conduct.[14]

Freitag's argument that BNYM has not complied with the pleading requirements under Rule 23.1(b) is also without merit. Rule 23.1(b) requires, among other things, that a derivative complaint "allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law[.]" Fed. R. Civ. P. 23.1(b)(1). BNYM has complied with that requirement. BNYM has alleged that it took title to the Property in August 2015 pursuant to the 363 sale. Dkt. 36 at 3. It has further alleged that since that date, Freitag has done all of the things listed as bulleted items in section IV.D.1 above.[15] *See supra* at § IV.D.1; Dkt. 36 at 16-18. Accordingly, BNYM has standing to bring its derivative claims against Freitag under Rule 23.1.

---

[14] In a footnote, Freitag suggests that BNYM's interests are opposed to other members of the Association based on four responses he received to an email in which he asked whether the cost of replacing windows in BNYM's unit should fall to BNYM or to the Association. That footnote is a red herring because Freitag asked the wrong question. In his email to the other members, Freitag stated: "As we all know, the windows [in BNYM's unit] must be replaced. The real question here is who will pay." Bundy Decl., Ex. 28 at 1. But the question has never been who should bear the cost of replacing windows. Rather, the question is, and always has been, whether BNYM should be required to replace the windows in the first place. If the windows have to be replaced, BNYM agrees that it would bear that cost pursuant to the Declaration. That is not the point. The point is that the windows do not need to be replaced in the first place because they are not defective and they are not what has been causing damage to the property. The damage has been caused, instead, by water intrusion and other deterioration brought about by Freitag's failure to properly maintain the Commonly Maintained Elements. (York Decl. at ¶¶ 8). If BNYM is not required to replace nondefective windows, everyone (except Freitag) wins because neither BNYM nor the Association has to pay the cost of needless replacement of functioning windows, and Freitag is required to finally address the real causes of damage to the property.

[15] To the extent BNYM complains of the plywood currently covering one of the windows in its unit, BNYM agrees it was not owner of the Property when the plywood was installed. However, BNYM seeks declaratory and injunctive relief to determine whether Freitag has any authority to prevent its removal, which involves a present issue that has existed since the time BNYM took title to the Property.

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W

2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

### E.    Movants Are Not Entitled to Attorney's Fees

Movants argue they are entitled to attorney's fees under the PCA and under the Declaration and Bylaws.  *See* MSJ at 22-23.  However, to recover fees under any of these, Movants must be the prevailing party, and in the case of the Bylaws, Movants must be the one seeking relief.  *See* ORS 94.719; (Storti Decl., Ex. A, at § 11.3; Storti Decl., Ex. B, Art. 13). Movants cannot recover attorney's fees in connection with their motion for summary judgment because they are not moving for summary judgment on their affirmative claims and they are not prevailing parties for the same reasons they are not entitled to summary judgment.

In any event, in no event is Freitag entitled to recover attorney's fees, even if he is a prevailing party on the claims asserted against him.  Neither the PCA, the Declaration, nor the Bylaws provide for recovery of attorney's fees by a declarant.  *See* ORS 94.719; (Storti Decl., Ex. A, at § 11.3; Storti Decl., Ex. B, at Art. 13).  In addition, as discussed above, Freitag has been operating without any authority to act on behalf of the Association since as early as 2004, and at least since 2009.  *See supra* at § II.B.  So, even if a declarant still in control of a homeowners association could recover attorney's fees for defending claims against him personally, he would not be entitled to such fees in this case.

## V.    CONCLUSION

WHEREFORE, BNYM respectfully asks the Court to deny Meritage Homeowners' Association and Third-Party Defendant Kurt Freitag's Motion for Summary Judgment, and to grant BNYM's Motion for Partial Summary Judgment as to HOA and Freitag's Lack of Authority.

DATED this 20th day of October, 2017.

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

STEWART SOKOL & LARKIN LLC          LOCKE LORD LLP

By: /s/ Thomas A. Larkin                      By: /s/ Brendan Herbert
    Thomas A. Larkin, OSB #923623          Thomas G. Yoxall (*admitted Pro Hac Vice*)
    tlarkin@lawssl.com                             tyoxall@lockelord.com
    Tyler J. Storti, OSB #034695           Brendan Herbert (*admitted Pro Hac Vice*)
    tstorti@lawssl.com                             Brendan.Herbert@lockelord.com
                                                           Daron L. Janis (*admitted Pro Hac Vice*)
    *Attorneys for Defendant/Third-Party*      djanis@lockelord.com
    *Plaintiff The Bank of New York Mellon*

                                                     *Attorneys for Defendant/Third-Party Plaintiff*
                                                     *The Bank of New York Mellon*

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to this Court's Order granting BNYM's Unopposed Motion for Leave to File

Over-Length Summary Judgment Responses, Dkt. 78, this brief complies with the applicable

word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 13,959

words, including headings, footnotes, and quotations, but excluding the caption, table of

contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED this 20th day of October, 2017.

STEWART SOKOL & LARKIN LLC


By: /s/ Thomas A. Larkin
     Thomas A. Larkin, OSB #923623
     tlarkin@lawssl.com
     Tyler J. Storti, OSB #034695
     tstorti@lawssl.com

     *Attorneys for Defendant/Third-Party*
     *Plaintiff The Bank of New York Mellon*

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(503) 221-0699
FAX (503) 223-5706

## CERTIFICATE OF SERVICE

I hereby certify that I am serving the foregoing DEFENDANT/COUNTER-PLAINTIFF/

THIRD-PARTY PLAINTIFF THE BANK OF NEW YORK MELLON'S RESPONSE IN

OPPOSITION TO MERITAGE HOMEOWNERS' ASSOCIATION AND THIRD-PARTY

DEFENDANT KURT FREITAG'S MOTION FOR SUMMARY JUDGMENT on:

| | |
|---|---|
| Mark C. Hoyt | Aaron J. Potter |
| Justin M. Thorp | Troy S. Bundy |
| Sherman Sherman Johnnie & Hoyt, LLP | Hart Wagner LLP |
| 693 Chemeketa St. NE | 1000 S.W. Broadway, 20th Fl. |
| P. O. Box 2247 | Portland, OR  97205 |
| Salem, OR  97308 | E-mail: ajp@hartwagner.com |
| E-mail: mark@shermlaw.com | E-mail: tsb@hartwagner.com |
| E-mail: justin@shermlaw.com | *Attorneys for Third-Party Defendant Kurt* |
| *Attorneys for Plaintiff/Nominal Third-Party Plaintiff Meritage Homeowners' Association* | *Freitag* |

by the following indicated method or methods:

☑    by **E-filing** a full, true and correct copy thereof to the attorney, as shown above, at the electronic mail address reflected on the court's CM/ECF system, on the date set forth below.

DATED this 20th day of October, 2017.


STEWART SOKOL & LARKIN LLC


By: /s/ Thomas A. Larkin
Thomas A. Larkin, OSB #923623
tlarkin@lawssl.com
Tyler J. Storti, OSB #034695
tstorti@lawssl.com

*Attorneys for Defendant/Third-Party Plaintiff The Bank of New York Mellon*

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706