IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

MERITAGE HOMEOWNERS'
ASSOCIATION,

        Plaintiff,

   v.

BANK OF NEW YORK MELLON,

        Defendant.

Case No. 6:16-cv-00300-AA
**OPINION AND ORDER**

---

BANK OF NEW YORK MELLON,

        Third-Party Plaintiff,

   v.

KURT FREITAG,

        Third-Party Defendant.

---

AIKEN, Judge:

In this diversity action, plaintiff Meritage Homeowners' Association ("Meritage") alleges that defendant Bank of New York Mellon ("BNYM") owes more than one million dollars in dues, assessments, fees, and interest associated with a property located in a planned community on the Oregon Coast, Meritage at Little Creek. BNYM initially had a secured interest in the property; its purported liability to Meritage stems from the fact that it briefly took title to the property in connection with the former owners' Chapter 13 bankruptcy proceeding and later purchased the property in a § 363 sale under the Bankruptcy Code. BNYM asserts that it is current on all liabilities to Meritage and counterclaims for nuisance and failure to maintain common property, alleging that such failure has caused substantial damage to the property. BNYM also contends that third-party defendant Kurt Freitag ("Freitag"), the developer of Meritage at Little Creek who is in administrative control of Meritage, breached his fiduciary duty to members of Meritage.

All parties now move for partial summary judgment. Meritage also seeks a preliminary injunction restraining BNYM from filing an action in state court to appoint a receiver to take over control of Meritage. The Court heard oral argument on the motions on April 4, 2018.

For the reasons set forth below, (1) Meritage and Freitag are entitled to summary judgment with respect to the portions of the third-party claim against Freitag related to failure to maintain an adequate reserve balance, failure to provide required financial disclosures, and the placement of fitted and unfitted plywood boards over windows; and (2) BNYM is entitled to summary judgment on the issue of Freitag's authority to act on behalf of Meritage. The parties' motions are otherwise denied.

## BACKGROUND

Meritage at Little Creek is a planned community of townhouses on the Oregon coast developed by Freitag in his capacity as managing partner of Big Fish Partners I ("Big Fish"). In 2003, Freitag made a Declaration of Covenants, Conditions, and Restrictions ("the Declaration") in connection with their development of Meritage at Little Creek. The Declaration established a set of rules for the planned community: it defined Meritage's membership, allocated maintenance responsibilities, and set procedures for passing bylaws and levying dues and assessments. It also provided that Freitag, as Declarant, would retain administrative control over Meritage until a certain portion of the units were sold and conveyed to new owners.[1] Freitag retained administrative control of Meritage at all times pertinent to this lawsuit.

Meritage at Little Creek was developed in phases, with construction on the first six units commencing in late December 2003. By October 2006, the community had grown to eighteen units, which sold for between $300,000 and $400,000. In 2006, Patricia and Nicholas Watt ("the Watts") took out a loan to purchase one of those units.[2] That loan was secured by a deed of trust and promissory note.

2008 kicked off a long, tangled series of lawsuits in state and federal court related to Meritage at Little Creek. First, Meritage and Big Fish filed a construction defect action in state court, alleging defective installation of windows in all eighteen Meritage at Little Creek units ("the window litigation"). Meritage alleged that defective windows had caused substantial water

---

[1] The Declaration initially identified both Freitag and a second Big Fish partner, Rita Schaefer, as Declarants. Schaefer's status as Declarant is not relevant to the issues in this lawsuit.

[2] The sequence of events in this case is quite complex. In this opinion, the unit the Watts purchased is variously referred to as "the property," "the Watts' unit," or "BNYM's unit," depending on who owned the unit at the time being discussed.

damage to individual units as well as to common areas of Meritage at Little Creek. In 2011, the Watts and other Meritage at Little Creek owners sued Freitag, Big Fish, and Meritage in state court ("the HOA litigation"). The plaintiffs in the HOA litigation alleged claims for breach of fiduciary duty and negligence against Freitag and attempted to force Freitag to turn over control of Meritage to the unit owners. The plaintiffs in the HOA litigation also intervened in the window litigation. Later in 2011, Meritage sued the Watts and other unit owners in individual collection actions in state court ("the collection litigation") for failure to pay assessments, dues, and other fees.

While those state court actions were pending, Freitag informed the unit owners by email that a window had blown out of one of the units and crashed to the ground. Freitag stated that, because other windows were at risk of falling in similar fashion, owners would be required to cover the windows until they were repaired or replaced. The owners objected, disputing whether the windows in fact needed to be covered. They threatened to seek a temporary restraining order to stop Meritage from covering the windows.

In the midst of that dispute, a coastal storm blew out two more windows, including a window in the Watts' unit. At that point (February 2012), fitted plywood boards were placed over the windows in the Watts' unit and other units. Those boards were removed in October 2012 after the Watts signed an agreement indemnifying Meritage from liability if another window fell.[3]

In 2012, the Watts defaulted on their mortgage payments. BNYM had by then acquired the beneficial interest in the Watts' loan and was the holder of the promissory note and deed of

---

[3] The window manufacturer made repairs to the windows and the fitted plywood boards were removed. Meritage refused to remove the boards without an indemnification agreement, taking the position that the repairs (re-glazing windows with failed seals) had not addressed the conditions that led to the windows blowing out.

trust on the property. Also in 2012, the HOA litigation settled. Through a written agreement, the Watts agreed to release any claims against Meritage and Freitag arising from the same events underlying the HOA litigation.

In September 2013, Freitag, in his capacity as Declarant, approved a resolution imposing a fine of $500 per day, up to $5,000 per month, against any unit owner that failed to repair the windows or deposit money to begin the window replacement process.

In 2013, the window litigation settled. The contractor who installed the windows in the Watts' unit and other units in that same phase of Meritage at Little Creek offered a financial settlement to unit owners in exchange for a promise to either replace their windows right away or re-cover the windows with plywood. The Watts agreed and a second set of plywood coverings were placed over the windows. However, for reasons unclear from the record, the windows were not re-covered until February 2014. The Watts promised to use window litigation settlement proceeds to replace the windows and released any future claims against Meritage or Freitag related to the events underlying the window litigation. The Watts also stipulated that the windows were defective and caused water damage to the property.

In February 2014, Meritage obtained a stipulated judgment of $175,504 against the Watts in the collection litigation. That amount reflected unpaid dues as well as special assessments levied against the Watts due to their failure to replace the windows. One month later, and without having made any window repairs, the Watts filed a petition for relief under Chapter 13 of the Bankruptcy Code. In June 2014, after Meritage objected to the Watts' first two plans, the Watts proposed a second amended Chapter 13 plan. That plan included a nonstandard provision vesting the Watts' unit in BNYM upon confirmation, in satisfaction of the Watts' secured debt to BNYM. BNYM objected to that forced vesting provision because, among other reasons, owning

the property would make BNYM responsible for the ongoing obligations associated with the property—including dues and assessments. Those obligations were and are substantial. Dues for the property now exceed $25,000 per year and, as noted, assessments for failure to replace the windows ran as high as $60,000 per year.

On October 15, 2014, the bankruptcy court confirmed the plan over BNYM's objection, and BNYM took title to the property. BNYM appealed. On April 22, 2015, this Court vacated and remanded, holding that the bankruptcy court lacked statutory authority to force an objecting creditor to assume a debtor's interest in and ongoing liabilities associated with a piece of property. *Bank of N.Y. Mellon v. Watt*, 2015 WL 1879680, *7 (D. Or. Apr. 22, 2015).[4] Title to the property transferred back to the Watts, who began work on a new Chapter 13 plan. On August 12, 2015, BNYM purchased the property through a sale under 11 U.S.C. § 363. Consistent with that statute, BNYM acquired the property "free and clear" of "any interest" in the property. Storti Decl. Ex. M, Oct. 20, 2017. The § 363 sale order made clear, however, that BNYM would be required to comply with the Declaration going forward—an obligation that included paying quarterly dues and any assessments levied by Meritage under the authority of the Declaration.

In late 2015, Freitag convened Meritage's annual meeting. Freitag and Meritage's lawyer were the only people present at the meeting. Freitag determined, in his capacity as head of Meritage, that any fines or assessments related to the replacement of windows were "essentially self-renewing upon any event that would otherwise abrogate them" —for example, "in the event of a bankruptcy filing, . . . whereas the prior fines and assessments might be discharged, a new assessment and continuing fines would effectively apply beginning immediately after the filing."

---

[4] The Watts appealed that decision, but the Ninth Circuit dismissed the appeal for lack of jurisdiction. *Bank of N.Y. Mellon v. Watt*, 867 F.3d 1155, 1158 (9th Cir. 2017).

Freitag Decl. Ex. 11 at 4–5, July 17, 2017. Freitag further concluded that "even if a sale free and clear did affect [a] prior assessment, a new assessment would attach immediately after the sale." *Id.* at 5.

In January 2016, Freitag sent BNYM invoices stating that it was required to pay approximately $300,000 in assessments, fines, dues, and fees arising from pre- and post-§ 363 sale events. Jonas Decl. Ex. 1. The invoice listed a payment due date of February 15, 2016. When BNYM did not pay by that date, Meritage filed this lawsuit, seeking to recover the money it alleges BNYM owes. In its Answer, Meritage asserted counterclaims against Meritage for failure to maintain common property, unlawfully placing boards over the windows of BNYM's unit, and nuisance. Meritage also asserted a thirty-party claim against Freitag for bad faith breach of fiduciary duty.

On March 14, 2016, BNYM paid Meritage $6,685.70, the amount necessary to cover dues for the first quarter of 2016, interest on those dues (because the payment was late), and a late fee. Jonas Decl. Ex. 4 at 2. BNYM disputed that it owed any additional money at that point. Because BNYM did not pay the full amount demanded in the January invoices, Freitag applied the payment to reduce the overall amount due, declared BNYM in default, and accelerated the remaining dues payments for 2016. That pattern has repeated with each quarterly invoice: Freitag bills BNYM for dues, assessments, fines and fees; BNYM pays its quarterly dues amount; and Freitag applies that payment against the total owed rather than specifically against BNYM's dues obligation.

BNYM has not replaced the windows at the property and they remain covered with plywood. BNYM had an architect examine the property during discovery; it now contends, citing that architect's expert opinion, that the windows at Meritage at Little Creek were not

defective when installed. Rather, BNYM contends that it was Meritage's failure to maintain common property such as the exterior and chimney of the units that caused water intrusion and created the risk that windows would blow out. That theory echoes claims the Watts and other unit owners made in the HOA litigation.

The windows have now been replaced in seventeen of the eighteen units at Meritage at Little Creek, with BNYM as the only holdout. In many of the seventeen other units, the new window system was installed only after Meritage obtained money and/or title to the unit through litigation with the unit owners. Pursuant to his unilateral authority as administrative head of Meritage, Freitag required uniform replacement that amounts to a substantial upgrade; the new window system increases the glass area of the units' ocean-facing façades from sixty percent to ninety-five percent. The upgrade costs approximately $175,000, or roughly half what the typical units in Meritage at Little Creek sold for in 2006. Meritage and Freitag contend that Meritage has the authority under the Declaration to require BNYM to install a conforming window system for aesthetic reasons, regardless of whether the windows are in fact defective.

The most recent invoice in the summary judgment record is dated October 2017. That invoice demanded that BNYM pay Meritage more than one million dollars. The total billed includes, among other items, more than $60,000 in dues and associated fees and interest; the $175,000 special assessment for failure to replace the windows; more than $80,000 in window fines and interest; a $25,000 "lost discount" assessment (levied because BNYM could have installed the new window system at a reduced rate had it acted sooner); a $206,250 "economic loss assessment" related to an appraisal Meritage obtained regarding how the plywood over

windows at the property has devalued the neighboring units; and more than $300,000 in attorney's fees.[5] Jonas Decl. Ex. 4 at 29.

The parties' versions of the facts in this case could hardly be more different. Meritage and Freitag contend that Freitag did what was necessary in his capacity as head of the HOA to ensure that a dangerous condition was eliminated, unit owners' investments were protected, and Meritage remained solvent. They argue that BNYM is, without legal or factual justification, simply refusing to bear its fair share of costs. BNYM, by contrast, argues that Freitag illegally maintained control over the HOA long after the time when control should have passed to the unit owners under the Declaration and Oregon law. It avers that Freitag both failed to live up to his obligations to maintain common property in a way that caused the damage he now attributes to defective windows and used aggressive, manipulative tactics to bully unit owners until they acquiesced to his demands, resulting in extravagant upgrades that have dramatically enhanced the value of his own investment. Unsurprisingly, and as set out in more detail below, such a dramatic dispute about the facts means that most of the parties' claims cannot be resolved at the summary judgment stage.

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine

---

[5] The attorney's fees amounts are not visible on the exhibit, apparently because those line items were printed in yellow ink, a color that does not show up on the black-and-white copy included in the summary judgment record. *Compare* Jonas Decl. Ex. 4 at 26 (color copy of the July 2017 invoice) *with* Jonas Decl. Ex. 4 at 29 (black and white copy of the October 2017 invoice). However, the attorney's fee total can be discerned by and subtracting all other line items from the final "pay this amount" line.

issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

## DISCUSSION

There are four motions before me. First, Meritage and Freitag move for summary judgment on all BNYM's counterclaims and third-party claims. Second, Meritage and Freitag move for summary judgment on a portion of Meritage's first claim for relief, related to BNYM's liability for dues, assessments, and related fees and interest. Third, BNYM moves for summary judgment on the issue of Freitag's authority to carry out the actions giving rise to Meritage's claims. Finally, Meritage seeks a preliminary injunction to prevent BNYM from filing a receivership action in state court during the pendency of this case. Below, I address each motion in turn.

I.    *BNYM's Counterclaims Against Meritage and Third-Party Claims Against Freitag*

Meritage and Freitag contend that they are entitled to summary judgment on all of BNYM's counterclaims and third-party claims for five reasons. First, they argue that BNYM is bound by the Watts' release of claims through the settlement agreements in the HOA litigation and the window litigation. Second, they aver that BNYM is bound by a separate covenant, recorded in Lincoln County, in which the Watts agreed not to sue over facts and circumstances alleged in the window litigation. Third, they assert that BNYM is judicially estopped from taking any factual position inconsistent with the facts to which the Watts stipulated in the settlement agreements and the covenant, including that the windows at the property are defective

and cause water intrusion. Fourth, they argue that BNYM's claims against Freitag are derivative actions, and thus must fail due to pleading deficiencies and because Oregon law does not authorize derivative actions against homeowners' associations. Finally, Meritage and Freitag assert that BNYM has produced insufficient evidence in support of its claims.

A. *Releases in Settlement Agreements*

First, Meritage and Freitag argue that BNYM's counterclaims and third-party claims are barred by the Watts' promise to release claims in two contracts between the Watts and Meritage: the settlement agreement from the window litigation and the settlement agreement from the HOA litigation. Both agreements, in broad terms, released present and future claims arising out of the facts underlying lawsuits. Both agreements also purported to bind the "successors" and "assigns" of the contracting parties. *See* Bundy Decl. Ex. 4 at 1 & Ex. 8 at 4, Aug. 1, 2017. BNYM appears to be both the Watts' successor and assignee with respect to the property. *See* Assignee, Black's Law Dictionary (10th ed. 2014) (defining "assignee" as "someone to whom property rights or powers are transferred by another"); Successor, Black's Law Dictionary (10th ed. 2014) (defining "successor" as "someone who succeeds to the office, rights, responsibilities, or place of another; one who replaces or follows a predecessor").

As an initial matter, BNYM cites *Erection Co., Inc. v. W & W Steel, LLC*, 2011 WL 5008325, *9–*10 (D. Or. Oct. 20, 2011) for the proposition that the settlement agreements are unenforceable because not all parties to the litigation signed the agreements. In *Erection Co.*, two businesses sent various drafts of an agreement back and forth. They finally reached an agreement on terms, but the deal fell apart before both parties signed a final version of the contract. A letter of intent signed by both parties before the negotiations began provided that the contract "shall be effective *only* . . . when signed by all parties." *Id.* at *2 (emphasis in original).

This Court held that the agreement was not enforceable. Ultimately, *Erection Co.* is not on point. Here, although some parties to the litigation did not sign the final agreements, both the Watts and Meritage did sign them. The Watts were therefore bound by their promise to abide by the terms of the agreements.

The question, then, is whether the Watts' promises bind BNYM. "The interpretation of a settlement agreement is governed by principles of state contract law." *Botefur v. City of Eagle Point, Or.*, 7 F.3d 152, 156 (9th Cir. 1993). It is plain from the language of the agreements that the Watts *intended* to release the claims of their successors and assignees. But, as a general rule, parties to a contract have no power to bind third parties without their consent. *Cf. Drury v. Assisted Living Concepts, Inc.*, 262 P.3d 1162, 1165–66 (Or. Ct. App. 2011) (holding that requiring a third-party beneficiary to arbitrate a contractual claim without first determining whether that beneficiary assented to the agreement would "allow contracting parties to alter the rights of a third party, based on whatever consideration the contracting parties intend to provide to the third party, and without regard for whether the third party deems that consideration to be an adequate exchange for the contractual obligations").

BNYM cites several cases from other jurisdictions holding that when a corporation's assets are sold in an arms-length transaction, the purchasing entity is not liable for the corporation's debts or obligations as a successor or assignee. *See, e.g., Cargo Partners v. Albatrans, Inc.*, 352 F.3d 41, 44–45 (2d Cir. 2003). Meritage and Freitag correctly point out that those cases are about the *de facto* merger doctrine, which is specific to corporate law. Nevertheless, I find the reasoning of those cases useful in adjudicating the question presented here. The *de facto* merger doctrine provides that, "when one corporation purchases all of the assets of another corporation, the purchasing corporation does *not* become liable for the debts

and liabilities of the selling corporation." *Tyree Oil, Inc. v. Bureau of Labor & Indus.*, 7 P.3d 571, 573 (Or. Ct. App. 2000). There are four exceptions to that rule:

> (1) Where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporations; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts.

*Id.* at 573–74. In other words, the *de facto* merger doctrine asks whether there is some special reason to depart from the general rule and hold a successor corporation liable for the debts of its predecessor.

Analogous reasoning can be applied here. There is no special reason in this case to depart from the baseline rule that contracting parties generally cannot bind absent third parties and hold BNYM to the promises the Watts made. Meritage and Freitag have failed to carry their burden to convince me that BNYM should be so bound. Their argument rests entirely on their assertion that the contract language plainly covers successors and assigns, and BNYM is both a successor and an assign. I agree on both points, but that argument simply misses the mark; BNYM was not a party to the agreements, and nothing in the summary judgment record suggests that I should depart from the usual rule and require BNYM to abide by promises it did not make. Thus, the releases of claims in the agreements do not bind BNYM.[6]

B.     *Covenant Not to Sue*

Meritage and Freitag next argue that BNYM's counterclaims and third-party claims are barred by a release contained in a restrictive covenant signed by the Watts and recorded in Lincoln County on February 24, 2014. In Oregon, "[c]ovenants running with the land are

---

[6] Because BNYM is not bound by the agreements, it is unnecessary for me to decide whether either agreement contains an anticipatory release of claims that violates public policy. *See Bagley v. Mt. Bachelor, Inc.*, 340 P.3d 27, 36–37, (Or. 2014) (invalidating a contractual anticipatory release on the ground of unconscionability).

binding upon and enforceable against subsequent purchasers with notice." *Texas Co. v. Butler*, 256 P.2d 259, 263 (Or. 1953). For a covenant to run with the land, "(1) there must be privity of the estate between the promisor and his successors; (2) the promisor and promisee must intend that the covenant run; (3) the covenant must touch and concern the land of the promisor; and (4) the promisee must benefit in the use of some land possessed by him as a result of the performance of the promise." *Nordbye v. BRCP/GM Ellington*, 266 P.3d 92, 101 (Or. Ct. App. 2011) (quoting *Johnson v. Highway Division*, 556 P.2d 724 (Or. Ct. App. 1976)). Even if the technical requirements for a restrictive covenant are not met, the release of claims in the covenant may be enforceable as an equitable servitude. In Oregon, a "promise is binding as an equitable servitude if (1) the parties intend the promise to be binding; (2) the promise concerns the land or its use in a direct and not a collateral way; and (3) the subsequent grantee has notice of the covenant." *Ebbe v. Senior Estates Golf & Country Club*, 657 P.2d 696, 700 (Or. Ct. App. 1983).

The Watts agreed that they, and their "successors and assigns[,] . . . shall not bring any future claims . . . arising out of, or related to, or in any way caused by the facts and circumstances alleged in the Window Litigation or related lawsuits . . . which could have been alleged [in those lawsuits.]" Bundy Decl. Ex. 10 at 2–3, Aug. 1, 2017. It is undisputed that there is privity of estate between the Watts and BNYM and that BNYM had constructive notice of the covenant, which was recorded before the § 363 sale. *See Huff v. Duncan*, 502 P.2d 584, 585 (Or. 1972). It is also clear from the use of the terms "successors and assigns" that the parties intended the covenant to run with the land. *See Butler Family Ltd. P'ship v. Butler Brothers, LLC*, 388 P.3d 1135, 1141 (Or. Ct. App. 2017). Thus, the parties' dispute over enforceability boils down to whether the covenant touches and concerns the land (the third prong of the restrictive

covenant test) or concerns the land or its use in a direct way (the second prong of the equitable servitude test).

At first glance, those two requirements appear somewhat different. However, the Oregon Court of Appeals has stated that "an equivalent formulation of the 'touch and concern' requirement is whether the promise is one respecting the use of the land of the promisor." *Ebbe*, 657 P.2d at 700 (quoting *Huff*, 502 P.2d at 584 n.2). Oregon courts eschew "applying the rule of touching and concerning in an overtechnical manner," and ask whether non-lawyers "would naturally regard the covenant as intimately bound up with the land, aiding the promisee as landowner or hampering the promisor in similar capacity[.]" *Abbott v. Bob's U-Drive*, 352 P.2d 598, 604 (Or. 1960). In light of that case law, I see no principled distinction between the third prong of the restrictive covenant test and the second prong of the equitable servitude test.

Whether the promise here touches and concerns the land presents a difficult and novel question of state law. In *Huff*, the Oregon Supreme Court held that a restriction requiring land to be used for residential purposes touched and concerned the land. 502 P.2d at 585. In *Abbott*, the court held that, because a covenant to pay rent touches and concerns the land, a covenant to arbitrate rent disputes also touched and concerned the land. 352 P.2d at 604. In *Ebbe*, the court held a restrictive covenant related to fees for maintaining an adjacent golf course did *not* touch and concern the land because subsequent purchasers had neither the right nor the obligation to become members with rights to use the golf course. 657 P.2d at 702. Finally, in *Summer Oaks Limited Partnership v. McGinley*, 55 P.3d 1100, 1105 (Or. Ct. App. 2002), the Oregon Court of Appeals held that "system development charge" credits available from the city to offset the costs of certain land improvements did not touch and concern the land because the credits were not tied to any particular parcel of land.

In *Summer Oaks*, the Oregon Court of Appeals began

> by acknowledging that the resolution to that question, or more specifically how to
> resolve it in the unique context of this dispute, is not obvious. That, largely, is
> due to the fact that, legally, the thing underlying this dispute—SDC credits—are
> 'neither fish nor fowl;' they relate neither to the title of the land nor are they
> neatly categorized as covenants or equitable servitudes that are more typically
> susceptible to the 'run with the land'-type analysis.

*Id.* at 1104–05. This case presents a similar "neither fish nor fowl" conundrum. *Id.* at 1105.

The covenant in question is connected to the land because it relates to a promise not to sue over

issues that were or could have been litigated in a construction defect lawsuit related to the

property. But the connection to land is somewhat attenuated; the covenant does not directly

restrict what a subsequent purchaser can or cannot do *with the property.* In sum, the Oregon

cases on the scope of "touch and concern" do not resolve whether the covenant in this case

touches and concerns the land. Accordingly, I turn to other jurisdictions for guidance.

The Washington Supreme Court has held that a promise not to sue may be a covenant

that runs with the land. *1515–1519 Lakeview Blvd. Condominium Ass'n v. Apartment Sales

Corp.*, 43 P.3d 1233, 1239 (Wash. 2002). In that case, the covenant in question required owners

of a particular piece of property to warn prospective purchasers that the property was a potential

"slide area" and released any claims against the city relating to soil movement. *Id.* at 1235–36.

The court noted the dearth of on-point case law and concluded that it was "an open question

whether a covenant warning of risk and exculpating liability for that risk touches and concerns

the land." *Id.* at 1238. The court then concluded that the covenant satisfied Washington's touch

and concern doctrine because "the covenant [wa]s limited to the reasonable enjoyment of the

land and limits rights normally associated with ownership" and "few things touch and concern

land more than the soil itself." *Id.* at 1239.

The Fifth Circuit Court of Appeals reached the opposite conclusion in *In re El Paso Refinery, LP*, 302 F.3d 343 (5th Cir. 2002). That case concerned an oil refinery. The court had to decide whether, under Texas law, a covenant not to "assert any claims for contribution and/or indemnity . . . for environmental liability" against the owner of the refinery's bankruptcy estate was enforceable against a subsequent purchaser. *Id.* at 347. The court began by explaining that a covenant may run with the land when it "affects the nature, quality or value of the thing demised, independently of collateral circumstances, or if it affects the mode of enjoying it." *Id.* at 356 (quoting *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 911 (Tex. 1982)) (internal quotation marks omitted and alterations normalized). It distinguished such covenants from personal covenants, which "affect[] the grantor personally and [are] unrelated to the use of the land." *Id.* Applying those tests, the Fifth Circuit held that the covenant in question did not touch and concern the land.

> Any burden or benefit credited by the [covenant] affects only [the debtor] personally and has no direct impact upon the land itself. The Refinery's owner may, in accordance with the [covenant]'s provisions, take remedial action or not take remedial action, pollute or not pollute, as long as contribution is not sought from [the debtor]. The covenant does not compel nor preclude the promisor or any subsequent owner from doing anything on the land itself.

*Id.* at 356–57.

Finally, in *Calabrese v. McHugh*, 170 F. Supp. 2d 243, 254 (D. Conn. 2001), the United States District Court for the District of Connecticut held that a promise not to sue did not touch and concern the land. In that case, a former manufacturer of brass products sold off portions of a thirty-acre landfill. *Id.* at 249. The recorded warranty deed in one of those sales purported to release the manufacturer from all claims for loss or damage related to the landfill's prior use "as a dump for fly-ash, cinders, and other refuse[.]" *Id.* Applying Connecticut law, the court held that the release "confer[red] a personal benefit" on the manufacturer but neither "conferred a

benefit on the remaining land" nor "impose[d] any burden" on the parcel itself. *Id.* at 254. Even though the text of the warranty deed made clear that the parties had *intended* the covenant to run with the land, its connection to the land was too tenuous to make it enforceable against subsequent purchasers. *Id.* at 255.

I find the reasoning of the Fifth Circuit and District of Connecticut persuasive and adopt it here. The release of claims in the covenant the Watts signed does not directly concern the windows at the property; rather, it purports to prevent subsequent owners from suing Meritage or Freitag in particular disputes related to those windows. In other words, the covenant's primary purpose is not to promote or prevent any particular use of the land, but to protect certain entities and individuals from liability. The release therefore is not enforceable as a restrictive covenant because it does not touch and concern the land. Similarly, it is not enforceable as equitable servitude because it does not concern the land or its use in a direct way. The covenant does not bar BNYM's counter-claims or third-party claims.[7]

C.    *Judicial Estoppel*

Meritage and Freitag next contend that the settlement agreements and covenant contain stipulated facts that bind BNYM in this litigation. As explained above, (1) BNYM was not a party to the settlement agreements and there are no special circumstances that support requiring BNYM to honor the terms of those agreements and (2) the covenant does not run with the land and is not enforceable as an equitable servitude against BNYM. Nevertheless, Meritage and

---

[7] Because BNYM is bound by neither the settlement agreements nor the covenant not to sue, I need not decide whether obligations under those agreements were cut off by the § 363 sale—a novel and difficult question of statutory interpretation that turns on whether Meritage's rights under the settlement agreements and the covenant constitute "claims" within the meaning of the Bankruptcy Code. *See In re Motors Liquidation Co.*, 829 F.3d 135, 155 (2d Cir. 2016) (acknowledging the breadth of the phrase "free and clear of any interest" but holding that a bankruptcy court's authority to cut off liabilities via a § 363 is no broader than its authority to extinguish debts through the bankruptcy process generally).

Freitag contend that BNYM is judicially estopped from taking factual positions contrary to the stipulations in the settlement agreements and covenant. Specifically, Meritage and Freitag argue that BNYM cannot take the position in this lawsuit that the windows were not defective and did not cause water intrusion.

Judicial estoppel is an equitable doctrine that protects the integrity of the judicial process by precluding a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position. *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600–01 (9th Cir. 1996). It applies only in cases where a court "relied on, or 'accepted,' the party's previous inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001). Obtaining a "favorable settlement constitutes the success required" for judicial estoppel to apply. *Rissetto*, 94 F.3d at 605. Even when the claim at issue arises under state law, "federal law governs the application of judicial estoppel in federal court." *Id.* at 603.

Judicial estoppel does not apply here. BNYM never agreed to the stipulated facts in the settlement agreements or the covenant; it therefore cannot possibly take an inconsistent position in this lawsuit. Meritage and Freitag insist that judicial estoppel nonetheless applies because the Watts and BNYM were in privity with one another. But in the context of judicial estoppel, privity means that "one of the parties to the earlier suit is so closely aligned with the non-party's interests as to be its virtual representative." *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 996 (9th Cir. 2012). That is plainly not the case here; the Watts and BNYM have been at odds over many issues related to this dispute, including when the Watts defaulted on their loan and when the Watts included a forced vesting provision in their bankruptcy plan.

BNYM is not judicially estopped from arguing that the windows are functioning and that water damage to the unit was caused by something else.

D.     *Derivative Action*

Meritage and Freitag also challenge BNYM's third-party claims against Freitag on the ground that BNYM cannot proceed with a derivative action in this case. A derivative action is a suit brought by an individual shareholder to enforce "a right that the corporation . . . may properly assert but has failed to enforce." Fed. R. Civ. P. 23.1(a). "Devised as a suit in equity, the purpose of the derivative action is to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1147–48 (9th Cir. 2014) (internal quotation marks omitted). Ordinarily, a party seeking to bring a derivative action must go to the corporation's board of directors to demand that it file a lawsuit or take other action to protect its own interests. *Sommers ex rel. FLIR Sys., Inc. v. Lewis*, 641 F. Supp. 2d 1151, 1156 (D. Or. 2009). Alternatively, a derivative-action plaintiff may plead "demand futility," which requires alleging that "the particularized factual allegations of the derivative . . . complaint create a reasonable doubt that the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* (quoting *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)) (alterations normalized). Federal courts look to the law of the state in which the company was incorporated in order to determine whether a derivative action may proceed. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989–990 (9th Cir. 1999), *abrogated on other grounds*, *S. Ferry L.P., No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

BNYM appears to have intended to plead its third-party claim against Freitag both as an individual claim and as a derivative action. *Compare* Am. Answer ¶ 70 ("As a consequence of

Mr. Freitag's breaches of fiduciary duties and bad faith, Meritage HOA has been and continues to be damaged in an amount to be proven at trial[.]") *with id.* ¶ 71 ("As a consequence of Mr. Freitag's breaches of fiduciary duty and bad faith, BNYM has been and continues to be directly damaged in an amount to be proven at trial."). BNYM alleges both shared harms (*e.g.*, failure to maintain common property) and individual harms (*e.g.*, receipt of inferior maintenance because it is involved in litigation with Meritage). Because BNYM alleges it has been harmed individually by Freitag's actions, it has individual standing to assert its third-party claim against Freitag. *See Noakes v. Schoenborn*, 841 P.2d 682, 687 (holding that minority shareholders could proceed with individual claims against majority shareholders because they had "allege[d] harm to themselves distinct from the harm to the corporation"); *cf. Gubitosi v. Zegeye*, 28 F. Supp. 2d 298, 306 (E.D. Pa. 1998) ("Where . . . the alleged harm being sued upon was suffered directly by the individual limited partners, it is not necessary that a derivative claim be asserted—the limited partners have standing to sue on their own behalf for damages which they themselves individually suffered.").

BNYM also may proceed with its claim as a derivative action. Meritage and Freitag argue that Oregon law does not authorize derivative actions against homeowners' associations. But homeowners' associations are nonprofit corporations. Or. Rev. Stat. § 94.625(1). Under Oregon law, any member with more than two percent voting power and any director of the nonprofit may bring a derivative action in the nonprofit's name. *Id.* § 65.174(1). The Oregon Court of Appeals has held, in a different context, that when "nothing in [the Planned Community Act] purport[s] to preclude or qualify the application" of Oregon's statute governing nonprofits to homeowners' associations, the law applies to the homeowners' association as it would to any other nonprofit. *Goodsell v. Eagle-Air Estates Homeowners Ass'n*, 278 P.3d 133, 137 (Or. Ct.

App. 2012). The Planned Community Act is silent with respect to whether a derivative action may be brought to enforce the rights of a homeowners' association. Accordingly, a derivative action is available under the Oregon statutes governing nonprofit corporations.

The only remaining question is whether BNYM has adequately pleaded a derivative action under Federal Rule of Civil Procedure 23.1. Because Freitag is the sole administrator of Meritage and obviously would not agree to bring a claim against himself, BNYM has adequately pleaded demand futility. Meritage and Freitag nevertheless argue that two of Rule 23.1's requirements are not met. First, they argue that BNYM cannot satisfy the requirement of being a shareholder at the time of the transactions alleged. Fed. R. Civ. P. 23.1(b). I am not persuaded. Because BNYM alleges breach of fiduciary duty, its claim against Freitag—whether asserted individually or derivatively—is limited to the period of time during which Freitag owed it such a duty, *i.e.*, the time when BNYM was a member of Meritage. That BNYM only become a member of Meritage after the § 363 sale is therefore not a reason to dismiss its derivative claim.

Meritage and Freitag also argue that BNYM is not a fair and adequate representative of the other members of Meritage, in violation of Federal Rule of Civil Procedure 23.1(a). The burden is on Meritage and Freitag to show that BNYM does not meet that requirement. *Guenther v. Pac. Telecom, Inc.*, 123 F.R.D. 341, 344 (D. Or. 1987). For the purposes of Rule 23.1(a), "[a]n adequate representative must have the capacity to vigorously and conscientiously prosecute a derivative suit and be free from economic interests that are antagonistic to the interests of the class." *Larson v. Dumke*, 900 F.2d 1363, 1367 (9th Cir. 1990). Courts considering adequacy of representation under Rule 23.1 should consider:

> (1) indications that the party advancing the derivative claims is not the true party in interest, (2) the claimant's unfamiliarity with the litigation and unwillingness to learn about the suit, (3) the degree of control exercised by the attorney over the litigation, (4) the degree of support received by the claimant from the other

shareholders, (5) the lack of any personal commitment to the action on the part of the representative claimant, (6) the remedy sought by the claimant in the derivative action, (7) the relative magnitude of the claimant's personal interests as compared to the derivative action itself, and (8) the claimant's vindictiveness toward the opposing party.

*Field Turf Builders, LLC v. FieldTurf USA, Inc.*, 2010 WL 817628, *3 (D. Or. Mar. 4, 2010) (citing *Larson*, 900 F.2d at 1367). "[T]he most important element to be considered is whether [the purported representative's] interests are antagonistic to those plaintiff is seeking to represent." *Puri v. Khalsa*, 674 F. App'x 679, 682 (9th Cir. 2017) (unpublished) (quoting 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1833 (3d ed. 2016)). There is no *per se* rule against maintaining simultaneous individual and derivative claims; rather, courts must "look behind the surface duality of the two types of actions, and . . . allow them to proceed unless an actual conflict emerges." *In re Tarcyznski*, 2015 WL 728410, *6 (9th Cir. B.A.P. Feb. 19, 2015).

Whether BNYM can fairly and adequately represent the interests of Meritage's other owners is a close question. On the one hand, there is ample vindictiveness between BNYM and Freitag. In addition, now that seventeen of the eighteen units in Meritage at Little Creek have the new window system, it arguably disadvantages the other owners if BNYM prevails in its argument that the windows do not need to be replaced. That is because a single unit that is different aesthetically may reduce the other units' property value. On the other hand, BNYM is the true party in interest and it has deep familiarity with and personal commitment to this case. Moreover, BNYM's interests are aligned with the other unit owners in other ways. BNYM challenges Freitag's authority on many of the some grounds raised by other unit owners in the failed HOA litigation. Unit owners who were plaintiffs in that case presumably still want to see control of Meritage taken away from Freitag. And if BNYM is correct that Freitag has shirked

his responsibility to maintain common property, all unit owners would benefit from a judgment in BNYM's favor.

In November 2015, Freitag emailed fourteen of Meritage's other members the following message: "As we all know, the windows [in BNYM's unit] must be replaced. The real question here is who will pay. [BNYM] argues, in effect, that it should not have to pay but rather it should be the financial obligation of the homeowners' group as a whole." Bundy Decl. Ex. 28 at 3, Aug. 1, 2017. The email went on to request other owners' feedback regarding whether Meritage members should share the expense of replacing the windows in BNYM's unit or BNYM should fund that replacement. Unsurprisingly, four people responded to say that they believed BNYM should pay for the window replacement; nobody responded to say that Meritage should foot the bill. Freitag and Meritage seem to think that this is powerful evidence that BNYM and the other Meritage members have divergent interests, but I am not convinced. Of course other unit owners do not want to be held financially responsible for replacing the windows in a unit that is not their own. But that is not what would happen if BNYM were to prevail on its claims in this lawsuit. The relevant evidence of support (or opposition) of other Meritage owners in this case relates to whether those owners support removing Freitag from his position of authority in the homeowners' association. The best evidence on that point is the 2011 HOA litigation, in which nearly all unit owners sought that same remedy—though due to the passage of time, the power of that evidence has weakened.

On balance, I conclude that Freitag and Meritage have failed to carry their burden to show that BNYM has a real conflict that will prevent it from vigorously and conscientiously prosecuting its derivative claims. BNYM may proceed both individually and derivatively with its claim against Freitag.

E.    *Adequacy of Evidence*

Finally, Meritage and Freitag contend that they are entitled to summary judgment because there is insufficient evidence in the summary judgment record to support the conclusion that they are liable on any of BNYM's counterclaims or third-party claims.

1.    *Counterclaims Against Meritage*

BNYM asserts three counterclaims against Meritage. First, BNYM seeks declaratory and injunctive relief relating to Meritage's alleged failure to "uphold its maintenance obligations" under the HOA's governing documents. Am. Answer ¶ 44. Specifically, BNYM asserts that Meritage has "failed to maintain siding, trim, exterior chimney, and other elements" of common property and that Meritage has "provided lower levels of maintenance to unit owners while those unit owners were or are in active litigation with Meritage HOA." *Id.* Substantial questions of material fact remain with respect to this counterclaim. BNYM submitted the declaration of David York, an architect who has been licensed in Oregon for thirty-three years. In his declaration, York states that it is his professional opinion that "lack of exterior maintenance" is the source of water intrusion and damage to the property; that the windows were code-compliant when installed and do not need to be replaced; and that the units that had newer window systems "also had visibly better newer, fully maintained exteriors built of newer materials, while the unit exteriors with older window systems – like BNYM's Unit – were visibly weathered, unkept and in need of basic maintenance and material replacement." York Decl. ¶¶ 5–6, Oct. 20, 2017. York's declaration provides support for concluding both that Meritage failed to maintain common property in a way that caused the damage it now attributes to defective windows and that Meritage has given preferential maintenance services to unit owners with whom it was not engaged in litigation. Of course, the record also contains contrary evidence tending to show that

defective windows caused the damage and explaining that upgrades to exterior elements of the units are made only after the defective windows are replaced. But that evidence merely establishes disputed questions of material fact. Meritage's first counterclaim cannot be resolved at the summary judgment stage.

Second, BNYM seeks declaratory and injunctive relief relating to Meritage's placement of plywood boards over certain windows at the property. BNYM contends that the windows in the unit "are performing" and that "there is no safety or other valid reason to require that plywood remain over the windows." Am. Answer ¶ 53. Moreover, BNYM alleges that Meritage initially placed "relatively inconspicuous" fitted plywood boards over the windows, but later replaced those fitted boards with "conspicuous and unattractive" unfitted plywood boards. *Id.* ¶¶ 51–52. Once again, substantial questions of material fact remain with respect to this counterclaim. Meritage leans heavily on the fact that the Watts conceded to the placement of the plywood boards over the windows through the settlement agreement in the window litigation. I agree that the Watts' consent shields Meritage from liability on this claim during the Watts' ownership of the property, and likely for a reasonable period of time thereafter.[8] However, because BNYM never consented to having the plywood over the windows and has asked to have it removed and because there is conflicting evidence in the summary judgment record regarding whether the windows are defective or need to be replaced, there necessarily are disputed questions of material fact regarding whether Meritage has *continuing authority* to require the plywood boards to remain over the windows.

---

[8] Meritage and Freitag argue that, if BNYM is not the Watts' "successor and assign" such that it is bound by the settlement agreements, it lacks standing to assert its counterclaims and third-party claims with respect to the period of time when the Watts owned the property. But BNYM has voluntarily limited its claims to events occurring during the period of time after the § 363 sale, with respect to which it clearly has standing.

Third, BNYM asserts a claim for nuisance against Meritage. It contends that Meritage's alleged failure to maintain common property pursuant to its obligations under the HOA governing documents "is causing moisture intrusion and other property damage to the exterior of the building that has begun or will soon begin to migrate into the interior of the building." Am. Answer ¶ 58. BNYM seeks damages to cover the cost of investigation, repair, and remediation of the property. Reasonable jurors could rely on York's expert opinion to conclude that Meritage is liable for damages on this third counterclaim. Meritage is therefore not entitled to summary judgment on any of BNYM's counterclaims.

### 2. Third-Party Claims Against Freitag

BNYM asserts a single third-party claim against Freitag, for bad faith breach of fiduciary duty. BNYM alleges that Freitag owes a fiduciary duty to the Meritage HOA and to individual Meritage homeowners, including to BNYM. BNYM further contends that Freitag has "grossly negligently or recklessly" breached that duty by incurring significant expenses that are not in the best interests of the Meritage HOA or its owners; failing to provide unit owners with the disclosures required under Oregon law; failing to fully fund and maintain adequate reserve account balances; wrongfully asserting fines and penalties for allegedly defective windows; wrongfully asserting authority to require plywood boards to be placed over functioning windows, wrongfully placing first fitted and then unfitted plywood boards over those windows; failing to hire adequate management and maintenance staff; failing to maintain common property and providing lower quality service to BNYM's unit; and retaliating against unit owners who engage in litigation with the HOA.[9] Am. Answer ¶ 69.

---

[9] The Amended Answer also alleges that Freitag wrongfully assessed owners for expenses attributable to him personally and approved conflict-of-interest transactions. Am. Answer ¶¶ 69(i)–(ii). At its 30(b)(6) deposition, BNYM voluntarily withdrew those allegations.

There is insufficient evidence in the summary judgment record to proceed on two of the allegations outlined above: the allegation that Freitag failed to provide required disclosures (subsection iv of Paragraph 69 of the Amended Answer) and the allegation that Freitag failed to maintain adequate reserve funds (subsection v). In response to Meritage and Freitag's motion for summary judgment, BNYM cites (1) Freitag's deposition testimony that, in March 2015, the HOA's reserve account was about half the size it previously had been; (2) Freitag's admission that he has not made it a practice to distribute the mandatory reserve study reports to all owners; and (3) BNYM's attestation that it never has received an updated reserve study or budget since it took title to the property. That evidence is insufficient. First, that a reserve account is fifty percent of what it once was is not useful information in a vacuum; BNYM has not explained what an adequate reserve balance would be for the HOA or cited any evidence comparing reserve balances to that standard. Second, the status of the HOA's reserve account in March 2015 does not provide sufficient information to support a claim that the account was inadequately funded five months later, when BNYM acquired the property. With respect to the disclosures, BNYM filed its initial Answer in this lawsuit in April 2016, about nine months after it acquired the property in the § 363 sale. It has not cited specifically which budgets or reserve studies it should have received but did not receive, and Freitag's testimony that it was not his regular practice to distribute those documents to all owners is insufficient to create a question of material fact on this issue. Moreover, a stipulation of facts filed October 19, 2017, establishes that BNYM had in fact received budget documents related to the years 2013, 2014, 2015, and 2016, through discovery *prior* to the May 2017 filing of its Amended Answer. Accordingly, Freitag is entitled to summary judgment on the theories outlined in subsections iv and v of

Meritage Homeowners' Ass'n & Third-Party Def. Kurt Freitag's Reply Supp. Mot. Summ. J. Ex. 30 at 6–7 (doc. 88-2).

Paragraph 69 of the Amended Answer. Freitag is also entitled to summary judgment on subsections ix and x of that paragraph, which relate to the placement of the fitted and unfitted plywood boards over the windows, as those boards were placed during the Watts' ownership of the unit.

There is, however, sufficient evidence to support the conclusion that Freitag took (or failed to take) the remaining actions listed above. The evidence supporting the allegations regarding failure to maintain common property (subsection xii), failure to hire adequate management and maintenance staff (subsection xi), providing lower quality maintenance service to certain unit owners (subsection xiii), requiring plywood boards to remain over the windows (viii), and retaliating against certain unit owners (subsection xiv) is sufficient for the reasons set forth in Section I.E.1, *supra*. With respect to the alleged incursion of expenses not in the interest of the HOA (subsection iii) and wrongful assertion of fines and penalties for allegedly defective windows (subsections vi and vii), the summary judgment record establishes that Meritage and Freitag have required unit owners not only to replace but to substantially upgrade the windows in their units. Freitag has also presided over the decision to levy assessments of thousands of dollars per month against unit owners who did not replace the windows. In addition, Freitag was in charge of the decision to incur hundreds of thousands of dollars in legal fees—in this lawsuit and in other lawsuits. Those facts are sufficient evidence to permit the allegations contained in subsections iii, vi, and vii to stand.

There is also a genuine dispute of material fact as to whether Freitag acted in bad faith or in a grossly negligent or reckless manner. Whether Freitag's actions rose to the level of gross negligence or recklessness is a question of fact. *Oregon Auto. Ins. Co. v. Fitzwater*, 531 P.2d 894, 898 (Or. 1975). As explained in Section III, *infra*, Freitag lacked legal authority to retain

administrative control of Meritage beyond June 5, 2004; that conclusion, while not dispositive to BNYM's third-party claim, is relevant to the determination of whether Freitag acted recklessly or with negligence.

The evidence here is capable of supporting dramatically different conclusions regarding whether Freitag breached his fiduciary duty and whether any such breach was in bad faith. One possible reading of the record is that Freitag, faced with a dangerous construction defect and a subgroup of owners who refused to step up to their obligations to address a pressing safety issue, zealously used the authority of the HOA in an attempt to responsibly and promptly resolve the problem, thereby protecting the owners who wanted to do the right thing and equitably distributing costs across all members of the HOA. But another plausible inference from the summary judgment evidence is that Freitag used a construction defect lawsuit and his powers under the HOA's governing documents to consolidate his own power and increase the value of his own investments by forcing owners to pay for upgrades that were unnecessary and incredibly costly when compared to the value of the underlying units.

In sum, Freitag is entitled to summary judgment on the portion of BNYM's third-party claim that relates to his alleged failure to maintain adequate reserve funds, provide required financial disclosures, and place fitted and unfitted plywood boards over the property's windows. Otherwise, Freitag's motion for summary judgment on the third-party claim is denied.

II.     *Meritage's Claim for Damages and Injunctive Relief under the Planned Community Act*

Meritage and Freitag next move for summary judgment with respect to money damages from (1) dues that accrued while BNYM had title to the property pursuant to the Bankruptcy Court's confirmed plan, from October 17, 2014 through April 22, 2015 ("Vacated Plan Period"); (2) dues that accrued after BNYM took title in the 363 sale, from August 12, 2015 to the present

("Post-§ 363 Sale Period"); (3) an assessment for failure to replace the windows in BNYM's unit after BNYM took title in the § 363 sale; and (4) fines and interest associated with each.

A.    *Dues During Vacated Plan Period*

Plaintiffs first seek summary judgment on the question of BNYM's liability for dues, interest, and collection/late fees assessed during the Vacated Plan Period. BNYM responds that because the plan was vacated, it has no ownership liabilities that predate the § 363 sale.

I agree with BNYM. The term "vacate" means "to nullify or cancel; make void; invalidate[.]" Black's Law Dictionary (10th ed. 2014). In a host of legal contexts, the Ninth Circuit has held that vacatur retroactively invalidates the prior decision. *See, e.g., Massachi v. Astrue*, 486 F.3d 1149, 1154 (9th Cir. 2007) (holding that when the Appeals Council vacates an ALJ's original decision, "the ALJ's original finding no longer exist[s]."); *United States v. Crowell*, 374 F.3d 790, 792 (9th Cir. 2004) (distinguishing expungement from vacatur, and noting that, "[w]hen a court vacates a conviction, it sets aside or nullifies the conviction and its attendant legal disabilities[.]"); *Wiedersperg v. I.N.S.*, 896 F.2d 1179, 1182 (9th Cir. 1990) (holding that a state court order vacating a criminal conviction that had triggered deportation retroactively rendered that deportation unlawful). When I vacated the order confirming the bankruptcy plan, the legal effect as to the forced vesting provision was that it never existed. BNYM's failure to seek a stay under Federal Rule of Bankruptcy Procedure 8007 was a gamble—had it lost on appeal, it would have been liable not only for dues but for interest and fees associated with those dues. But it was a gamble that paid off. *Cf. In re Brown*, 563 B.R. 451, 454 (D. Mass. 2017) (stating that a creditor who decided to go ahead with a foreclosure sale without seeking a stay ran "the risk that this court would uphold the forced vesting provision").

Plaintiffs insist that this result is unfair because it effectively bars them from recovering dues for the vacated plan period from anyone. They cite my statement in *Watt*, 2017 WL 1364209 at *1, that "[t]he practical effect of th[e] complex procedural history" in that case was that, "after they filed for bankruptcy, the Watts were the owners of the property for two periods of time:" from "the date of the Chapter 13 filing" to "the date of plan confirmation, when BNYM took title," and from "the date of this Court's order vacating the order confirming plan" to the "date of the § 363 sale to BNYM[.]" Plaintiffs argue that this statement necessarily implies that the Watts had no ownership responsibilities during the Vacated Plan Period.

I am not persuaded. First and most importantly, in *Watt*, I never decided who owned the property during the Vacated Plan Period. That is because Meritage never raised the issue. Meritage did not seek dues or assessments from the Watts for that period of time; both Meritage's adversarial complaint, filed initially in bankruptcy court, and its summary judgment briefs expressly addressed *only* the pre-confirmation and vacatur-to-§ 363 sale periods of time. *See* Complaint, *Meritage Homeowners' Ass'n v. Watt*, Case No. 3:17-cv-00267-AA (doc. 1-1); Mem. Supp. Pls.' Am. Mot. Part. Summ. J. 3 & 5, *Meritage Homeowners' Ass'n v. Watt*, Case No. 3:17-cv-00267-AA (doc. 19). Any limits on Meritage's ability to recover dues and assessments from the Watts for the Vacated Plan Period, therefore, flow from its own prior litigation decisions.

Second, the statement that the Watts owned the property for the pre-confirmation and vacatur-to-§ 363 sale periods does not necessarily lead to the conclusion that they were *not* liable for dues during the vacated plan period. The prior opinion states that BNYM was "in title" but never concludes that it was the owner of the property or that it owed dues. Third, even if the prior opinion could fairly be interpreted as stating that BNYM was liable for dues in the vacated

plan period, it would have no preclusive effect in this case because the issue was not actually litigated in the prior action. *See State ex rel. English v. Multnomah Cty.*, 238 P.3d 980, 988 (Or. 2010). Relatedly, the prior decision would not bind the court here because principles of *stare decisis* do not apply to decisions of district courts. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") (internal quotation marks omitted).

BNYM is not liable for any dues, interest, or fees from the Vacated Plan Period.

B. *Dues Post-§ 363 Sale*

Plaintiffs next seek summary judgment on the question of BNYM's liability for dues, interest, and late fees from after the § 363 sale. BNYM agrees that it owes dues for this period of time, but insists that it has paid those dues, as well as applicable late fees and interest, in full. It contends that Meritage has unlawfully applied those dues payments to liabilities it does not actually owe, and that any deficiency arises from Meritage's refusal to apply the payments correctly. Meritage's calculation of what BNYM owes rests in part on its application of Meritage's payments to fees associated with dues assessed for the Vacated Plan Period. BNYM is not liable for those dues, as explained in Section II.A, *supra*. Meritage's calculation of what BNYM owes also rests in part on its application of Meritage's payments to fees associated with the $175,000 window assessment. As explained in Sections II.C and III, *infra*, plaintiffs are not entitled to summary judgment with respect to BNYM's obligation to pay that assessment because Freitag lacked legal authority to act on behalf of Meritage when he levied the assessment. Accordingly, it cannot be determined at this stage whether BNYM has paid its post-§ 363 sale dues in full or whether it still owes dues and related fees.

C.  *Windows Assessment*

Plaintiffs also seek summary judgment on the question of BNYM's liability for the $175,000 assessment (plus associated fines and interest) Meritage levied against BNYM for refusing to replace the windows. Plaintiffs are not entitled to summary judgment with respect to liability for this assessment because, as explained in Section III, *infra*, Freitag lacked legal authority to act on behalf of Meritage both in 2013, when the resolution permitting the monthly assessments for failure to replace the windows was passed, and in 2016, when Meritage first began its attempts to collect the windows assessment from BNYM.

D.  *Attorney's Fees*

Because Meritage is not entitled to summary judgment with respect to BNYM's obligation to pay dues during the Vacated Plan Period, dues during the Post-§ 363 Sale period, or the windows assessment, it cannot be determined at this stage whether BNYM is liable to pay any of Meritage's attorney's fees. Meritage's motion for partial summary judgment is denied.

III.  *Freitag's Authority to Act on Behalf of HOA*

Finally, BNYM moves for partial summary judgment regarding whether Freitag had the legal authority to levy assessments (and related interest, fines, and fees) related to the windows at the property, take other action related to the windows and window replacements, and choose to apply BNYM's quarterly dues payments to the total (disputed) balance owed rather than solely to dues.[10] BNYM's argument rests on its contention that Freitag failed to turn over administrative control of Meritage to the unit owners at the time mandated by the Declaration and Oregon law.

---

[10] In their response brief, Meritage and Freitag take issue with BNYM's motion; they assert that "it is unclear exactly which sections of BNYM's counter-claims and Third-Party Complaint th[e] motion references" and suggest that BNYM's argument is "better couched as a 'motion for declaratory determination' of sorts." Meritage Homeowners' Ass'n and Third-Party Def. Kurt Freitag's Resp. BNYM's Mot. Part. Summ. J. 2 (doc. 92). I do not find BNYM's

As a threshold matter, Meritage and Freitag contend that BNYM cannot proceed on the theory that Freitag violated the Declaration by retaining administrative control of Meritage for two reasons. First, they contend that BNYM's 30(b)(6) witness expressly disclaimed reliance on any such theory. Having reviewed the excerpts of deposition testimony provided by the parties, I am unconvinced. Witnesses answer only the questions they are asked; nowhere does the 30(b)(6) witness disclaim reliance on a lack-of-authority theory.

Second, Meritage and Freitag argue that it is inherently contradictory to pursue claims for breach of fiduciary duty while simultaneously contending that Freitag lacked legal authority to take action on Meritage's behalf. According to that theory, if Freitag violated the Declaration by failing to turn over control of Meritage, he owed Meritage's members no fiduciary duty during any time period after turnover was required. Once again, I am not persuaded. First, it is well-established that parties may proceed to trial on alternative theories of liability even if they ultimately cannot prevail simultaneously on both theories. *Cf., e.g., Hamlin v. Wilderville Cemetery Ass'n*, 313 P.3d 360, 367 n.3 (Or. Ct. App. 2013) (allowing claims for negligence and intentional infliction of emotional distress based on the same conduct to proceed to trial). Second, when Oregon courts assess whether a relationship triggers a heightened duty of care (such as fiduciary duty), the question is whether "the party who is owed the duty effectively has authorized the party who owes the duty to exercise independent judgment in the former party's behalf and in the former party's interests." *Shin v. Sunriver Preparatory Sch., Inc.*, 111 P.3d 762, 771 (Or. Ct. App. 2005) (internal quotation marks omitted). Whether or not Freitag's

---

motion confusing. Whether the assessments and fees were levied with or without lawful authority is at the heart of the parties' dispute; it bears particular relevance to BNYM's third-party claim against Freitag and to whether Meritage has a right to recover most of the money it asserts BNYM owes. Accordingly, plaintiff's motion is an appropriate request for summary judgment on a part of a claim or defense, as expressly authorized by Federal Rule of Civil Procedure 56(a).

control of the Meritage was authorized under the Declaration, he *in fact* retained control of Meritage throughout the events giving rise to this litigation; during that time, he was legally bound to act in the interest of Meritage and its members. Whether Freitag acted without legal authority does not affect whether he owed Meritage's members a fiduciary duty; instead, it goes to whether he breached that duty recklessly or with gross negligence, as required for BNYM to hold him personally liable under Oregon law.

A.    *Effect of Or. Rev. Stat. § 65.084*

In a statement of supplemental authorities, Meritage cites Or. Rev. Stat. § 65.084. That statute, titled "Challenge of Corporate Authority," provides:

> (1) Except as provided in subsection (2) of this section, the validity of corporate action may not be challenged on the ground that the corporation lacks or lacked power to act.
>
> (2) A corporation's power to act may be challenged:
>
>> (a) In a proceeding by a member or members, a director or the Attorney General against the corporation to enjoin the act;
>>
>> (b) In a proceeding by the corporation, directly, derivatively or through a receiver, a trustee or other legal representative, including the Attorney General in the case of a public benefit corporation, against an incumbent or former director, officer, employee or agent of the corporation . . .
>
> (3) In a proceeding under subsection (2)(a) of this section to enjoin an unauthorized corporate act, the court may enjoin or set aside the act, if equitable and if all affected persons are parties to the proceeding, and may award damages for loss other than anticipated profits suffered by the corporation or another party because of enjoining the unauthorized act.

Or. Rev. Stat. § 65.084. Meritage argues that BNYM's challenge to Freitag's authority to act does not fall within subsection (2)(a) or (2)(b), and thus any of BNYM's claims or defenses that rest on Freitag's purported lack of authority must fail.

BNYM responds that its wrongful assessment argument does not constitute a challenge to the corporation's power to act. BNYM concedes that it is "assuredly within the scope of [Meritage's] power to levy assessments consistent with the Declaration and Bylaws[.]" Reply Supp. BNYM's Mot. Part. Summ. J. 26–27 (doc. 108). BNYM contends that it is challenging not Meritage's authority to levy assessments, but the legality of the particular assessments levied by Freitag in this case; if those assessments were not levied "according to specific procedures set forth in [Meritage's] governing documents," BNYM argues, they are "a legal nullity." *Id.* 26–27.

Meritage's argument is foreclosed by *Dischinger Orthodontics, PC v. Regence Bluecross Blueshield of Oregon*, 405 P.3d 164 (Or. Ct. App. 2017), the only Oregon case to address the meaning of § 65.084. In *Dischinger*, policyholders brought a putative class action against the defendant insurance company, claiming that the defendant "breached insurance contracts with its policyholders by retaining excessive earnings and distributing them as compensation to executives, in violation of defendant's contracts, articles of incorporation, and state law." 405 P.3d at 165. The plaintiffs sought a declaration that the defendant had violated its articles of incorporation. *Id.* The trial court held that the plaintiffs lacked standing to assert their claims. On appeal, the plaintiffs argued that "their claims [we]re not made on the ground that [the] defendant lacked the *power* to act, but rather that, in so acting—contrary to its status as a nonprofit public benefit corporation through its retention and distribution of profits—defendant breached its contracts, articles of incorporation, and state law." *Id.* at 167 (emphasis in original). The Oregon Court of Appeals affirmed the trial court's dismissal, explaining

> On this record, and based on the allegations of the complaint, plaintiffs' attempted distinction escapes us. . . . If, as plaintiffs contend, defendant had the power to act as it did, then it did not violate its articles. Plaintiffs' complaint alleges, in essence, that the retention of profits and the payment of generous bonuses to

defendant's executives are contrary to defendant's status as a nonprofit corporation for the public benefit as stated in its articles, and that those profits should be shared with defendant's policyholders in the form of premium reductions. . . . We, like the trial court, conclude that plaintiffs' contention that defendant's actions are not within the corporation's purposes as defined in its articles is a claim that defendant lacked the power to act.

*Id.*

I see no ground for distinguishing this case from *Dischinger*. In both cases, the argument is that a challenge to corporate action as unauthorized by the corporation's governing document is not a challenge to corporate action based on lack of authority. The *Dischinger* court, interpreting the text of § 65.084, rejected that argument; I am bound to do the same. BNYM's argument is a challenge to corporate action on the ground of lack of authority, and so it is barred unless it falls under subsection (2)(a) or (2)(b).

As explained in Section I.D, *supra*, BNYM has stated both individual and derivative claims. As a result, its claims qualify under both subsections of the Oregon law: they are proper claims for injunctive relief under subsection (2)(a) and proper derivative actions against an officer under subsection (2)(b). Although Or. Rev. Stat. § 65.084 applies to BNYM's argument regarding Freitag's lack of authority, it does not bar that argument because the requirements of the statute are satisfied.

B.    *Interpretation of the Declaration*

In analyzing a document like the Declaration, a court's task is to discern "the meaning . . . that was most likely intended by the parties." *Andrews v. Sandpiper Villagers, Inc.*, 170 P.3d 1098, 1102 (Or. Ct. App. 2007). Oregon courts employ a multi-step process to achieve that goal. "First, the court examines the text of the disputed provision, in the context of the document as a whole." *Yogman v. Parrott*, 937 P.2d 1019, 1021 (Or. 1997). The purpose of that inquiry is to determine whether the text is ambiguous; if it is not, "the court construes the words of a contract

as a matter of law." *Id.* If, on the other hand, the "provisions . . . have no definite meaning or are capable of more than one sensible and reasonable interpretation[,]" *Andrews*, 170 P.3d at 1103, the parties' intended meaning becomes a question of fact, and the court proceeds to the subsequent steps in the analysis. As the party seeking summary judgment on this issue, BNYM has the burden of proving that Freitag's failure to turn over control of Meritage to the other unit owners violated the Declaration.

I begin at step one, by analyzing the text of the Declaration. Article 7 of the Declaration provides that each unit owner is a member of Meritage. Storti Decl. Ex. A § 7.1. The Declaration establishes two classes of voting members: Class A members, defined as all owners of lots other than the declarant, and Class B members, defined as "the Declarant." *Id.* §§ 7.3.1 & 7.3.2. Pursuant to those provisions, Freitag was a Class B member and all other unit owners were Class A members. As a Class B member, Freitag was entitled to enhanced voting rights compared to Class A members. *Id.* §§ 7.3.1 & 7.3.2. The Declaration further states:

> The Class B membership shall cease and be converted to Class A membership upon the earlier of the following dates (the "Termination Date"):
>
> (a) The date on which seventy-five percent (75%) of the total number of Lots in Meritage have been sold and conveyed to Owners other than Declarant;
>
> (b) The date on which Declarant elects in writing to terminate Class B membership.

*Id.* § 7.3.2.

Article 8 of the Declaration governs control of the homeowners' association. Initially, the Declarant (Freitag) has "administrative control[,]" including the right to appoint and remove members of an interim board invested with "all powers and rights" to run the association. *Id.* § 8.1. The Declaration further requires the Declarant to turn over administrative control of the association to the Class A members by convening a turnover meeting within sixty days of the

earlier of the following dates: (1) "[t]he date on which Lots representing seventy-five percent (75%) of the total number of votes of all Lots in the final Phase of Meritage have been sold and conveyed to persons other than Declarant" or (2) "[t]he date on which Declarant has elected in writing to terminate Class B membership." *Id.* §§ 8.2.1 & 8.2.2.

Article 2 of the Declaration elaborates on the declarant's right to annex additional property. The Declarant has the right to annex adjacent property to the development through a "Supplemental Declaration not later than ten (10) years from the date the Declaration is recorded." *Id.* § 2.2. Article 1 of the Declaration contains a number of definitions relevant to interpreting the above provisions. "Meritage" is defined as "Lots 1 through 6 of the Property and Tract 'A', as designated on the Plat of Meritage, and any future phases annexed to the development." *Id.* § 1.17. "Phases" is defined as "any group of Lots and Common Area Tracts which are subject to this Declaration at a specific time." *Id.* at § 1.20. Finally, "Property" means Lots 1 through 6 and Tract 'A', "together with such additional Lots and Common Areas as may, from time to time, be annexed to the Association." *Id.* § 1.23.

Meritage and Freitag argue that the text of the Declaration is unambiguous and that the turnover meeting requirement has not yet been triggered. They note that because Freitag has not voluntarily terminated his Class B membership, the turnover requirement is tied to the date on which Lots representing seventy-five percent "of the total number of votes of all Lots in the *final Phase of Meritage* have been sold or conveyed" to persons other than Freitag. *Id.* § 8.2.1 (emphasis added). They further note that the Declaration was initially recorded on December 19, 2003, and that Freitag—consistent with his authority under § 2.2 of the Declaration—annexed a fourth set of six Lots to Meritage through a Supplemental Declaration recorded December 11, 2013, just inside § 2.2's ten-year time limit. Accordingly, Freitag and Meritage contend that "all

Lots in the final Phase of Meritage" refers to the six most recently-annexed Lots, and that the turnover requirement will not be triggered until seventy-five percent of the voting rights associated with *those six Lots* have been sold to someone other than Freitag. Put more simply, under this interpretation, the "final Phase of Meritage" means the last Phase annexed to the development inside of the ten year period identified under § 2.2 of the Declaration.

In response, BNYM counters that it does not make any sense to read the Declaration in the way Freitag and Meritage urge. BNYM contends that the only sensible way to read the Declaration is to interpret the phrase "all Lots in the final Phase of Meritage" from § 8.2.1 and the phrase "the total number of Lots in Meritage" from § 7.3.2(a) to mean the same thing. BNYM further notes that because annexation was not required under the Declaration, the meaning of "final Phase of Meritage" necessarily changed as new Phases were annexed. At any given time, the "final Phase of Meritage" was the Phase most recently established or annexed. Under that interpretation, mandatory turnover was triggered on June 5, 2004, when five of the six Phase I Lots—the only Lots then in existence, which meant that at that time Phase I was the "final Phase of Meritage"—were sold to people other than Freitag.

I find BNYM's reasoning persuasive. Under the reading proffered by Freitag and Meritage, the "final Phase of Meritage" is inextricably linked to the Declarant's right to annex. Because the Declarant has the authority to annex for ten years, the final Phase would exist only as an ever-elusive possibility, to be identified in hindsight after the ten year period had run. Moreover, because mandatory turnover is tied to the "final Phase," the triggering event could never be defined until the end of the same ten-year period. That is not a reasonable interpretation when considered within the in the context of the Declaration as a whole, as it would produce the absurd result of allowing the Declarant (Freitag) to ensure and maintain unencumbered control of

Meritage for a period of ten years or longer, even if no additional Phases were annexed to Meritage at Little Creek within ten years. Accordingly, I find that BNYM presents the only reasonable reading of the Declaration, and under the terms of the Declaration, mandatory turnover was triggered on June 5, 2004, the first date on which seventy-five percent of the Lots then subject to the Declaration were sold to people other than Freitag.[11]

C.    *Effect of Mandatory Turnover*

Meritage at Little Creek is subject to the provisions of Oregon's Planned Community Act. *See* Or. Rev. Stat. § 94.550(3) (providing that as a planned community containing at least thirteen lots and having an estimated annual assessment exceeding $10,000 is a Class I planned community). That statute requires the declarant to call a turnover meeting within ninety days of the expiration of the "period of declarant control." *Id.* § 94.609(1). At the turnover meeting, "the declarant shall turn over to the homeowners association the responsibility for the administration of the planned community, and the association shall accept the administrative responsibility from the declarant." *Id.* § 94.616(1). The law contemplates turnover happening before development of a planned community is complete, and states that, after the turnover meeting, "the declarant may continue to hold special declarant rights, other than a right of

---

[11] Meritage and Freitag argue that mandatory turnover could not have been triggered in 2004, when Meritage at Little Creek had only six lots, because the development did not become a Class I planned community until Phase III was annexed, increasing the total number of lots to eighteen. They contend that such classification matters because different provisions of the Planned Community Act apply depending on whether a development is classified as a Class I, Class II, or Class III planned community. *See* Or. Rev. Stat. § 94.570(1). I am not persuaded; in relevant part, the Planned Community Act defines a "Class I planned community" as a planned community that "[c]ontains at least 13 or lots *or in which the declarant has reserved the right to increase the total number of lots beyond 12*[.]" *Id.* § 94.550(3)(a) (emphasis added). It appears, based on that definition, that Meritage at Little Creek was a Class I planned community from its inception. But it is not necessary to determine when Meritage at Little Creek become a Class I planned community in order to rule on BNYM's summary judgment motion; even if Meritage and Freitag are correct on this point, mandatory turnover was triggered on July 12, 2007, when all the lots in Meritage's first three phases had been sold to people other than Freitag.

declarant control, reserved under the declaration." *Id.* § 94.621. Even the in absence of a turnover meeting, the law provides that, when the period of declarant control expires, "the rights automatically shall pass to the lot owners[.]" *Id.* § 94.600(3).

The parties dispute whether a 2009 meeting at which turnover was addressed qualifies as the turnover meeting discussed in the Planned Community Act and the Declaration. Freitag also asserts that he wanted to begin the turnover process by forming transition committees that would allow unit owners to "take part of the management of the HOA [and] gain experience" in preparation for "the responsibility of turnover." Freitag Decl. ¶ 11, Nov. 13, 2017. He reports that those committees ended disastrously: the first committee "dissolved after meetings resulted in tearful implosions" while the second dissolved when the committee members did not want to assess their fellow unit owners for a shortfall after one unit owner failed pay dues. Freitag Decl. ¶¶ 15 & 18, Nov. 13, 2017. In the end, disputes related to those facts are immaterial; once mandatory turnover was triggered under the Declaration, the rights to administrative control passed automatically to the owners, who became responsible for choosing Meritage's governing board. If Meritage's unit owners were unwilling to accept responsibility for administering the homeowners' association or otherwise "fail[ed] to fill vacancies on the board of directors sufficient constitute a quorum," Oregon law provides a remedy: the appointment of a receiver "to manage the affairs of the association." Or. Rev. Stat. § 94.642(1). Neither Oregon law nor the Declaration contemplates the Declarant remaining in administrative control of a homeowners' association beyond the mandatory turnover date simply because the other members of the association are uninterested in assuming responsibility.[12]

---

[12] Meritage argues that Freitag retains legitimate administrative control even if the mandatory turnover date has passed because, by the terms of the Declaration, control does not pass to the other unit owners until the turnover meeting. As noted, however, the Planned

Under the unambiguous terms of the Declaration, mandatory turnover was triggered on June 5, 2004. Oregon law provides that once mandatory turnover is triggered, the period of declarant control ends and the rights and responsibilities associated with the management of the homeowners' association pass to the owners. Freitag therefore lacked legal authority to act on behalf of Meritage after June 5, 2004. BNYM is entitled to summary judgment on the issue of Freitag's legal authority.

IV.    *Motion for a Preliminary Injunction*

BNYM has notified Meritage that it plans to file an action in state court seeking appointment of a receiver to manage Meritage, pursuant to Or. Rev. Stat. § 94.642(1). Meritage seeks a preliminary injunction to prevent BNYM from filing that receivership action while this case is pending.[13] I agree with Meritage that litigating this dispute on two fronts—in state and federal court—is a waste of judicial resources and creates a substantial risk of inconsistent judgments. Nevertheless, I am compelled to deny Meritage's motion because it has not met the demanding standard to justify the extraordinary relief of a preliminary injunction.

To obtain a preliminary injunction in federal court, the party seeking the injunction generally must establish that (1) it is likely to succeed on the merits; (2) it will suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in its favor; and (4) an

---

Community Act makes the transfer of administrative rights and responsibilities automatic upon expiration of the period of declarant control. *Id.* § 94.600(3). To the extent that provision conflicts with the Declaration, the Planned Community Act controls, both by terms of the statute and because Meritage's bylaws expressly provide that the Planned Community Act "shall control over . . . the Articles and Declaration[.]" Storti Decl. Ex. B § 11.

[13] Federal courts generally cannot enjoin state court proceedings. 28 U.S.C. § 2283. However, federal courts do have authority to enjoin a party in a federal case from commencing a *new* proceeding in state court. *See Dombrowski v. Pfister*, 380 U.S. 479, 484 n.2 (1965) ("This statute and its predecessors do not preclude injunctions against the institution of state court proceedings, but only bar stays of suits already instituted.")

injunction is in the public interest. *Winter v. Nat'l Resources Def. Council*, 555 U.S. 7, 21 (2008). The Ninth Circuit also employs a "sliding scale" variant of that test. *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). Under the sliding scale variant, "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing that likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor,and the other two *Winter* factors are satisfied." *Id.* (internal quotation marks omitted) (emphasis in original).

Meritage does not meet the standard under either variant of the preliminary injunction test. As explained in more detail above, the majority of the claims at issue in this lawsuit cannot be resolved at the summary judgment stage—however, to the extent any party has shown likely success on the merits, that party is BNYM. Meritage makes a number of arguments relevant to whether BNYM would be likely to succeed in its contemplated receivership action in state court. But that is not the relevant success-on-the-merits inquiry. In determining whether to enter a preliminary injunction, the question is whether Meritage is likely to prevail on the merits on the claims before *this* Court. If BNYM moves ahead with its plan to file a receivership action, Meritage can present its estoppel, waiver, and claim preclusion arguments to the state court.

Meritage has shown serious questions going to the merits of many of its claims. But it falls short under the sliding scale variant of the test as well, because I cannot find that the balance of hardships tips *sharply* in Meritage's favor; indeed, the hardships seem quite well-balanced in this case. Because Meritage cannot meet the preliminary injunction standard, its motion must be denied.

**CONCLUSION**

Meritage and Freitag's motion for summary judgment (doc. 46) is GRANTED IN PART and DENIED IN PART as follows: the motion is granted with respect to the portions of the third-party claim against Freitag related to failure to maintain an adequate reserve balance, failure to provide required financial disclosures, and the placement of fitted and unfitted plywood boards over windows, and is denied in all other respects. Meritage's motion for partial summary judgment (doc. 50) is DENIED. BNYM's motion for partial summary judgment (doc. 84) is GRANTED. Meritage's motion for a preliminary injunction (doc. 114) is DENIED.

IT IS SO ORDERED.

Dated this 13th day of April 2018.

_____
Ann Aiken
United States District Judge