IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


MERITAGE HOMEOWNERS'
ASSOCIATION, an Oregon, nonprofit
corporation,

                Plaintiff,                                   Case No. 6:16-cv-300-MC

             v.                                      OPINION AND ORDER

THE BANK OF NEW YORK MELLON, fka
The Bank of New York, as Trustee on Behalf
of the Holders of the Alternative Loan Trust
2006-0A21, Mortgage Pass Through
Certificates Series 2006-0A21,

                Defendant.

_____


THE BANK OF NEW YORK MELLON, a
Delaware corporation,

                Third-Party Plaintiff,

MERITAGE HOMEOWNERS'
ASSOCIATION, an Oregon domestic
nonprofit corporation,

                Nominal Third-party Plaintiff,

v.

KURT FREITAG,

       Third-Party Defendant.

_____

**MCSHANE, Judge**:

Plaintiff Meritage Homeowners' Association, acting through Rohn M. Roberts as the Court-appointed Receiver for Plaintiff, moves the Court to approve a settlement reached with Defendant/Third-Party Plaintiff Bank of New York Mellon ("BNYM"). ECF No. 446. Sue Cowden, PSRG Trust, Big Fish Partners, and Sherman Sherman Johnnie & Hoyt, LLP object to the proposed settlement. ECF Nos. 449–50. On June 4, 2025, the Court presided over an evidentiary hearing. These are the Court's findings of fact and conclusions of law.

## BACKGROUND[1]

In 2003, Big Fish Partners broke ground on Meritage at Little Creek, a planned community of 18 townhouses on the Oregon coast. Kurt Freitag is the Managing Parter of Big Fish Partners. Initially, things appeared to go well. Before long, problems arose with respect to the townhouses' windows. In 2008, litigation commenced regarding allegedly defective installation of windows in all 18 units. Big Fish Partners, many unit owners, and ultimately the Receiver on behalf of Meritage, spent much of the next 17 years engaged in various lawsuits connected, at least in some way, to the failed windows.

This litigation, at least with respect to the pending motion to approve Meritage's proposed settlement agreement with BNYM, generally asks who is liable for water damage to a unit owned

---

[1] A more complete recounting of the history of this dispute is found in Judge Aiken's opinions dated April 13, 2018, and March 29, 2024. ECF Nos. 119, 359. The Court incorporates the background from those opinions here.

by BNYM. BNYM, which held a security interest in one unit, took title to that unit during bankruptcy proceedings of the unit's former owners. Ultimately, in August 2015, BNYM purchased the property through a sale under 11 U.S.C. § 363. This background is laid out in thorough detail in Judge Aiken's April 13, 2018, Opinion. ECF No. 119, 3-9. "Consistent with that statute, BNYM acquired the property 'free and clear' of 'any interest' in the property." *Id*. 6.

Freitag, BNYM, and the Receiver spent the next several years fighting over dues, assessments, replacing the windows, and who is ultimately responsible for water damage to the unit. The BNYM unit is the lone unit to not have replacement windows installed. For years, the windows in BNYM's windows were covered with plywood. Meritage—when Freitag purported to act on its behalf—imposed significant fines and assessments on the BNYM unit. As Judge Aiken noted in her April 13, 2018, Opinion, "[i]n January 2016, Freitag sent BNYM invoices stating that it was required to pay approximately $300,000 in assessments, fines, dues, and fees arising from pre-and post-§ 363 sale events." ECF No. 119, 7. By October 2017, the amount allegedly owed to Meritage by BNYM had ballooned to over $1,000,000. *Id*. 8. BNYM, however, argued "that it was Meritage's failure to maintain the common property such as the exterior and chimney of the units that caused water intrusion and created the risk that windows would blow out." *Id*. The "new window system" Freitag chose as a replacement cost approximately $175,000 to install. This substantial sum is approximately half of what the townhomes sold for back in 2006. For several years, Meritage and BNYM remained at an impasse.

In April 2018, Judge Aiken concluded that Freitag lacked authority to act on Meritage's behalf after June 5, 2004. ECF No. 119, 44. The following month, Judge Aiken appointed Rohn Roberts as Receiver to manage Meritage under Federal Rule of Civil Procedure 66. ECF No. 157. The case was then stayed from May 2018 until June 8, 2023.

As noted, the Receiver and BNYM have now agreed to resolve their dispute rather than proceed to a costly and unpredictable trial. The objectors generally argue that the agreement is not fair to other unit owners because the Receiver abandons valuable claims in return for little monetary gain while burdening itself with a high likelihood of substantial future repair costs. As discussed below, the Court finds that the proposed settlement is the best outcome the Receiver can achieve for Meritage given the circumstances.

## DISCUSSION

Judge Aiken previously laid out the relevant law regarding receiverships:

> Courts possess "extremely broad" power when "determin[ing]" the appropriate action to be taken in the administration of the receivership." *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986). The court's power and its related "wide discretion" extend to "determine[ing] the appropriate relief in an equity receivership." *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978). "The role of the receiver is equivalent to that of a bankruptcy trustee," and "[l]ike trustees, receivers often must use their discretion to make difficult business decisions." *Bangor Hydro Elec. v. Bridgewell Resources, LLC*, No. CV-10-726-HZ, 2011 WL 1630812, at *2 (D. Or. April 28, 2011)

April 26, 2024 Order, ECF No. 363, 2.

"[A] primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *Hardy*, 803 F.2d at 1038. Judge Russo recently explained the primary factors a district court must consider when determining whether to approve a settlement in a receivership:

> (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views. *In re Open Med. Inst., Inc.*, 2022 WL 1711774, at *7 (B.A.P. 9th Cir. May 26, 2022). In the bankruptcy context, a trustee "is entrusted to marshal an estate's assets and liabilities, and proceed in settling its accounts on whatever grounds he, in his informed discretion, believes will net the maximum return for the creditors (on whose behalf he toils)." *In re Mailman Steam Carpet Cleaning Corp.*, 212 F.3d 632, 635 (1st Cir. 2000).

*S.E.C. Aequitas Mgm't, LLC*, No. 3:16-cv-00438-JR, 2022 WL 9501186, at *7 (D. Or. Aug. 22, 2022), *rep. & recommendation adopted*, 2022 WL 9317393 (D. Or. Oct. 14, 2022).

With that in mind, Plaintiff moves the Court to approve settlement on the following terms:

(a) State Farm Insurance Co., the insurance carrier for Plaintiff and Third-Party Defendant, will contribute $75,000 toward the settlement of the claims referred to herein, which funds shall be used as partial payment for the replacement of the windows in the Defendant's Meritage Units (as more particularly referred to in the pleadings on file herein);

(b) Defendant will contribute $99,000 toward the replacement of the windows referred to in paragraph (a) above;

(c) Contemporaneously with the payments referred to above, Defendant will convey all of its right, title and interest in and to its Meritage Unit to Plaintiff;

(d) Upon satisfaction of the conditions referred to above, Plaintiff and Defendant/Third Party Plaintiff will stipulate to a dismissal of the claims asserted in the litigation with prejudice and also execute mutual releases of all other claims—known or unknown, which they have, or may have, against the other;

(e) The funds referred to in paragraphs (a) and (b) will be deposited into the Arnold Gallagher P.C. Trust Account with instructions for said funds to be disbursed to [Black Line Glazing] for the replacement of the windows in the Meritage Unit being conveyed to Plaintiff pursuant to the terms of the [bid attached as Exhibit 1 to Plaintiff's Withdrawal of Motion to Strike].

Pl.'s Mot. Approve Settlement, 3; ECF No. 446; *see* Pl.'s Withdrawal Mot. Strike; ECF No. 479 (substituting Black Line Glazing for Dallas Glass as contractor to replace the window in the BNYM unit).

The objectors argue that the proposed settlement is unfair to creditors. They insist that: (1) there is little risk in aggressively pursuing Meritage's strong legal claims against BNYM; and (2) the proposed settlement is likely to saddle Meritage with large expenses necessary for repairing not only the BNYM unit, but the connecting unit which is owned by Meritage. PSRG Trust, Big Fish Partners, and Susan Cowden's Resp. 14; ECF 450 ("The Receiver cannot be allowed to fold, leaving so much money on the table, at the expense of the parties whose interests he is dutybound

to protect.")[2]; Sherman Sherman Johnnie & Hoyt, LLP's Resp. 16-18; ECF 449 (arguing that water damage to the unit makes it a "complete tear down"). In Response, Plaintiff argues:

> In exercising his discretion in pursuing a settlement of the BONY litigation, the Receiver has been motivated by a variety of factors, including (a) uncertainties concerning the nature and scope of relief that could be afforded in the event Plaintiff prevailed in the litigation; (b) the adverse impact the pendency of the litigation has had on (i) the ability of the HOA and its members to successfully market and sell their respective Meritage units, and (ii) the Receiver's ability to recruit HOA members to serve as members of the HOA Board of Directors; which impacts would continue in the event of an appeal; (c) the expense of continued litigation and the potentially catastrophic impact an adverse result at trial (or on appeal) could have on the HOA and its members; and (d) a desire to have the windows in the BONY unit replaced as expeditiously and economically as feasible.

Pl.'s Reply ECF No. 453, 3.

Finally, BNYM's summarizes its position: "It should come as no surprise that the impetus for this years-long litigation cannot possibly accept its end. . . . The most telling fact is that the receiver is seeking approval and *not one current member of the HOA not affiliated with Freitag has lodged an opposition to the settlement*. The court should allow the HOA its bargained-for peace." BNYM Reply 2; ECF No. 454.

On June 4, 2025, the Court presided over an evidentiary hearing regarding Plaintiff's motion to approve the settlement with BNYM. The evidentiary hearing in general, and specifically with respect to the Receiver's own testimony providing useful context, were quite beneficial to the Court's analysis of the pending motion. The Court's findings of fact and conclusions of law follow.

The Receiver contacted K. Scarlett Kier to provide market information regarding the Meritage townhouses. Kier has worked in Lincoln County as a real estate agent for over 30 years

---

[2] PSRG Trust, Big Fish Partners, and Susan Cowden also "request that . . . the Court revisit its earlier decision that Mr. Freitag acted without administrative control between June 2004 and May 2018." Resp. 18. Even assuming that this Court had the slightest inkling to revisit Judge Aiken's ruling—it does not—the Big Fish group appealed Judge Aiken's ruling. Oct. 18, 2024, Not. App. ECF No. 397. As that appeal is currently pending before the Ninth Circuit, this Court likely lacks jurisdiction to revisit Judge Aiken's ruling.

and sits on the Lincoln County Planning Commission. In October 2021, Kier informed the Receiver that there were many obstacles to selling Meritage units. For starters, the community generally knew the history of Meritage, including the longstanding litigation with Freitag who, in Kier's opinion, "is not one to make friends in the community." Pl.'s Ex. 9. Kier noted that "this property has a long history with locals" and due to the ongoing litigation, buyers would be concerned with the possibility of future special assessments and increases in dues needed to create a reserve fund. *Id*. Kier noted that Lincoln County is "a small community. We knew that there was a tremendous amount of litigation going on with Meritage." Tr. 21–22.

In July 2022, Kier listed a "frontage unit" in Meritage for $350,000. Kier and the seller had to disclose the pending litigation, and, in July 2023, Kier took the unit off market. One prospective buyer pulled an offer due to the litigation. Kier testified that lawsuits often involve special assessments. Those fears limit the marketability of Meritage units. Shortly before the hearing, Kier spoke with another agent who had a listing at Meritage. That agent ran into the same issues Kier experienced; initial listings produce interest only for that interest to disappear as soon as potential buyers heard about the lawsuits. Kier also noted that there had been several years of "deferred maintenance" at Meritage with respect to landscaping, maintenance of roadways, and the siding of individual units. Some progress, however, was being made with respect to some of the maintenance issues. The last unit to sell sold for $365,000. The Court finds Kier's testimony credible. Her testimony establishes that the local community knew: of Meritage's extensive litigation history; of Freitag's general reputation (including a reputation with respect to costly litigation); that litigation often involves special assessments; and that the threat of additional special assessments substantially reduced the marketability of Meritage units.

Aaron Broderick of Johnson Broderick Engineering testified next. Broderick works as a structural/civil engineer and has been licensed in Oregon since 2009. Broderick was one of several individuals including the Receiver, Freitag, Jacob Cook, and Wallace Corwin, who performed a site inspection of the BNYM unit in May 2025. The inspection hoped to learn more about the amount and cause of the water damage, and to look for any structural issues in the unit.

Broderick examined the crawl space and did not observe signs of water damage. The framing Broderick observed was free of moisture, the concrete was clean, and the wood generally looked good with no indication of structural damage. Tr. 46 (Broderick observed no signs of "significant moisture intrusion" as "[t]he framing in the crawl space, from what I observed, appeared to be free of indications of moisture intrusion. It looked dry. The concrete looked clean. The wood looked—looked good from—from what I could see."). Although Broderick observed some "incidental moisture," he could not identify the source without additional destructive testing.

Broderick examined the outside of the chimney. Pl.'s Ex. 11, 1. The exterior of the unit was "weathered and was showing the results of being exposed to the elements over time." However, Broderick saw no evidence of "major moisture infiltration" in the crawl space opposite the weathered portions of siding.

The inspectors removed some paneling on the outside of the unit to expose the water-resistant barrier. Ultimately, the water barrier was not removed and therefore Broderick could not determine the extent of, or even if there was any, structural damage. Broderick commented that the flashing around the chimney was installed backward, *in front of* the barrier. Pl.'s Ex. 11, 2–4. The flashing should have been installed in a fashion to divert more water away from the structure. The bottom of the chimney panel exhibited signs of dry rot which Broderick believed to be caused by the incorrectly installed flashing. Pl.'s Ex. 11, 4. Broderick's examination of siding on the other

side of the house revealed similar flashing installation, similar dry rot issues, and even some wood missing under one window. Pl.'s Ex. 12.

Examination of the framing cavity of the chimney revealed water stains that Broderick did not believe to be "overly significant." Broderick testified that this area exhibited minor contact with moisture and was something to keep an eye on. More signs of dry rot did not appear to be a "major issue." Broderick admitted that it was tough to see the extent of the damage with the limitations of the inspection. He would like to "open things up" a bit more to see the full extent of the damage. Broderick "would need to see more" to be able to form an opinion about the extent of the repairs. Ultimately, Broderick testified that it was "hard to say" what the source of water was. Although the inspection was limited, Broderick did not see any signs of structural issues in the unit. He saw no cracks or unevenness in the floors and the unit did not appear to be structurally unstable. Broderick confirmed that the siding issues did not cause the windows to fail. Broderick opined that the failure of the windows likely contributed to "some localized effects in the area of the windows" but that other factors led to deterioration in areas away from the windows. Broderick testified that while the failed windows would need to be repaired, he did not have access to enough of the unit to determine if it had any structural damage in need of repair. While Broderick observed some indication of water damage from the chimney, such damage was not a major concern at this time but rather something to be watched.

The Court finds Broderick's testimony credible. He admitted that he lacked information allowing him to form an opinion on the full extent of the water damage. But he observed no signs of significant structural damage (such as cracks in the floor or doors not closing) and believed water damage from the windows was likely "localized" to areas near the windows. Significantly, Broderick observed no evidence of "major moisture infiltration" in the crawl space opposite the

weathered portions of siding. Broderick's testimony and opinion conflicts with those of the objectors, and their expert, that water damage from the windows meant that the unit was essentially in need of a total rebuild. *See* Sherman Sherman Johnnie & Hoyt, LLP's Resp. 16-18 (arguing that water damage to the unit makes it a "complete tear down").

Jacob Cook has worked as a licensed contractor for 10 years. Cook works primarily in property management of over 500 properties in Lincoln County, repairing "everything from windows, doors, siding, foundation, decks, roof repairs, water intrusion, leaks." Tr. 101. Cook repaired a chimney in another unit at Meritage that had dry rot caused by improper installation of the step flashing where the roof met the chimney. Cook testified that the BNYM unit's chimney exhibited the same issues other Meritage units exhibited previously. Cook previously worked on four other Meritage units with water intrusion in the area along the joint walls connecting two units. Tr. 110 ("Most of the water intrusion that we've dealt with is due to the valleys of the rooflines when they have the party wall in between, as well as those chimneys."). That type of intrusion, similar to the intrusion along the units' chimneys, stemmed from improper installation of flashing. Tr. 113.

Cook has performed repairs of almost every deck in Meritage. Cook completely replaced seven of the decks. Cook believed that while the Meritage units were beautifully designed, the quality of materials and craftsmanship was lacking in places. Cook observed "a lot of rookie mistakes," such as improperly applied flashing. Tr. 115.

Cook did not observe stress fractures or uneven or lifting floors in the BNYM unit. Doors withing the unit opened and closed properly. Cook saw similar water damage (in closets, the chimney, and the internal walls between the units) in other Meritage units and, in Cook's opinion, those types of specific water damage were not connected to any issues with the windows.

Specifically, Cook observed water intrusion in a closet that stemmed from the roof, not the windows, and water damage from the chimney that was unrelated to the windows. Tr. 117. Additionally, the similar water damage Cook saw in other units occurred in units that had previously had their windows replaced.

Cook opined that water damage from the windows would likely "be within that region, within that area. It's not spreading over the entire wall and causing a major problem." Tr. 118. Cook estimated repairing the unit would cost approximately $65,000. That estimation did not include replacing the actual windows but included replacing the outside deck, repairs to the chimney, and repairing the areas around the defective windows, including necessary framing. Tr. 118–19. Cook acknowledged that providing an estimation of repairs without examining the framing was difficult. Based on his experience working on many Meritage units over the years, including repairing water damage, Cook believed that an estimate of $350,000 for repairing the BNYM unit was "exaggerated."

The Court finds Cook's testimony credible. He has quite a bit of experience working on units at Meritage. He is familiar with water damage from roofs and chimneys common to many units. He is familiar with damage to the decks and windows. Like Broderick, Cook observed no signs of structural damage. Like Broderick, Cook admitted that he would not know the full extent of the damage until opening up the walls. Like Broderick, Cook estimated that water damage from the windows would be limited to the general area around the windows. The Court finds that testimony credible and it contradicts the objectors' theory that water damage has resulted in the BNYM unit essentially needing a complete rebuild.

Rohn Roberts, the Receiver, took the stand after Cook. Roberts testified that the biggest obstacle to moving forward with the BNYM litigation was Freitag's claims of $1,250,000 or so

against Meritage.[3] Freitag's outstanding claims were "the elephant hanging over the room." When Judge Aiken lifted the stay in mid-2023, the Receiver focused on resolving Freitag's claims. As noted, in March 2024, Judge Aiken issued her findings and conclusions rejecting Freitag's claims. March 29, 2024, Op. & Order, ECF No. 359. Judge Aiken noted:

> Freitag's simultaneous control of Meritage, Big Fish, and PSRG Trust put Freitag in a position where he was able to engage in a considerable course of poorly documented self-dealing. The inherent difficulties in disentangling that self-dealing are exacerbated by Freitag's failure to memorialize transactions between the entities he controlled and his failure to preserve financial records. The Court is left, in many places, with little more than Freitag's testimony that certain sums were advanced to Meritage by PSRG Trust and that those sums were not repaid. The Court considered Freitag's demeanor and manner of testifying, as well []as his obvious pecuniary interest in the outcome of PSRG Trust's claim and finds Freitag's testimony not credible.

*Id.* 5-6.

The Receiver testified that the threat of litigation from Freitag impacted how the Receiver ran Meritage's operations. For example, when the Property Manager the Receiver hired to run Meritage passed away in 2022, the Receiver could not find anyone else willing to manage Meritage. In part due to the long history of litigation, "they had no interest" in being connected to Meritage. This testimony aligns with that of Kier, who testified that the threat of litigation was a main hurdle for those attempting to sell units. The evidence quite clearly indicates—and the Court expressly finds—that Freitag has a reputation in the community and that reputation—including the threat of expensive, time-consuming litigation—is a large detriment to those looking to sell Meritage units. The Court agrees with the Receiver's opinion that resolving Freitag's claims was the Receiver's number one priority.

---

[3] For the most part, Judge Aiken and the Receiver did not differentiate between Freitag, Big Fish Partners, or PSRG Trust. This Court generally does the same. Freitag is the Managing Partner of Big Fish and controlled Big Fish's actions. To the extent Judge Aiken disallowed Big Fish's claims against Meritage, she essentially disallowed claims from Freitag, the individual who determined the amount of the claims pursued by Big Fish and PSRG Trust.

With respect to the BNYM unit, the Receiver did not believe that anyone could come up with a precise repair estimate until opening up the unit. Roberts believed that the best course of action at trial was to get injunctive relief ordering BNYM to repair or replace windows with the Court retaining jurisdiction to determine later the cost of water damage from the windows versus the cost of water damage from the roof and siding.

The Receiver had access to the expert report provided by Wallace Corwin. This report is reproduced in objectors' exhibit 532 and documents Corwin's opinion as to the failures of the seals in the windows' "insulated glass units" and the subsequent "degradation of wood components adjacent to" the windows. The Receiver felt "pretty strongly" that with Corwin's report, Meritage would prevail by demonstrating the windows failed and needed to be replaced. The Receiver was much less confident that any water damage not directly tied to the failed windows would ultimately be BNYM's responsibility. The Court agrees. At least with respect to allocating damages to the failed windows or the improperly installed flashing, Meritage's claims against BNYM were much more in doubt or disputed than as argued by the objectors here. Additionally, collateral damages and unknows were, in the Receiver's opinion, "concerning." Given the different causes of water damage over the course of many years, Roberts viewed this litigation against BNYM as "complex." The Receiver's assessment is reasonable and mirrors the Court's own assessment regarding the likely outcome at trial.

Roberts viewed Meritage's nuisance claim against BNYM as one not worth pursuing. The nuisance claim was filed by Freitag, when he purported to act for Meritage before Judge Aiken appointed the Receiver. The Receiver's assessment of the value of the nuisance claim was certainly a reasonable one, as Judge Aiken had previously concluded that diminution in value is not available as a remedy when the nuisance is capable of being remedied.

The Receiver testified that "from the very get go, it became apparent to me" that the only ways to pay Meritage's creditors were by: (1) borrowing money; (2) imposing special assessments on unit owners; or (3) selling units owned by the HOA. Special assessments were "out of the question" based on what the unit owners had already gone through over the past 20 years or so. No bank would lend Meritage money when it was involved in active litigation regarding resolution of $3,000,000 in claims against Meritage. Therefore, the Receiver believed that the only realistic option to pay creditors was to raise money by selling units. Additionally, the Receiver noted that other unit owners "were anxious" to move forward and wanted the BNYM litigation to end. The Court finds that testimony credible and, again, agrees with the Receiver's assessment.

The Receiver believed in Fall 2024 that the BNYM litigation and the Dallas Glass claim would be resolved. Unltimately in early 2025, Dallas Glass refused to settle its $140,000 claim against Meritage because there were "too many unknowns. There's [sic] too many issues."

In response to a question as to whether he considered the interests of creditors in looking to resolve the claims against BNYM, the Receiver responded, "you bet I considered the interests of creditors." The Receiver noted that with a claim of $230,000 in fees, he was Meritage's second largest creditor. The Court finds the Receiver took seriously not only the creditors' interests, but the interests of the other unit owners. The Court finds the Receiver diligent, capable, and reasonable in that respect.

The Receiver commented on the April 1, 2025, settlement offer. That offer, included as objectors' exhibit 550, outlined a proposal from the objectors here along with Freitag and Dallas Glass. The proposed settlement noted that the creditors had claims against the HOA of approximately $3,250,000. Ex. 550, 1. The Receiver viewed the offer as "a non-starter." Given his knowledge of the sentiment of the unit owners, the Receiver believed that other than Cowden, who

was aligned with Freitag, the other unit owners would "never" agree to anything that would resuscitate the PSRG claims that Judge Aiken previously rejected.[4]

The Court finds the Receiver's testimony here quite credible. Additionally, in general, the Court finds the Receiver credible and capable. The Receiver is clearly seeking to make the best out of a difficult situation. The Receiver could not accept any proposal that would re-insert Freitag into Meritage's affairs. The other unit owners simply would not allow any settlement giving Freitag more control of the HOA. As the Receiver testified, the general sentiment from unit owners regarding a settlement giving Freitag security liens on Meritage units was, "we can't let the fox back into the hen house." The Court finds that Freitag's history with Meritage, including when he purported to run the HOA and later brought claims against Meritage, had soured the relationship with other unit owners to the point that any settlement involving a debt or security lien in favor of Freitag was dead on arrival.

The Receiver believed that once "the cloud of litigation is removed," he will have the opportunity to raise funds to address the deferred maintenance and siding issues. To the extent that this view is disputed, the Court finds it credible. The Court also finds that the Receiver evaluated the BNYM settlement proposal in good faith and with an eye to what would benefit all affected parties based on the limited resources available. The Receiver testified that even if the BNYM unit had $300,000 of damage, the HOA would be in a better position owning the unit outright with $174,000 from BNYM and State Farm towards repairing the unit than not owning the unit but

---

[4] "PSRG Trust is a retirement trust account for the sole benefit of Freitag and his spouse, Rita Schaefer, and for which Freitag is the grantor, trustee, and beneficiary." March 29, 2024, Op. & Order, 4. Judge Aiken denied PSRG Trust's claims, noting that "Freitag engaged in a flagrant course of self-dealing by purporting to enter into loans between Meritage and PSRG Trust. The alleged loans were poorly documented and what evidence is available demonstrates th[at] Freitag commingled funds between his various entities, obscuring where money went and what money might be attributable to which entity." *Id.*, 29.

Page 15 - OPINION AND ORDER

having to pay for perhaps $100,000 in repairs for damages the HOA was responsible for. The Court agrees.

The Court roundly rejects the objectors' argument that the Receiver only agreed to a last-minute settlement on the eve of trial due to his failure to adequately prepare for trial. This argument ignores the roadblocks facing Meritage's nuisance claim while severely overstating the ease of proving that BNYM is responsible for all water damage to the unit. As the Receiver put it:

> The roof is the HOA's responsibility, correct. So all that's the HOA's responsibility. So, I mean, when we talk about the siding issue on the BONY unit, why it's important whether or not it's original construction defect or other—or lack of maintenance by the HOA, or is it a result of the failed windows.
>
> BONY is only responsible to the extent it was caused by the failed windows, and the HOA would be responsible for the rest. So again, we can litigate with BONY 'til the cows come home and we can win and they can replace the windows, and then the fun starts. And that's the collateral damage and how are we going to be able to parse that out?

Tr. 160; ECF No. 472-1.

The Court finds that the Receiver adequately (and correctly) assessed the risks of allocating responsibility for water damage to BNYM. Relatedly, the Court finds that the creditors largely ignore this risk and (incorrectly) assume that BNYM would be liable for any and all damage to the unit. Additionally, the creditors ignore the reality that proceeding to trial left Meritage at risk of an award of attorney fees in favor of BNYM. The Receiver testified that with "all those things considered, I felt that achieving [the proposed settlement with BNYM] was the best way to go." As discussed in greater detail below, the Court agrees.

Mark Hoyt, the prior attorney for Meritage and Freitag, testified after the Receiver. Hoyt's law firm has a claim of nearly $600,000 for outstanding attorney fees incurred representing the HOA (under Freitag). Hoyt testified that the proposed settlement consists of the Receiver and BNYM who, in Hoyt's view, did essentially nothing for seven years, "asking the owners to pick

up the difference." In other words, Hoyt believes the years of inactivity with respect to the BNYM unit, "while water and wind is whipping at that unit, driving water inside," caused the unit to rot. And the proposed settlement asks the owners to pay for the damages caused by the Receiver and BNYM's refusal to act. Hoyt acknowledged that the Receiver has acted in good faith. But Hoyt believes the Receiver could have done more to "effectively bring this case to a resolution." The Court finds Hoyt generally credible. The Court, however, has a different view of the Receiver's decision to focus on resolving the PSRG claims first while facing obvious financial constraints with running the HOA. The Court also has a different view (than Hoyt and the creditors) with respect to the strength of the claims against BNYM. The Court agrees, essentially with everyone, that BNYM would ultimately be forced to replace the windows. There are serious questions, however, with respect to allocating water damage to the unit to BNYM versus the HOA itself. Given all of this, the Court understands why the Receiver believes the proposed settlement is the best option available.

Wallace Corwin, an expert regarding windows and structural elements in residences, testified next. Corwin previously spent time as head of Research and Design for a window company. Corwin first visited Meritage in 2007 to inspect potential leakage in the windows. Over the next several years, Corwin (or Corwin's company) went to Meritage on 76 occasions investigating and repairing the units.

During Corwin's recent inspection of the BNYM unit in May 2025, he inserted a quarter-inch probe six inches into the wall under the windows and met no resistance. Corwin applied the ASTM 2128 standards to his inspection of the unit. Corwin, who has experience working on other Meritage units, explained that water damage to the BNYM unit was more severe than in the units with windows and siding replaced years earlier. Corwin's probe met no resistance to approximately

one inch in the earlier units (as opposed to six inches in the BNYM unit). Corwin explained that the BNYM unit's four two-by-sixes providing structural support "are compromised." Corwin was not concerned with the roof of the unit caving in but had serious concerns regarding the structural stability of the wall with the bank of windows.

Corwin also observed water intrusion on the south wall. The water staining went from an upstairs closet all the way to the crawl space below. Corwin testified this water intrusion consisted of "substantial moisture in the crawl space." Tr. 218. Corwin, however, acknowledged that this water damage came from the roof, not the windows. Tr. 218–19. Corwin testified that damage to the deck, which needed to be repaired, was not caused by the windows.

In Corwin's latest report, he estimates that Meritage would have to spend $203,000 repairing the areas around the windows before the windows could be replaced. Exhibit 553, 15. The bid was, as the Court noted, for "building a new home" as opposed to simply repairing the water damage. As the Court noted at the hearing, this report has limited value in permitting the Court to determine the amount of damage stemming from the water damage.[5] Additionally, Corwin testified that when he worked as an expert for Meritage in 2007, he notified owners of the units of "potential ongoing damage from water penetration." BNYM did not take possession of the unit until nearly one decade later. If anything, Corwin's report and testimony only substantiates the

---

[5] The Court understands that Corwin allocated 39% of the bid to water damage. Despite reading Corwin's explanation on page 4 of exhibit 553, it is unclear how Corwin settled on this percentage. It is also unclear why the bid is to replace the entire walls, flooring, and the entire unit, as opposed to merely replacing the areas with dry rot. Again, this report is of limited value to the Court's determination here. The Court also notes that in March 2025, mere months before submitting his latest report with the full bid for constructing an entirely new home, Corwin submitted a declaration stating that "Due to the lack of detailed analysis, input from local officials and repair scope, estimating the biddable total repair cost is not feasible." ECF No. 451. Corwin's report appears to be designed to allow the creditors to attempt to argue that the cost of repairing the unit will be staggering. But the report, like the creditors' arguments, ignores the difficulties in allocating water damage to BNYM specifically. Corwin's testimony regarding water damage from the roof and to the area between the walls separating the unit merely reinforce these difficulties. The Court finds Cook more credible than Corwin as to the estimated cost of repairs to the BNYM unit. Like Corwin, Cook has years of experience working on similar repairs on Meritage units. Unlike Corwin, however, Cook believes the repairs are unlikely to require a complete rebuild of the entire unit. The Court finds Cook's testimony more persuasive than Corwin's.

Receiver's concerns regarding the difficulty of establishing that BNYM is responsible for all of the water damage in the unit. The creditors ignore this reality.

To the extent there was any doubt in the Court's mind regarding the fairness of the proposed settlement, any doubts were dashed by the conclusion of the evidentiary hearing. First, the Receiver provided very credible testimony regarding the unit owners' views regarding Kurt Freitag. This testimony was reinforced by the testimony of Kier. The objectors appear oblivious to the fact that with the exception of Cowden, none of the unit owners would accept any settlement that let the "rooster back in the hen house." The creditors plow forward, blithely ignorant of any evidence contrary to their view that Freitag is a selfless activist on a crusade to fight for what is best for Meritage. Instead, the evidence indicates that Freitag's actions were motivated first by what benefitted him and anyone who supported him. If those interests happened to coincide with the best interests of Meritage, then Meritage too would benefit. The Court incorporates Judge Aiken's May 1, 2018, Opinion and Order, ECF No. 139, here. That opinion, supported by documentation from several unit owners, indicates that Freitag operated with a "my way or the highway" approach and had no qualms about threatening unit owners to acquiesce to the Freitag Scheme. At the June 2025 evidentiary hearing, Hoyt referred to BNYM as a "bully." In the Court's view, it is Freitag who acted as the bully with respect to other unit owners. The Court finds that any settlement which allowed Freitag greater control of Meritage was a non-starter.

Additionally, the creditors' proposed settlement was not a serious proposal. First, it required Meritage to "validate" PSRG's claims. These claims, for well over $1,000,000, had already been rejected by Judge Aiken. Additionally, the proposed settlement required that PSRG's claims (and those of Cowden, Dallas Glass, and Sherman Sherman Johnnie & Hoyt) be secured

by notes and deeds of trust on all units owned by the HOA. Again, Judge Aiken previously rejected PSRG's claims. The Court agrees that the Receiver could never accept such terms.

Additionally, there are serious questions with respect to the fees Hoyt's firm is entitled to. The Receiver raised some of these questions in its Objections to the firm's claim. ECF No. 212. While the answers to those questions are for another day, the Court agrees that there are "genuine issues of material fact concerning whether, or to what extent, the services provided by claimant will ultimately result in a net benefit, or burden, to the HOA and its members." *Id.* 3. Yet the creditors' proposed settlement required Meritage to validate nearly $600,000 in contested fees.

The creditors' proposed settlement also supports the testimony indicating that very few people in the community wanted to do business with Freitag. The proposal notes that if the Receiver rejects the offer, "litigation will only multiply." Ex. 550, 2. The creditors will initiate litigation against the Receiver for breach of duty and waste of the HOA's assets. *Id.* The proposal notes that "the Receiver's proposed settlement with BNYM will only result in more litigation." *Id.* Freitag clearly employs the threat of costly litigation as a bargaining tool.[6] And that may be a valid negotiating tactic. But such tactics inform the Court with respect to why the Receiver could not accept any settlement proposal giving Freitag more leverage and control over Meritage. Again, the Court finds the proposed settlement was not a serious proposal but, instead, a "nonstarter" as viewed by the Receiver. Tr. 153.

The objectors argue that the Receiver is abandoning hundreds of thousands of dollars in fines and assessments (and prejudgment interest) owed to Meritage in the proposed settlement with BNYM. Objectors' Closing Br. 10. In support, the objectors cite Meritage's Complaint that alleged

---

[6] In a May 22, 2025 email to the Receiver, Freitag warned the Receiver: "I can promise you that I will exercise to the utmost of my resources and spare no expense or effort to insure that both you personally and all members of your so-called Board (who also knew of the removal [of the plywood boards from BNYM's unit]) are held both financially and criminally liable for the damage done." Ex. 551, 2.

$311,134.76 in unpaid dues and special assessments. *Id.* The objectors also argue that the Receiver could "obtain prejudgment interest on the substantial sums BNYM has now owed the HOA for more than 10 years." *Id.* 10. These arguments border on pure fiction. The objectors, in a footnote, concede that Meritage's "claim for unpaid dues and assessments was limited in part" by Judge Aiken's summary judgment opinion in April 2018. *Id.* n.2. Judge Aiken's opinion, however, essentially *established* that BNYM paid its dues. Freitag simply decided to apply the dues to other fines and assessments that he (unlawfully) unilaterally imposed on BNYM. And Judge Aiken's conclusion that Freitag "lacked legal authority to act on behalf of Meritage after June 5, 2004" disposed of the unlawful (and exorbitant) fines and assessments Freitag purported to impose on BNYM. April 13, 2018, Op. 44; ECF No. 119. Indeed, as the Receiver stated at the evidentiary hearing, "We have essentially withdrawn the million dollar special assessment. You know, there was an exorbitant assessment at one time that was put on by Mr. Freitag, and they've all but prevailed on that. And I don't think it would be in our best interest to try to engage in that much overreach." Tr. 239. Based on the record, including Judge Aiken's prior rulings, the Court finds the Receiver assessment here to be correct.

Another constant theme of the objectors' arguments throughout is that they argue, usually implicitly, that the Court should consider their interests first and only then, to the extent any additional funds remain, should the Court consider the interest of the other unit owners. The Court finds the Receiver's testimony on what the other unit owners have gone through credible. Many of the original owners walked away from their units years ago. The owners have been hit with fines and assessments, many imposed unlawfully by Freitag. In Freitag's view, that's what any unit owner who pushed back on his scheme deserved. These comments are not necessarily relevant to resolving the pending motion, but the Court offers it to provide context to the Ninth Circuit Court

of Appeals when reviewing how this Court reached its decision. To be sure, Freitag will fund the sure-to-come appeal of this decision. Freitag's current goal appears to be to bully Meritage into a settlement by using protracted, costly litigation as a stick. Regardless, the Court finds the Receiver was correct to consider the interests of not only the creditors, but the unit owners.

Most importantly, the Court finds that the Receiver achieved the best result possible for Meritage given the circumstances. Meritage is low on cash. Litigation is not only expensive, but uncertain. The proposed settlement almost certainly provides Meritage with a *better* outcome than it could have achieved at trial. The creditors greatly exaggerate Meritage's likelihood of success at trial. Everyone agrees—with the possible exception of BNYM—that BNYM would ultimately have to replace the windows. The objectors, however, presume that BNYM would have been liable for *all* of the water damage to the unit.

On this point, the objectors make much of Brian Johnston's post-hearing declaration stating that Dallas Glass "discovered and observed NO water intrusion in any unit that was not directly attributable to the defective Milgard windows." Obj.s' Closing Br. 9; ECF No. 471. As indicated above, the objectors' own expert at trial testified to significant water damage, in the unit and extending down to the crawl space, that stemmed not from the windows, but from a leaky roof. In fact, the *undisputed* evidence at the hearing established a good deal of water damage—from the roof and the chimney—that was not related to the defective windows. The objectors, their expert, and Brian Johnson appear to overlook this obvious fact. Cook, in statements the Court found credible, testified that other units at Meritage had similar water damage unrelated to the defective windows. The Court finds Johnston's declaration not credible and accords it no weight. Additionally, the statement contains no declaration submitted under threat of perjury that the statements are, in fact, true.

The objectors make much of the uncertainty of the extent water damage. To be sure, the full extent of repairs will not be known until Cook opens up the walls. The fact that Corwin stuck a probe six inches into the siding directly below the window is not surprising. The Receiver, and Cook, acknowledge that the areas directly around the windows will need to be replaced. As Cook testified, those repairs will almost certainly involve re-framing. Tr. 118. But there is simply no credible evidence that the BNYM unit will need a complete rebuild.[7] The Court finds Broderick and Cook's testimony on this issue more credible than Corwin's. As described above, Broderick and Cook opined that water damage from the windows would largely be "localized" to areas surrounding the windows. Tr. 89; Tr. 118 (opinion that water damage from the windows "would be within that region, within that area. It's not spreading over the entire wall and causing a major problem.").

Could the repairs be more expensive than Cook or the Receiver estimate? Without a doubt, yes. They, along with Broderick, acknowledge that. The Court finds that *even if* the repairs end up costing double, or even triple, what Cook estimates, Meritage will come out well ahead of its best outcome at trial. Meritage will certainly have to pay for repairs that could be costly. But this part of the litigation will be behind them. There is a light at the end of this dark, 20-year tunnel. And after the repairs, Meritage will own a unit that is far more marketable than it is today. Additionally, the proposed settlement avoids any chance, however remote, that Meritage is liable for BNYM's attorney fees. The Receiver testified that the threat of attorney fees was one reason he thought the proposed settlement was favorable to creditors and unit owners. The Court finds that specific testimony, like all of the Receiver's testimony, credible.

---

[7] The Court finds that the water damage today is worse than it was when Judge Aiken appointed the Receiver. But the Court finds that the objectors greatly overstate the extent of that additional damage.

Page 23 - OPINION AND ORDER

Relatedly, the Court finds that the creditors make much too much of the Receiver's alleged inactivity and its alleged impact to (1) the claims against BNYM and (2) damage to the unit. The Receiver testified that he simply had bigger fires to put out and faced a dearth of time and money needed to tackle everything at once. The biggest fire was resolving Freitag's claims for $1,250,000. Meritage prevailed on those claims (with BNYM too shouldering much of the heavy lifting). The creditors make much of the Receiver not obtaining an expert report. As noted by the Receiver, however, he had Corwin's earlier report and was confident that Meritage would prevail on its claim that BNYM must replace the windows. As discussed above, BNYM would have had to replace the windows and any water damage attributable to the windows. But the nuisance claim, and any related claim based on the BNYM unit devaluing the other units, was essentially worthless.

The proposed settlement will allow Meritage to replace the windows, make much needed repairs, and emerge with title to a marketable property to sell to satisfy creditors. The Court finds the proposed settlement the best option to ensure creditors are repaid.[8] In essence, the cash portion of the settlement will pay for much of the replacement of the windows themselves. The additional damage caused by the defective windows will now be borne by Meritage as opposed to BNYM. However, after making those repairs, which the Court finds much more likely to be closer to $65,000 than $200,000, Meritage will own a unit that will likely sell for at least $300,000 and potentially up to $500,000. The Court cannot imagine Meritage obtaining a similar outcome at trial.[9]

---

[8] Hoyt, whose firm has the largest outstanding claim, did not dispute this fact. As Hoyt conceded at the hearing, his "firm is probably going to get paid sooner" if the Court allows the proposed settlement. Tr. 244. Hoyt focused instead largely on fairness, and how the Court should not let BNYM bully its way to any outcome allowing it to avoid paying its fair share. The Court understands, and is sympathetic to, Hoyt's view on this matter. The Court, however, must focus on the objective benefits the proposed settlement provides for creditors. And in the Court's view, the objective benefits greatly outweigh any benefits of proceeding to trial.

[9] As BNYM argues in its post-hearing brief, the proposed settlement also removes liability to BNYM for failing to maintain common areas, including the deck (which everyone agrees is a known hazard requiring a complete rebuild). Because Meritage is obligated to maintain the deck, BNYM would likely succeed on that claim with

Finally, the Court must briefly address the objectors' arguments that the Receiver's "multiyear failure to do *anything* to investigate conditions at the BNYM unit or to maintain HOA common property in that area—constitutes waste that will require further litigation." Obj.s' Closing Br. 8; ECF No. 471. The Court could not disagree more. That argument purposefully ignores the significant financial obstacles the Receiver faced. Their argument ignores the Receiver's decision that he had bigger fish to fry, mainly consisting of resolution of the seven-figure claim asserted by Freitag entities. The argument ignores that the Receiver had to factor in the interests of the homeowners whose decision to purchase units in Meritage had turned into a decade-long nightmare. Even with the benefit of hindsight, the Court is hard pressed to imagine a scenario where the Receiver could have proceeded in a more appropriate fashion. In the Court's view, the Receiver should be commended on a job very well done in light of the challenges faced.

## CONCLUSION

Plaintiff's Motion to Approve the Proposed Settlement, ECF No. 446, is GRANTED. Plaintiff's Motion to Withdraw the Motion to Strike, ECF No. 479, is GRANTED. Black Line Glazing is substituted for Dallas Glass as the contractor to perform the window replacement. Plaintiff's Motion to Strike, ECF No. 474, is DENIED as moot. Objectors' Motion to Strike, ECF No. 456, is DENIED as moot given that the Court presided over an evidentiary proceeding. Claimant, Sherman Sherman Johnnie & Hoty's Motion for Approval of Destructive Investigation, ECF No. 484, is DENIED. The Court recognizes there are uncertainties with respect to the extent, and cause, of water damage in the BNYM unit. The credible testimony of Cook, Broderick, and

---

evidence introduced at the hearing that a videographer recently fell through the deck. BNYM also alleged that Meritage treated it differently and essentially retaliated against it (by not maintaining the deck) for not going along with the "Freitag Scheme." As Judge Aiken previously concluded, BNYM presented evidence on this issue that could allow a jury (or the Court) to rule in its favor. Additionally, it appears to be undisputed that Meritage is liable for the water damage from the chimney and roof. And it is undisputed that the siding on the chimney has not been replaced. The Court finds that Meritage faced much riskier odds at trial than argued by the creditors.

the Receiver convince the Court that going forward with the proposed settlement, even in light of those unknowns, will put Meritage (and its creditors) in a better position than going to trial.

      The largest remaining claims against Meritage are Dallas Glass's claim for $143,520. and Sherman Sherman Johnnie & Hoyt, LLP's claim for $585,630. The Receiver objects to portions of each claim. Those creditors and the Receiver are granted 60 days to discuss how to move forward with resolving those two claims. If the parties agree on how to proceed, they shall file a Joint Status Report laying out the proposed path forward. If the parties are unable to agree on how to proceed, each party shall submit its own recommendation regarding how to move forward.

      IT IS SO ORDERED.

DATED this 3rd day of November, 2025.

          _____s/Michael J. McShane_____
              Michael J. McShane
            United States District Judge